1 | Anthony Ferrigno, Esq. (SBN: 61104)
2 | 3445 Golden Gate Way
Lafayette, CA 94549
3 | (423) 744-4041
a-trust-fraudlaw@msn.com
4 | Attorney for Defendants

5 |                UNITED STATES DISTRICT COURT

6 |              NORTHERN DISTRICT OF CALIFORNIA

7 |                   SAN FRANCISCO DIVISION

8 | HILJA KEADING/KEADING FAMILY          Case No.:
TRUST,

9 |              Plaintiff,

10 |                                        NOTICE OF REMOVAL OF
vs.                                    ACTION UNDER 28 U.S.C. § 1441(a)(c)

11 |
KENTON KEADING,                        [Filed concurrently with Civil Cover Sheet,
12 |                                       Corporate Disclosure Statement,
              Defendant                Declaration of Sumona Majumdar]
13 |

14 |

15 |         TO THE CLERK OF THE ABOVE-ENTITLED COURT:

16 |         PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1331, 1441, and

17 |
18 | 1446, Defendant, Kenton Keading ("Defendant"), hereby removes this civil action from the

19 | Superior Court of California for the County of Contra Costa, where it is currently pending as

20 | Case No. MSP 16-00402, to the United States District Court for the Northern District of

21 | California.  This Court has original jurisdiction over this action under 28 U.S.C. § 1331.

22 |                            BACKGROUND

23 |
24 |     On March 15, 2016, an action was commenced in the Superior Court of the State

25 | of California in and for the County of Contra Costa, against Defendant, Kenton Keading, to

26 | remove Defendant as trustee of the Keading Family Trust ("Trust").  The complaint alleged

27 |
28 | NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 144J(A)(C) (FILED CONCURRENTLY WITH
CIVIL COVER SHEET,  CORPORATE DISCLOSURE STATEMENT, DECLARATION OF SUMONA
MAJUMDARJ - I

wrongful taking of property pursuant to Probate Code Section 850 and liability for taking such property in bad faith pursuant to Probate Code Section 859.  While no hearing pursuant to Probate Code Section 850 ever occurred, a Probate Code Section 859 hearing resulted in a finding that Defendant, Kenton Keading, committed financial elder abuse.  Despite no finding of bad faith, Defendant was held liable in the amount of $1,523,330, payable to the Trust, pursuant to a "double damages" provision of Probate Code Section 859.  Defendant filed a motion to vacate the judgment pursuant to Code of Civil Procedure (CCP) Sections 472(d) on March 28, 2023 **(Exhibit A).**  In this action Defendant claims Due Process violations void the judgment and that the court not only exceeded its jurisdiction, but lacked both subject matter and personal jurisdiction when it made a ruling pursuant to a statute which itself violates the U.S. Constitution regarding Equal Protection and for being unconstitutionally vague.

## GROUNDS FOR REMOVAL

## I.  TIDS COURT HAS SUBJECT MATTER JURISDICTION

Pursuant to 28 U.S.C. § 1331 this court has "original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States."  In the instant case, a civil action arose under the Fifth Amendment's Due Process Clause and the Fourteenth Amendment's Equal Protection Clause.  Defendant(s), including Earth Island Institute ("Ell"), a 'stranger' to the action which joined the Motion to Vacate the Judgment as void was  deprived of the right to be noticed of a pending hearing affecting property rights, and the Defendants were deprived of the right to be heard at hearings which are deemed mandatory according to statutory procedure. Failing procedural Due Process, the trial court lacked both subject matter jurisdiction, personal jurisdiction, and exceeded its jurisdiction causing the judgment to be void.  Pursuant to 28 U.S.C. § 1441(a)(c) this state court action is removable to this Court and Federal Rules Of Civil

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(A)(C) [FILED CONCURRENTLY WITH CIVIL COVER SHEET, CORPORATE DISCLOSURE STATEMENT, DECLARATION OF SUMONA MAJUMDAR] - 2

Procedure Rule 60 allows this court to vacate a judgment which is void.

Additionally, Equal Protection of Defendant(s) was violated when a statute imposes different fine amounts deemed by the legislature to "punish" when defendants are similarly situated. This action also asserts a claim that the statute is unconstitutionally vague, violative of Due Process.

## II. THE OTHER PREREQUISITES FOR REMOVAL ARE SATISFIED

### A. This Notice For Removal Is Timely

This Notice of Removal is timely filed. The underlying cause of action was filed with the state court on March 28, 2023, and this notice is within the 30-day period to file a notice of removal under 28 U.S.C section 1446 (b)(3) after service on Ell on 6/20/'23 of the pleading.

### B. The Venue Is Proper

This action is properly removed to the United States District Court for the Northern District of California, which is "the district and division embracing the place where [the] action is pending." 28 U.S.C. § 1441(a); see also 28 U.S.C. § 84(a) (listing counties for the Northern District of California.)

### C. This Notice Has Been Properly Served

Defendant has provided written notice of this Notice to counsel or record for plaintiff. A true and complete copy of this Notice will be filed in the State Court Action.

### D. Copy Of Pleadings Attached

Pursuant to 28 U.S.C. § 1446(a), requiring a copy of all process, pleadings, and orders served upon Defendant to be included with a notice of removal, Plaintiffs initial complaint,

Defendant's response to complaint, and statement of decision are attached as **Exhibit "B".**

The remainder of the pleadings and orders will be forthcoming due to a technical problem in

transmitting those documents by the recorder's office.


Respectfully submitted,

Dated: June 20, 2023

/s/ Anthony A. Ferrigno
Attorney for Defendant, Kenton Keading

Anthony Ferrigno, Esq. (SBN: 61104)
3445 Golden Gate Way
Lafayette, CA 94549
(423) 744-4041
a-trust-fraudlaw@msn.com
Attorney for Defendants

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441 (A)(C) [FILED CONCURRENTLY WITH
CIVIL COVER SHEET,  CORPORATE DISCLOSURE STATEMENT, DECLARATION OF SUMONA
MAJUMDAR] - 4

**CERTIFICATE OF SERVICE**

I hereby certify that on June 21, 2023, the foregoing Notice of Removal, and all exhibits thereto, were filed via this Court's electronic filing system and that copies of same were served upon all parties via e-service.

/s/  Anthony A. Ferrigno

Attorney for Defendant, Kenton Keading

Anthony Ferrigno, Esq. (SBN: 61104)
Law Offices of Anthony A. Ferrigno
3445 Golden Gate Way
Lafayette, CA 94549
(423) 744-4041
a-trust-fraudlaw@msn.com
Attorney for Defendants

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 144l(A)(C) [FILED CONCURRENTLY WITH CIVIL COVER SHEET,  CORPORATE DISCLOSURE STATEMENT, DECLARATION OF SUMONA MAJUMDAR]-5

EXHIBIT A

Anthony Ferrigno,
Limited Scope Counsel

3445 Golden Gate Way
Lafayette, CA 94549
a-trust-fraud1aw@msn.com
(423)744-4041


Kenton Kcading
In Pro Pee
POBox20250
El Sobrante, CA 94820
510 778 2875


### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF CONTRA COSTA

| | |
|---|---|
| HILJA KEADING/EADING FAMILY TRUST, | Case No.: P16-00402 |
| Plaintiff | |
| **vs.** | **NOTICE** OF **MOTION** AND MOTION **TO** VACATE JUDGMENT **AFTER TRIAL; FOR** JOINDER; **MEMORANDUM OF** POINTS AND AUTHORITIES; DECLARATIONS IN SUPPORT THEREOF (CCP 389, 473) |
| KENTON KEADING, | |
| Defendant | |

TO THE COURT, ALL INTERSTED PARTIES AND THEIR ATTORNEYS OF

RECORD:·

PLEASE TAKE NOTICE that on ──·── ──.──══·at          9:00
6/22/2023
Dept. 30   Judge Virginia George          A.M.          or as soon thereafter

as.the matter may be heard, in·Departmem·01·/39,·Honorable·Ed.ward·W.Cl presiding, in the above

entitled com1 located at 725 Court Street, Martinez, Defendant, Kenton Keading, will and does

move this Court pursuant to Code of Civil Procedure Sectio1J 473(d) to vacate that judgment after

trial, dated and filed September 23, 2017, and quash any Writ of Execution pursuant to the trial

court's findings of financial elder abuse and found Defendant liable pursuant to Probate Code§

1

859 for "double" damages for wrongful taking of elder Lewis Keading's property including real property, stocks and a vehicle. ordering the trustee of the Keading Family Trust to take possession of that real property commonly described as 21, 50 and 60 Laurel Lane, El Sobrante, California.

Said motion is made pursuant to CCP 473(d) on the ground that the judgment is void. Motion for joinder of Earth Island Institute (EII) is made pursuant to CCP 389 and the fact that EII possesses and claims to own property subject to the disposition of this court.

Said motion is based upon this Notice, the pleadings, declarations, records and filed in the attached Memorandum of Points and Authorities, and oral and documentaty evidence that may be presented at the hearing.

Dated: March 19, 2023

Anthony faS. Heyli, Esq.
Attorney for Defendant,
Kenton Keading

2

## MEMORANDUM OF POINTS ANH AUTHORITIES

## I. THE COURT MAY SET ASIDE ANY VOID JUDGMENT OR ORDER

Code of Civil Procedure (CCP) §473 (d) states that a court may "on motion of either party afrer notice to the other party, set aside any void judgment or order."

### A.  A Motion Pursuant To CCP § 473 (d) May Be Made At Any Time

A judgment which is void is vulnerable to direct or collateral attack at any time. (*County of San Diego v. Gorham,* 186 Cal. App. 4th 1215 (20100 Cal. Rptr. 3d 147 citing *People v. American Contractors Indemnity Co.* (2004) 33 Cal. 4th 653, 660 [16 Cal. Rptr. 3d 76, 93 P. 3d 1010].)

### n.  The Judgment Is Void For Lack Of Jurisdiction

When a court has no jurisdiction there is an entire absence of power to hear or determine the case.  *(Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal. App.4th 525, 538 [66 Cal, Rptr. 3d 175].)  While the tem1 "jurisdiction" is used in a variety of situations, "lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties" *(People v. American Contractors Indemnity Co.* supra, at p. 81 citing *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 287, 109 P 2d 942.)  Even whe11 the court has jmisdiction over t11e pa11ies and subject.matter in a fundamental sense, it has no jurisdiction or power to act in the absence of certain procedural prerequisites. *(Abelleira,* supra, 155 Cal. App. 4th at p. 289.) In the instant case, the court made findings pursuant to Probate Code§ 859 in the absence of procedures pursuant to Probate Code Sections 850 et seq. resulting in an egregious en-or, ordering the trustee of the Keading Family Trust to take possession of reai property belonging to

3

Ell, namely 21 Laurel Lane, El Sobrante, without any prior adjudication that said property was Keading family Trust property. (Exhibit A at p. 10.)   " Probate proceedings being purely statutory, and therefore special in their nature, the superior court, although a court of general jurisdiction, is circumscribed in this class of proceedings by the provisions of the statute conferring such jurisdiction, and may not competently proceed in a manner essentially different from that provided *(Smith v. Westel;fi.eld,* 88 Cal. 374, 379 [26 P. 206] , *Estate of Strong,* 119 Cal. 663,666 (51 P. 1078).)

Lack of jurisdiction may be demonstrated both when defects appear without going outside the record or judgment roll, or when a judgment is shown by extrinsic evidence to be invalid for lack of jm-isdiction *(County of San Diego v. Gorham,* supra at p. 1226.)   Here, as discussed below, extrinsic evidence of the grant deed (Exhibit B) and property tax bill (Exhibit C) shows unequivocally that 21 Laurel Lane is not, nor was at time of trial, Keading Family Trust Property.   The fact is that 21 Laurel Lane was included as Keading Family Trust property subject to the '·double damages" provision of Probate Code§ 859 without the prerequisite finding that said property was Keading Family Trust propeliy. (Exhibit A at pp. 1, 10.)   Courts have affirmed that the wording of l>robate Code *§ 859* qualifying property subject to the double.damages provision as being property "recovered by an action under this part" to mean property having been adjudicated as to ownership and subsequently ordered returned to the rightful owner pursuant to Probate Code Sections 850 et seq. *(In re Pereira and Melo Dairy* (Bank E.D. Cal 2005) 325 B.R.; *In re Estate of Young,* 72, Cal.Rptr.3d 520 (2008) 160 Cal.App.4th 62, *Estate of Ashlock* (2020) 45 Cal App 5ᵗ 1066, 1073.)

4

The court in *In re Pereira* explains as follows:

"Probate Code Sections 850 to 859 together make up Part 19 of the Probate Code. Part 19 is a coherent scheme designed to llow guardians, conservators, executors, or trustees to recover assets which should be part of the relevant estate but which are not because they were transferred improperly. Section *850* permits a conservator to sue third parties to recover property allegedly belonging to the conservator estate. See Ross & Grant, Cal. Prac. Guide.: Probate, § 15:350.1 (The Rutter Group 2005); *Eslate o fLinnic/c,* 171 Cal. App. 3d 752, 760, 217 Cal Rptr. 552 Cal. Ct. App. 1985.) ("Section 851.5 [now 850] now provides the authority and the procedure for the hearing of a petition by a decedent's estate concerning any claim involving property allegedly wrongfully possessed by another.")  Once property is recovered under Section 850, it becomes "property belonging to the estate of . . . a conservatee" and a double recovery is available if the co't t then finds that the property was wrongfully taken in bad faith. The double recovery is not available jn a vacuum. It requires that the conservator first prevail under Section 850. "Damages equal to twice the value of any property allegedly 'taken concealed or disposed of are recoverable in § 850 proceedings from the persons who in 'bad faith' deprived the estate of same." Ross & Grant, Cal. Prac. Guide.: Probate, § 15:351.1 (Tqe Rutter Group 2005) …… As noted above, double recovery is unavailable until the court determines that the property is recoverable under Section 850." *(In re Pereira,* supra, at p. 5,)

In concurring with the federal comt in *Pereira,* California State Appeals comt in *In re Estate o fYoung* opines: "The conditions set forth in sections 850 through 857 must be proven before a damages entitlement under section 859 becomes operai ve and can be adjudicated as to amount." *(In re Young,* supra, at p. 541.)

Then again, the court in *Estate of Ashlock* more specifically identifies a recovery order pursuant to Probate Code Section 856 as pi·erequisite to any relief under section 859.

"Furthe1n1ore, the statutory language treats the duty to return the property as a separate and antecedent obligation: "the person shall be liable for twice the value of the property *recovered* by an action under this part. ıı (Italics added.) Even cases construing the statute as a damages provision recognize that a recovery order under section 856 is a prerequisite for additional relief under section 859. If the Legislature had intended to merge the restorative obligation with the punitive penalty, inclusion of the word "recovered" would serve no pw-pose. ıı A construction making some words surplusage is to be avoided. ıı (Dyna-Med. Inc. v. Fair Employment & Housing Com. (1987) 43 Cal. 3d 1379, 1387 [241 Cal.Rptr. 67. 743 P. 2d 1323].)" *(Estate of Ashlock,* supra at p. 1077).

The process to first detennine the preliminary fact of rightful ownership is set forth in the preceding Probate Code sections 850 et seq. The wording of Probate Code Section 859, "the pes on shall be liable for twice the value of the prope1ty <u>recovered</u> by an action under this pa1t." (emphasis added) indicates that some prior proceeding occurred in order for the past tense 'recovered' to make sense. Before one can be held liable for punitive damages for taking property which rightfully belongs to another, adjudication of the preliminary factual finding that the subject property belongs to another must first be deteimined. Historically speaking, P'o bate Code Sections 850 et seq. are the codificationof Heggstad where the court found that prope11y claimed to belong to another was in fact trust property. *(Heggstad v. Heggstad,* 16 Cal.App.4th 943 (1993) 20 Cal. Rptr.2d 433.)

Purtu ant to the holdings in both *Young, Pereira* and Ashlock, any adjudication of Probate Code Section 859 must be preceded by a hearing pursuant to Sections 850 et seq. *(Estate of Young,* supra at p.541; *.Jn re Pereira and Melo Dairy* (Bank E.D. Cal 2005) 325 B.R. 1, 4-5, *Estate o fAsh'o c'k* supra at p. 1077). This stems from the very wordjng of Probate Code Section 859: "the person shall be liable

6

for twice the value of the property recovered by an action under this part" That 'action' must be according to sections 850 et seq. which define who may file the petition (Section 850), requires notice given to any person claiming an interest in or having title to or possession of the property (Section 851 ), provides for discovery (Sections 851.1, &52), and provides for the court to make an order of conveyance of property i.e.. "property recovered" (Section 856). "This part" refers to those Probate Code statutes 850-857.   "Probate Code Sections 850 to 859 together make up Part 19 of the Probate Code." *(In re Pereira,* supra, at p. 5.)

**C.   Lack Of Jurisdiction Is Evidenced Facially By The Judgment Roll**

A judgment is void on its face when defects appear without going outside the record or judgment roll *(County a/San Diego v. Gorham,* supra at p. 1226.)  The judgment roll includes the statement of decision according to CCP Section 670:(b) "In all other cases, the pleadings, all order striking out any pleading in whole or in part, a copy of the·verdict of the jury, the statement of decision of the court, or finding of the referee, and a copy of any order made on demurrer, or relating to a change of parties, and a copy of the judgment... "

Here, the following defects appear in the statement of decision:  1) "The Comt notes, however, that the evidence is not clear as to whether it is an asset of the tl'Ust, or was Lewis's separate prope1ty.  The trustee may need to move to confirm the stock as an asset of the trust, if she concludes that is necessary and appropriate." (Exhibit A, p 10.); 2) "While there was evidence presented concerning the personal property in the residence, Hilja has not requested any specific relief related to that issue.  Since the current trustee will be given possession of the premises, it will be *up* to her to address proper inventory of the personal property, including whether any property was disposed of in such a manner that it does not belong to the trust. When Kenton vacates the premises, he is not to take any of his parents' or

the trust property with him/ (Exhibit A, pp. 10); 3) "The only evidence submitted as to the value of the stock in Freedom Motors was the purchase price, which was $1 per share. This \1/0uld make the transfe!l"ed shares worth nearly $100,000, but there was no evidence of their value tod$_{ay}$. Since they have not been liquidated, the Court can simply order that the shares be rettm1ed to the trust, or to Lewis's estate. If they belong to the trust, the successor trustee may have to detennine their value in o'der to properly distrjbute trust assets." (Exhibit A, p 11.)

The first defect is an admission that no adjudication regarding rightful ownership of Freedom Motors stocks had been made, but rather the trustee may need to *move* the court for such determination. The court only concludes that its transfer was not valid no matter who it belongs to. Because there was no determination of ownership there could be no order pursuant to Probate Code Section 856 and therefore the property not meeting the prerequisie quality of being "recovered by an action under this part." The court's statement is an admission that trial proceeded pursuant to Probate Code § 859 without the statutory prerequisite inquiry pursuant to Probate Code sections 850-857. Indeed, the finding that the trustee should "move" the court concefn ing stock ownership confim1s 110 such proceeding pursuant to Probate Code Sections 850 et seq. ever took place.

The second defect directs the trnstee to make a detennination of who the rightful owner of "personal property" found in the residence where Kenton resides such that it is not disposed of in a wrongful manner, i.e., that it does not belong to the trust. The tird defect amplifies and c01Toborates the first defect, namely that there was no determination as to the rightful owner of the property. Not only is a determination of ownership of property prerequisite to dete1mining to whom or what entity the propel1Y is ordered recovered pursuant to Probate Codes 850-857, if the

8

properly was taken from· the trust as opposed to the elder, then according to the court's finding

that bad faith is only not required in instances of financial elder abuse, there would be no

liability if taken from the trust absent a showing of bad faith (Exhibit A at p. 12.)

Lastly, the judgment roll shows no judgment nor entry of order pursuant to Probate Code

Section 856, as is prerequisite to hearing of Probate Code Section 859 *(Ashlock,* supra, at

p. 1077.)

The defects as shown individually and taken together within the record and judgment

*roll* make facially the judgment void for lack of jurisdiction.   The court was without jm-isdiction

to determine liability pm-suant to Probate Code Section 859 for property 'recovered' \Without

first making a determination of the ownership of that property and then ordering it to be

transfe11·ed to the rightful owner pursuant to Probate Code Section 856.

**D.  Extrinsic Evidence Demonstrates Lack Of Jurisdiction**

When extrinsic evidence outside the record or judgment roll demonstrates lack of

jurisdiction, the judgment is void with all the same attributes of a judgment void on its face.

(*County o f San Diego v. Gorham,* supra at p.1226.)   "A motion to vacate a judgment is a direct

attack. [Citations] '[O]n direct attack, lack of jurisdiction may be shovm by extrinsic evidence,

i.e. evidence outside the judgment roll." *(Strathvale Holdings v. E.B.H* (2005) 126 Cal. App. 4th

1241. 1249 [25 Cal. Rptr. 3d 372].)   Extrinsic evidence that the 21 Laurel Lane real propetty is

not, nor ever was, Keading Family Trust property is the grant deed of that property to EII, a

California non-profit corporation executed on August, 16, 2005 (Exhibit B.)   Ukewise, the

property tax assessee dated January 1, 2017 is EII. (Exhibit C.)   The executive director of EII,

David Phillips, corroborates that EII is the owner now and continuously in yeat-s past prior to the

commencement of this cause of action, of that real property and that no notice was ever received

9

by EII nor the residents at 21 Laurel Lane regarding any hearing as to the ownership of that property pursuant to Part 19 of the Probate Code encompassing Sections 850-859 (Exhibit D.) Lack of jurisdiction emanates fundamentally when Due Process is violated.  Here procedural due process violations occurred when Probate Code § 859 damages were considered without a prior adjudication of the ownership of property pursuant to Probate Code Sections 850 et seq.  In fact the wording of Probate Code § 859 "the person shall be liable for twice the value of the propelly recovered by an action under this part." qualifies "property" subject to the double damages as property having been recovered pursuant to Probate Code Sections 856, 857 which are the court orders  to convey or transfer property to its rightful owner after adjudication of owllership pursuant to Probate Code § 850.

Due Process is violated when people having claim to or possession of property are not given notice of hearing pursuant to Probate Code sections 850- 859 and therefore the right to be heard at such hearing denied regarding that property. Procedural Due Process is violated when defendants are prosecuted pursuant to Probate Code Section 859 without a hearing pursuant to Probate Code sections 850 - 857 as to whether the "recovered" property subject to the double damages provision deemed to have been wrongfully taken was in fact trust property or pᵣoperty belonging to another. The U.S. Supreme Comt has determined that due process requires at minimum (1) notice; (2) an opportunity to be heard; and (3) an impartial tribunal *(Mullane v. Central Hanover Bank,* 339 U.S. 306 (1950.)  If either the judgment is void or voidable (void after court determination based on extrinsic evidence) the judgment is "equally ineffective and unenforceable because it violates constitutional due process." *(County o/San Diego v. Gorham* 186 Cal. App. 4ᴵᴵᴵ 1215 (2010) citing *Peralta v. Heights 1vfedical* Cente, *Inc.* (1988) 485 U.S. 80, 84 [99 L. Ed. 2d 75, 108 S. Ct. 896].)

In order to ensure that the protections afforded by Due Process are met, it was incumbent upon the trial court to first have ensured that all the statutory provisions encompassed by Probate Code sections 850 -·857 were met prior to any adjudication of Probate Code section 859. There must be a prior order of the court to return property pursuant to Probate Code section 856 before proceeding to a Probate Code section 859 hearing. *(Estate of Ashlock.* supra at p. 1077.) No notification of any hearing pursuant to Probate Codes sections 850-859 was ever given to the interested party(s) (ow11er/purpo1ted owner) of 21 Laure.l Lane, one of three purported subject properties of the Keading Family Trust. This violation of Due Process resulted in the wrongful judgment of the probate court ordering the trustee to take -possession of 21 Laurel Lane, when in fact it is not, nor ever was, trust property.

## E.   The Record Is Void Of Any Prerequisite Hearing Or Findings

Prior to any hearing regarding double damages pursuant to Probate Code § 859, a hearing pursuant to Probate Codes Sections 850 et seq. including a court order to return property pursuant to Probate Code § 856 must occur in order for such property to even be considered as property subject to a double damages award *(Ashlock* supra at *p.* 1077.) Although the initial complaint by way of Ex Parte Petition (the "Petition") mentions Probate Code § 850 (Exhibit E, p. l) such proceeding never occurred. The Petition alleges wrongful taking of property by Kenton including a vehicle, real property, stocks and by way of reference jntimates a Probate Code § 850 hearing, but no such hearing ever occurred prior to the trial court's decision of elder abuse and findings of "double damages" liability pursuant to Probate Code § 859, which was also pied in the Petition. (Exhibit E, p. 18.)   While the Petition alleges specifically that 21 Laurel Lane is Keading Family Trust property (Exhibit E, p. 17) no notice of the petition nor of an

1   impending proceeding affecting that property was ever given to the residents at that address, nor

2   notice to EII, the rightful owner (Exhibit D.)

3

4   **F.   Heal'ing And Ordel· Regarding Cross Briefing Did Not Constitute A Probate Code§**

5       **850 Hearing**

6       Probate Comt determined that the deed regarding 21, 50 and 60 Laurel Lane, El Sobrante

7   (the Property) was invalid and that the Property remained as Keading Family Trust propelty

8   (Exhibit F.)  During that hearing only the issue of the validity of the deed purported to have

9   transferred the Property to Lewis Keading and Kenton Keading as joint tenants was considered,

10  not the ownel·ship of those propel1ies.  Had ownership been consjdered, undoubtedly. through a

11  proper Probate Code§ 850 hearing, the court would have determined that not only is 2l Laurel

12  Lane not Keading Family Trust property, but it is not described in the deed which purportedly

13  transferred its ownership (Exhibit G)  The grant deed only contains two assessor's parcel

14  numbers (APN) and legal descriptions corresponding to two real propelties, not tlu·ee.

15  Ownership was presumed and hence only the validity of the attempted transfer was considered.

16  Having found that the instrument (power of attorney) used to make the transfer was not valid for

17  that purpose, the grant deed to Kenton and Lewis Keading as joint tenants was declared invalid

18  and hence the property remained in the Keading Family Trust.  There was no order to "return"

19  property pm-suant to Probate Code § 856 nor any mention of § 856 because this was not such a

20  proceeding and there could be no "return" of pmperty that was never legaJly transferred to begin

21  with.  In fact, the court admits that this hearing was not an adjudication of any of the causes of

22  action contained in the Petition including Hilja's cause of action pursuant to Probate Code§ 850.

23  (Exhibit F, p. 4.)

24

25

26

27

28                                          12

**G.   Procedural Due Process Error Occurs When There Is A Concurrent Hearing Of Ptobate Code § 850 And § 859**

Although Defendant claims that no Probate Code *§* 850 hearing ever occurred, if it were held concm1·ently with a Probate Code§ 859 hearing, statutory procedure would be violated and the court would have no jurisdiction or power to act in the ab ence of ce11ain procedural prerequisites. *(Abelleira,* supra, 155 Cal. App. 4th at p. 289).   The court in *Ashlock* makes clear that prerequisite to any Probate Code§ 859 inquiry into the "double damages" provision; is the finding that such property must first be ordered "returned" pursuant to Probate Code *§* 856, which then qualifies such property as even being considered as a bac:is for double damages *(Estate of Ashlock,* supra at p. 1077).  This failure to make inquiry into the ownership of property pursuant to Probate Code§ 850 was the cause of 21 Laurel Lane, El Sobrante, CA being wrongfl.1lly included in the judgment and in the dete1mination of total property value.

**G.   The Error Is Not Harmless**

Although the inclusion of real property commonly known as 21 Laurel Lane, is error as is the order for the Keading Family Ttust trustee to take possession of the same, it is anticipated that it will be argued that such is harmless error regarding the judgment as to elder abuse and the finding of double damages liability pursuant to Probate Code§ 859.  While it is trne that error is haimless when absent such error the result would be the same *(Cassim v. Allstate Insurance Co.* (2004) 33 Cal 4th 780, 800) such an argument fails for two rea,;ons. FiIh't, any judgme11t which flows from a violation of Due Process is void.  As explained by our Supreme Court, "Where a person has been deprived of property in a manner contrary to the most basic tenets of due process, "it is no answer to say that in his particular case due process of law

*13*

1  would have led to the same result because he had no adequate defense upon the *merits."(Coe v.*

2  *Armour Fertilizer Works,* 237 U.S. 413,424 (1915).)  As we observed in *Armstrong v. 1)lanzo,*

3  380 U.S., at 552, only "wip[ing] the slate clean ... would have restored the petitioner to

4  the position he would have occupied had due process of law been accorded to him in the

5  first place. " The Due Process Clause demands no less in this case." *(Peralta v. Heights*

6  *lvfedical Center, Inc.,* 485 U.S. 80 (1988).)

7

8      Secondly, had the issue of ownership of this property been properly addressed through proper

9  statutoly procedure pursuant to Probate Code Sections 850 - 857, it would have been excluded

10  from the purpolted stipulation as to the total real properly value.   Therefore, the stipulation

11  agreement used by this court in detennining value pursuant to Probate Code *§* 859 is en-or.  It

12  should be noted that objection to the stipulation agreement was made at the outset of trial by

13  defense counsel but overruled.  (Exhibit F.)  In any event, in the absence of a proper stipulation

14  and absent any showing of value at tiial, there could be no award of damages with respect to the

15  real estate *(In re Young,* supra, at p. 541.)  Any stipulation agreement absent inclusion of 21 Laurel

16  Lane would not be tlie same as a stipulation which included 21 Laurel Lane. Therefore, it cannot

17  be presumed the same stipulation would be reached had 21 Laurel Lane not been included, and

18  absent such stipulation to value, there is no basis for a double damages award. The error was not

19  harmless.

20

## II. THIS COURT SHOULD JOIN EARTH ISLAND INSTITUTE

21      When the trial court knows that an individual is a necessary party to the action under Civil

22  Code of Civil Procedure§ 389, it should order joinder *(Tuller v. Superior Court* (1932) 215 Cal.

23  352. 353-354, 10 P. 2d 43).   Earth Island Institute has an ownership interest in that real property

24  commonly known as 21 Laurel Lane, El Sobrante, CA (Exhibits B. C, D) which was mistakenly

14

included in the judgment and order for the trustee of the Keacting Family Trust to take possession of the same property.

## CONCLUSION

In considering the facts and law as set forth above, Defendant respectfully requests that this court vacate its judgment as being void. This will restore all parties to the position they would have occupied had Due Process of law been accorded them in the first place. Earth Island Institute would then no longer be subject to the wrongful loss of their property and Kenton Keading afforded the opportunity to correctly address any issue of property ownership through a prerequisite Probate Code § 850 hearing prior to adjudication of possible double damages pursuant to Probate Code § 859 should the court *so* order return of wrongfully taken property pursuant to Probate Code § 856.

Dated: March 19, 2023

Anthony Ferrigno, Esq.
Attorney for Defendant,
Kenton Keading

15

# DECLARATION

I, Kenton Keading, declare as follows:

1. I am the Defendant in the matter of HiJja Keading/Keading Family Trust, case no.: P16-00402, and if called to testify as to the matters represented below, will do so in any court proceeding.

2. I make this Declaration in support of Defendant, Kenton Keading's Motion To Vacate Judgment After Trial And For Joinder.

3. On August 23. 20.17, the Honorable Edward Weil, filed a Statement of Decision after trial, a true and correct copy of the same is described as Exhibit A.

4. According to Contra Costa County Records, a true and correct copy of a Grant Deed, filed November16, 2005, showing Earth Island Institute as the Grantee regarding title to that property commonly known as 21 Laurel Lane, El Sobrante CA is described as Exhibit B.

5. A true and correct copy of a Reprinted Bill from the Contra Costa County Tax Assessor's Office, showing Earth Island Institute as the payor regarding property tax con-esponding to 21 Laurel Lane, El Sobrante, CA is described as Exhibit C.

6. A true and correct copy of a letter from the Executive Director of Earth Island Institute, David Phillips, dated May 21, 2021, to the Chief Justice and Associate Justices of the California Supreme Court is described as Exhibit D.

7. A true and correct copy of Plaintiffs Ex Parte Petition set for hearing on March 15, 2016, is described as Exhibit E.

8. A true and correct copy of Probate Cotut order filed after hearing on June 23, 2017, is described as Exhibit F.

9. A true and con·ect copy of a Grant Deed filed with the Contra Costa County Recorder's Office, dated January 8, 2016, regarding real property subject to the trial comt's Statement of Decision, is described as Exhibit G.

10. I have never received an order pursuant to Probate Code Sections 856-857 to retum any property as a result of a Probate Code§ 859 hearing, nor any other hearing regarding ownership of said property.

I declare under penalty of perjmy, according to the laws of the State of Califomia, that the foregoing is true and com ct.

Executed on March 20, 2023 at Hercules, California.

Kenton Keading

EXHIBIT A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21--

22

23

24

25

26

27

28

F I L E

AUG 23 2017

STEPHEN H. NASH CLERK OF THE C
SUPERIOR COURT OF THE STATE OF CAL
COUNTY OF CONTRA COSTA

DENESE JOHNSON

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF CONTRA COSTA

| | | |
|---|---|---|
| IN RE KEADING FAMILY TRUST | ) | NO. P16-00402 |
| | ) | |
| | ) | |
| | ) | |
| IDLJA KEADING, | ) | STATEMENT OF DECISION |
|         Petitioner, | ) | |
| | ) | |
| | ) | |
| KENTON KEADING, et al., | ) | |
| | ) | |
|         Respondents. | ) | |

## I.   BACKGROUND AND PROCEDURAL HISTORY

This matter came before the Court on the Petition of Hilja Keading raising a number

claims arising from the trust of Lewis and Lucille Keading, including appointment of a

successor trustee, confirmation of ownership of the residence commonly described as 60, 50,

and 21 Laurel Lane, El Sobrante, and claimS for ftau(l, conversion, zmd elder abuse_  In Marc!

of 2016, Elizabeth Soloway (a professional fiduciary) was appointed by the court as successc

trustee, and she ultimately joined in the portion of the petition seeking confirmation of the re

property to the trust.  Trial was held on June 28-30, with closing ar ents      on July 3, 2017.

Closing briefs were provid      and the matter was deemed submitted on July 18, 2017.

On July 28, 2017, the Court issued a Tentative Decision and Proposed Statement of

Decision.. pursuant to CRC 3.1590(c)(l).  Hilja Keading did not object, but requested a

clarification of the description of the residence {which has been made).  Kenton Keading

objected.  The objections are addressed either specifically, or simply through making

appropriate changes in the text  If an objection is not addressed, it is overruled,

-1-

## II. FACTS

### A. Background

Lewis and Lucille Keading ("the Parents") lived long lives as husband and wife, and had two children, Kenton, now 65, and Hilja, now 56.  Lucille died on September 10, 2015, Lewis died on January 4, 2016.  In January of 1998, the parents had executed a family trust that, in essence, divided their assets among the children after the death of both parents.

Over time, however, while the Parents were alive, they began to provide more assistance and assets to Kenton, owing in some respects to helping to alleviate the consequences of his felony convictions that resulted in imprisonment for nine years.  In the meantim  they provided nothing to Hilja, due to a period of estrangement that resulted from their lack of acceptance of her sexual orientation. On October 31, 2011, 1hey amended the tr to give Hilja a specific gift {a Bancorp investment account), and made Kenton the residual beneficiary of the remainder of the trust.  In the fall of 2014, however, Hilja and her parents reconcile  and Hilja began to see her parents more.  Nonetheless, on February 5, 2015, the parents executed another trust amendment essentially restating the terms of the 2011 am.en  (perhaps due to concerns about its validity).   On the same day, Lewis, acting in individual capacity only, granted a power of attorney to Kenton.

### B. Summer and Fall of 2015

In June of 2015, LUCille was cUagnosed Wllll a bra.in tunor  :Hilja  en. ame back to parents' home, and began spending most of her time there, talcing care of her parents physically, cleaning and organizing the home, and organizing finances and medical care.

From June through September 10, Lucille's condition deterio     rapidly.  Kenton lived elsewhere, and actually was out of the country during much of that spring.  After his return from Thailand, he visit.ed the home frequently, including some overnight stays; thus parties dispute whether he "lived there."

After Lucille,s death on September 10, Lewis,s health began to deteriorate.  He bei to require semi-weekly kidney dialysis treatments.  He required ongoing in-ho m e care.  Ot care was provided by Hilja, by Connie Warner (a long-time friend of Lewis and Lucille),

-2-

1  eventually, by an employee of a home health care agency, Kim Terry.  At one point, Kenton

2  began staying overnight to take the 8pm to 8am "shift" of watching over his father, who

3  required some degree of supervision even when sleeping at night.

4      On September 26, 2015, Lewis executed a document granting a Durable Power of

5  Attorney to Hilja.  At about the same time, Lewis decided that he wished to "equalize,, the

6  assets that his children would receive on his death.  Therefore, on October&, 2015, he execute

7  an "equalizing amendment" to his trust, providing in essence that, rather than splitting

8  remaining assets equally, assets should be divided in order to result in a net equalization, after

9  allowing for the assets that Kenton bad obtained over time.  It specifically noted that the

10  Parents had lent Kenton $75,000, and addressed the previous firilure to fund either of the

11  •Gsuhtrusts" created in the original trust document.  The evidence, including testimony of the

12  drafting attorney, Peter Sproul, indicated that Lewis was lucid, unpressured, and fully

13  informed, when he executed this amendment.  More to the point, Kenton bas not challenged t

14  validity of the amendment, and therefore its validity will not be questioned in this proceeding

15      There was a great deal of testimony concerning Lewis's care in the last weeks of his

16  life.  Hilja and Connie claim that Kenton was at times neglectful of Lewis, at other times

17  intimidated and berated him.  Kenton denies it.  Kim Terry, a home health care worker who

18  was often present in the home, saw no abuse.  Two managers of home health care agencies

19  (David Green and Karen Wells), testified tbat. their woncers arc --manwu.eci repon<;n./" but no

20  abuse was ever reported.  While there were difficulties associated with Lewis's deteriorating

21  health, the evidence does not show any physical abuse or neglect.

22      C.  The Power of Attorney, the "No Elder Abuse" Declara'tj.on, and the Transfei

23          the Residence.

24      From December 8 to 14, Hilja made a short trip back to her home in Los Angeles.  C

25  December 8, she sent an intemperate e-mail to an attorney indicating that she was looking fi

26  an attomey who would pursue Kenton aggressively for claimed elder abuse.  (This email m:

27  have been a privileged attorney-client communication, but Hilja waived any privilege by

28  deHberately including it in her binder of exhibits submitted to the Court for the trial,

1    notwithstanding her later claim of privilege.)   According to Kenton, Hilja must have left thi

2    message open on a computer in the home, because he found it merely by pressing a keyboar

3    key while the computer was in sleep mode.  According to Hilj   the message was sent while

4    was in Los .Angeles, and Kenton could have obtained it only by hacking into her account.

5        However Kent.on came by the email. he promptly shared it with his father, who was

6    understandably upset.  According to Kenton, Lewis said "I have misjudged your sister', and

7    have made a big mistake/' and he wished to change the disposition o f his estate.

8        According to Hilja, after she returned from Los Angeles, she discussed the email w

9    Lewis, and he was upset-because it suggested that she would call Adult Protective Service

10   about Kenton's treatment of Lewis-but he said "it didn't change anything."

11       Whether Kenton came by the document properly or not, it makes sense that its conte

12   would make Lewis upset, and concerned about what would happen after his death.  On

13   December 12, 2015, while Hilja was still in Los Angeles (and thus before she had spoken\\

14   Lewis about the email), Kenton took Lewis to a UPS store, where the new power of attorne

15   designating Kenton as the attorney-in-fact was executed and notarized.  Hilja, however,

16   testified that the initials puq,orting to be Lewis's on the individual pages o f the document a

17   not his initials.

18       On December 19, 2015, Lewis executed a document stating that he had not been the

19   victim or elder abuse, which included quotations :from the statutory de:finmon o f t h e  -cenn.

20       Why?  According to Kenton, once he explained to Lewis that he feared that Hilja v.

21   trump up criminal elder abuse charges against him, which might result in his return to jail,

22   given his prior record, Lewis agreed to sign the declaration.  The general contents were Le

23   idea, but Kenton added the references to the statute.  Lewis :fully unde.cytood the document

24   agreed to it.  When Lewis signed it, it had a blank cover sheet over the signature page, bee

25   he did not want other people in the home to see it.  Lewis saw it and knew its contents.  T,

26   people, Scott Maskell and Kim Teny, signed it as witnesses to Lewis's signature.

27       According to Kim Terry  there was a blank cover sheet over the document.  She nc

28   that the document was composed at the computer by Kenton, who made various changes t

-4-

1  She stated that Lewis sai  "I wrote it," which she found difficult to understand, because she

2  had just seen that Kenton had drafted the document himself on the computer (Tous. she

3  inferred that Lewis may have thought he was signing something different from what he actu

4  did sign.)

5  Scott Maskell, a neighbor who also witnessed the signing, also said that it was cover

6  such that Lewis could not see what he was signing. But according to him, Lewis said "I wro

7  it," confumed that it concerned his estate, and seemed to know what he was doing. Mr.

8  Maskell also stated that Lewis confirmed that his estate was in order. Assuming this to be

9  correct, it is not clear what it meant. Hilja interprets this as a confirmation of the equalizing

10  amendment fiom October. But at that point, Lewis already had signed the new power of

11  attorney making Kenton his attorney-in-fact, although Kenton bad not yet purported to trans

12  the residence.

13  On December 30> 2015, acting under the power of attorney, Kenton executed a deed

14  transferring the family residence (the primary asset of the trust), out of the trust and to Lewj

15  and Kenton in joint tenancy, with right of survivorship. While the validity of this transfer v

16  disputed for some time. as of June 16, 2017, Department 14 of this court found that the trar

17  was not valid for a number of reasons unrelated to elder abuse claims. Kenton has stipulatt

18  that the transfer was not valid, and that the house remains an asset of the trust.

19  On January 1, 2016, LeWis transrerrccl over 10 Kenton 99,678 shares of' stock in

20  Freedom Motors. The stock was purchased some years ago for $1 per share, but no one

21  produced any evidence of its current value, or whether it even can be sold. Lewis's signat

22  barely legible.

23  On January 2, 2016, Kento  using his power of attorney, exec   an amendment

24  trust that changed the trustees from he and Hilja to be Connie Kruse, or as a successor tru

25  Linda Bonta.

26  C. Actions After Lewis's Death.

27  The parties also dispute the whereabouts over some of the personal property that -

28  the home at Lewis's death.

-5-

1     Hilja left the residence on January 9, 2016, and Kenton has had possession of it since.

2  For a period of time, he rented the premises to Fernando Ochoa, a long time gardener. for a

3  nominal sum, plus some landscaping maintenance.   Kenton is still in possession of the house.

4     Subsequently, the Comt appointed Lisa Soloway, a professional fiduciary, as the

5  trustee.  She has only entered the premises when she has an order allowing it, because of

6  Kenton'_s possession of lhe premises.  She did not ask for rent or seek to oust him from

7  possession because of the cloud on title created by the deed.  This has made it difficult to

8  administerth.e trust, i e., inventory, value, and sell the personal property, and sell the residenc

9     Finally, after Lewis's deatl4 Kenton sold Lewis's 2008  Chrysler for $8,500 and kept

10  funds.

11     **III.LEGAL CLAIMS**

12     Hilja challenges the following actions taken by Kenton: (1) execution of the power of

13  attorney on December 12' 2015; (2) the "No Elder Abuse" declaration on December 19, 201

14  (3) transfer of the residence on December 30, 2015 (and subsequent retention of possession);

15  (4) transfer of the Freedom Motors stock on January 1, 2016; (5) the change in trustees on

16  January 1, 2016; (6) disposition of personal property after January 3, 2016; (7) sale of the 20

17  Cluysler.  She alleges that these actions constituted both a breach of fiduciary duty and

18  statutory undue influence.

19     **A.  Breach of Fiduciary Duty**

20     Hilja claims that Kenton's actions constituted a breach of fiduciary duty.  Based on t

21  relationship between Kenton and Lewis, and the nature of the transactions (to create a gift tc

22  Kento    at Hilja's expense), there is a presumption of lmdue influence, and Kenton bears the

23  burden of proving that the transaction was fair and free from undue influence or fraud.  *(Sol*

24  *v. Lichtenstein* (1952) 39 Cal.2d 75, 81; *Estate o fSarabia* (1990) 221  Cal.App.3d 599, 605.:

25     Once the power of attorney w a s  sj.gned, Kenton had a duty "to act solely in the inter.

26  of the principal and to avoid conflicts of interest."  (Probate Code§ 4232(a).)  This does no

27  however, prohibit all actions that also benefit the attorney-in-fact  (Probate Code s 4232(b)

28

1  Under this theory, the execution of the power of attorney itself would not constitute the

2  violation, but rather the subsequent property transfers would constitute the violation.

3  **A. Statutory Elder Abuse.**

4      1.  Standing.

5      Kenton argues that Hilja has no standing to raise an elder abuse claim.  A statutory

6  petition under Probate Code section 850 may be brought by "any interested person" under

7  Probate Code section 48, which includes a beneficiary.  *(Estate of Migliaccio v. Midland Na*

a  *Life Ins. Co.* (2006) 436 F.Supp.2d 1095, 1100 [wife of trustor that was beneficiary of trust v

9  an interested party]; *Estate of Lowrie* (2004) 118 Cal.App.4[th] 220, 227 [Welfure and Instituti

10  Code§ 15657.3(d) allows elder abuse action by personal representative, "or if none, to the

11  person or persons entitled to succeed to the decedent's estate."]; *Estate of Giraldin* (2012) 5

12  Cal.4[th] 1058, 1062 [beneficiaries of trust could sue for breach of fiduciary duty after death o

13  settlor].)  While it is correct that ordinarily civil claims on behalf a trust cannot be brought b

14  beneficiary, that requirement does not apply to statutory claims under the Probate Code.  (Se

15  *v. Damon Raike & Co.* (1992) 7 Cal.App.4[th] 419, 422.)  In addition, the current trustee, Ms.

16  Soloway joined in the petition to remove Kenton as trustee and to confirm the trust's

17  ownership of the residence.

18      2.  Taking

19      Kenton **argues** that ID\7C i: n o --uaiting- box-c because "the "transf"er of the house vvas "

20  and thus of no legal effect as found by Judge Sugiyama on June 16, 2017, and as not conk

21  by Kenton.  The fact that the transfer ultimately was found to have no legal effect does not

22  change the fact that Kenton claimed that it was effective and used the transaction in order·

23  maintain possession and control of the premises.  The fact that he erred in his execution of

24  transaction is hardly a defense.  *(Bonfigli* v. *Strachan* (2011) 192 Cal.App.4[th] 1302, 1316

25  [allegation of a real property transfer executed pursuant to an invalid power of attorney

26  constitutes elder abuse under the statute]; *Mahan* v. *Charles W. Chan Ins. Agency, Inc.* (21

27  12 Cal.App.5[th] 442, 461-462 [actions that reduced value of child of eider's interest in a tn

28  deprived the elder of a property right by damaging right to dispose of property].)

-7-

### 3. Definition of Undue Influence

Under Welrare and Institutions Code section 15610.30(a)(3), undue influence means "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." It then sets out three factors to be considered (1) vulnerability of the victim; (2) the influencer,s apparent authority; and (3) the actions or tactics used by the influencer. With respect to actions or tactics, the provision specifically provides that the court may consider "(i)nitiation of changes in personal or property rights, of baste or secrecy in effecting those changes, effecting changes at inappropriate times and places, and claims of expertise in effecting changes." (§ 1561030(a)(3)(C)-) The court also may consider "the equity of the result, which includes °any divergence from the victim's pr intent or course of conduct or dealing[.]" (§ 15610.30(a)(4).) An inequitable resul4 howevi is not sufficient by itself to prove undue influence. (§ 15610.30(b).)

## IV. CONCLUSIONS BASED ON THE EVIDENCE

The transfer of the home to joint tenancy with Kenton and the transfer of the stock represented a substantial change in the disposition of property from that contemplated by th equalizing trust executed just two and a half months before. Why the change of heart, if th was one? In this instance₇Lewis was vulnerable. He was physically ill even before he stol dialysis. He was distressed about the end of his own life, and grieved the loss of his wife_ While Kenton did not have substantial autb.oiity over L,    he had some veneer of expert due to actions that he and Lewis had taken to transfer and manage assets while Kenton w3! prison. He was caring for Lewis, at least some of the time. There is no evidence, howevei he isolated Lewis or made Lewis solely dependent on him

Lewis was generally upset by the email, but that does not entir ly explain the chan the disposition of assets. Kenton took advantage of the message and its effect on Lewis, a used it as part of the exertion of substantial undue influence over Lewis. This led to the execution of the power of attorney on December 12, 2015, and the deed to the home.

The tactics used by Kenton indicate undue influence: Once he obtained Lewis's t'agreem.ent" to siₐₙ a power of attorney, he took Lewis to a local UPS store, quickly, ani

-8-

1   without anyone else's knowledge.  The very fact that the document in question was a power

2   attorney, rather than an actual change to the trust is significant  Rather than simply making

3   change in the disposition of property, it purported to give Kenton full authority to sign anyth

4   on Lewis's behalf.

5        Kenton testified that he did not even know of the equa)jzing amendment at this time,

6   simply erred        the residence in order to keep the property "out of probate.>'  Of course,

7   since the property was in a trust, rather than disposed of in a will, it would not go through a

8   fonnal probate in any event  Moreover, if Kenton's testimony that Lewis was upset about th

9   email were correct, presumably Lewis would have told Kenton about the equalizing

10  amendment

11       While the Court is hesitant to determine what generally might be called '1nequitable

12  between siolings given the history of this family, the changes made by Kenton are inequitah

13  in this context.  Toe last clear, lucid, considered disposition of the trust was to equalize the

14  distribution between Hilja and Kenton.  Kenton's actions dramatically changed this in his

15  favor, giving him the major asset, the home.  This was not equitable.

16       Despite the attention given to it by the parties, the '110 elder abuse declaration" is no

17  critical here.  It has no binding legal effect.  It serves only, at best, to give us either a V.Illdo

18  into Lewis's state of mind, or into Kenton's efforts to manipulate Lewis, or both.  Viewing

19  facts most favorably to Hilja, it iS meaningless tccLfC  Lewi., aanwill  y had no ida, vbt  he

20  signing.  Even viewed in the light most favorable to Kenton, Lewis still was extremely ill a

i1  tired.  He was emotionally swayed by the prospect that his son could be charged with

22  something that would land him back in prison.  Not wanting his son tQ return to prison is o

23  thing, but changing his disposition of assets to favor his son dramatically is another.

24  Accordingly, the Court finds that Hilja has proven by a preponderance of the evidence

25  the durable power of attomey was the result of elder abuse.  The transfer of the residence,

26  executed only by virtue of the power of attorney, also was the result of elder abuse (in add

27  to its other deficiencies), and a breach of Kenton's :fiduciary duty to his father.  The transf.

28  stock was executed by Lewis himself, but suffers from the same deficiencies as the power

-9-

1  attorney.  Lewis was ill and grieving-and getting more ill by the day.  It   not valid.  The

2  transfer of the residence also was a breach of fiduciary duty.  (As to the breach of fiduciary

3  duty, since the evidence proved elder abuse, a fortiori. it proves 1hat Kenton violated his

4  fiduciary duty, even if Kenton did not have the burden of proof on that issue.)

5      Since the "no elder abuse" declaration has no legal effect, the Cowt makes no finding as

6  its "v3li:dity_.  Since the appointment of the professional fiduciary, the change in the trust to

7  change trustees is no longer an issue.  Finally, despite much dispute about the dis position of

8  personal property, neither Hilja or the Trustee have sought any specific relief.

9      With respect to the transfer of the 2008 Chrysler, no justification for the transfer has bee

10  presented.  Accordingly, the Court orders Kenton to repay $8,500 to the trust

11  **V. REMEDIES**

12      **A. Non-Monetary Relief**

13      The transfer of the residence already has been declared invalid.  The successor truste

14  entitled to immediate possession of 1he residence, i.e. the premises commonly known as 60,

15  and 21 Laurel Lane, El Sobrante, California

16      The transfer of the stock in Freedom Motors is declared invalid.  The Court notes,

17  however, that the evidence is not clear as to -whether it is an asset of the trust, or was Lewis

18  separate property.  The trustee may need to move to confirm the stock as an asset of the tru

19  she concludes that is necessary and appropriar.e.

20      While there was evidence presented concerning the personal property in the resider

21  Hilja has not requested any specific relief related to that issue.  Since the current trustee wi

22  given possession of the premises, it will be up to her to address prop r inventory of the per

23  property, including whether any property was disposed of in such a er      that it does no-

24  belong to the trust.  When Kenton vacates the premises, he is not to take any of his paren

25  the trust's property with him.

26      Hilja requests that, pursuant to Probat.e Code section 259, Kenton be deemed to ha

27  predeceased his parents under Probate Code section 259.  To do this, the Court would be

28  requiied to find, i n t e r •  that neglect or financial abuse "has been proven by clear and

1    convincing evidence[.]"  (Probate Code§ 259(a)(l).)  In this case, however, the Court finds

2    $ a t the material facts have been proven by Hilja only by a preponderance of the evidence.

3    Accordingly, this request is denied.

4       **B.  Statutory "Damages"**

5         **1.  Value of the Property**

6        Hilja seeks a recovery of the property, plus double its value, pursuant to Section 859

7    Kenton argues that there was been no damage, and therefore there should be no award.  Firs

8    the Comt notes that section 859 actually does not refer to "damages" at all, but provides tha

9    where a person has "taken, concealed, or disposed of the property…through the commission

10   elder or dependent adult :financial abuse…the person shall be liable for twice the value of th

11   property recovered.',  This is in addition to any other remedies available.  *(Id.)*  This

12   presumably would include any actual damages.

13       The parties have stipulated the Laurel Lane residence bas a value of $761,665, and t

14   its rental value is $2,500 per month.

15       The only evidence submitted as to the value of the stock in Freedom Motors was th

16   purchase price, which was $1 per share.  This would make the transferred shares worth nea

17   $100,000, but there was no evidence of their value today.  Since they have not been liquid,

18   the Court can simply order lhat the shares he returned to the trust, or to Lewis's estate.  If t

19   belong to the trust, tne succes:sor lrU:Jl.C;e:; may bAve to detennine theh- value in order to prot

20   distribute trust assets.

21·      **2.  Doubling of Value of Property**

22       The "double damages" liability is created by Probate Code section 859, which pro-

23   that where property has been taken "by the use of undue influence in bad faith or through

24   commission of elder•…financial abuse as defined in Section 1561030 of the Welfare and

25   Institutions Code, the person shall be liable for twice the value of the property covered b}

26   action under this part.'"  Kenton argues that there is no bad faith here, and that bad faith h

27   required for an award of statutory damages under this section.  The provision, however,

28   that damages shall be awarded where property is taken by "undue influence in bad faith '

-11-

1 | financial elder abuse under section 15610.30. The court also notes that the application of the

2 | "double damages" liability to financial elder abuse under Welfare and Institutions Code section

3 | 15610.30 was deliberately added to the statute in 2013, and therefore appears to be a deliberate

4 | expansion of the liability, made with no reference to a requirement of bad faith. (Stats., 2013

5 | c. 99 (AB. 381), Assembly Floor Analysis, July 1, 2013 [leginfo.cagov].) Since the Court has

6 | found the statutory elder abuse, the damages provision applies without a finding of bad faith.

7 | (In *Estate of Young (2008)* 160 Cal.App.4th 62, 89-90, the court indicated that a finding of bad

8 | faith was required, but it was decided before the 2013 amendments.)

9 |     The next issue is whether the award of double of the value of the property is <u>mandatory</u>

10 | or discretionary. The statute provides that where property is taken through the commission of

11 | elder or dependent :financial abuse as defined in Welfare and Institutions Code section

12 | 15610.30, "the person *shall be* liable for twice the value of the property recovered by an action

13 | under this part . . . ." (emphasis added.) In co    the person *"may,* in *the court's*

14 | *discretion.,* be liable for reasonable attorney,s fees and costs.,, (Emphasis added.) The word

15 | choices ("shall be" versus "may, in the court•s discretion"), appear to differentiate the

16 | mandatory and discretionary nature of the award of double damages and the award of

17 | attorney's fees and costs.

18 |     This treatment of the provision has been upheld by the Court of Appeal in *Estate of*

19 | *.Kraus (2010)* HS4 Cal..App.4" 10:,, 118. In 'th  <>t=e, uparty banE _  roughly !±197.000 in

20 | funds (in a manner that was void). and was ordered to repay the funds, plus the statutory double

21 | amount of about $394 000. The court referred to the provision *as* a "mandatory statutory

22 | penalty *(Id.,* at 118, emphasis added). and also noted that because the ory   penalty is not

23 | the equivalent of punitive damages, the party's financial ability to pay 2łd overall financial

24 | condition were not relevant. *(Id.)* (See also *Hill v. S$_{u}$$_{p}$ erior CoUTt* (2016) 244 Cal.App.4th

25 | 1281, finding that the Section 859 penalty is not the equivalent of punitive damages, and does

26 | not require a similar showing.)

27 |     Accordingly, based on the stipulated value of the property. the mandatory statutory

28 | penalty under Probate Code section 859 is imposed in the amount of $1 523,330. (Any

-12-

1   perceived harshness is mitigated by the fact that since the money is paid to the trust, Kenton in

2   essence gets half of his money back.) In objecting, Kenton asserts that the stipulated value of

3   the property is no longer accurate, and that in any event, the value should be measured by the

4   difference between the fair market value of the property with unclouded title and the value with

5   a void or voidable transfer impairing its value. Section 859, however, requires an award of

6   "twice the value of the property recovered,," not a hypothetical determination of the temporary

7   loss in value caused by the respondent's actions.

8       In addition,, based on the $8,500 value of the 2008 Chrysler, the Court orders an

9   additional penalty of $17,000.

10       Because the items in question belonged to the        the payments are to be made to the

11   trust The Court understands that this results in Kenton in essence receiving half of his

12   payment back, but this is consistent with the statute.

13       **3. Additional Compensatory Damages**

14       Because the statute provides that the statutory penalty is in addition to all other

15   remedies, the Court must consider an additional award of actual damages. The conveyance,

16   and Kenton's defense of it tmtil Jtme of 2017, however, did interfere in the successor trustee's

17   ability to administer the trust and deprive the trust of potential rental value of the premises from

18   January of 2016 to the time of trial. Based on the $2,500 per month rental value, the trust was

19   deprived 0£$45 000 by K4Dng wvcnsnl withhdln6 olpasosiqn of Pc praperty- The

20   Court concludes> however, that the statutory penalty is more than adequate compensation for

21   -this loss and does not award any additional compensatory damages.

22       **4. Punitive Damages**

23       Hilja seeks punitive damages based on clear and convincing evid ce of oppression,

24   fraud, or malice, pursuant to Civil Code section 3294(a) and Welfare and Institutions Code

25   section 15657.5. The court does not find that oppression, fraud, or malice have been proven b

26   clear and convincing evidence. Accordingly, the request is denied.

27

28

1       **5. Attorney Fees**

2       Section 859 also gives the court discretion to award attorney fees in a case in which

3  elder abuse is found.  In exercising its discretion, the Court has reviewed the legislative histor

4  of the 2013 amendments to the statute that added the attorney fee provision.  In the Assembly

5  Floor .Analysis that accompanied the bill before its final approval (for approval after Senate

6  amendments) it was stated that the pmpose of the fee provision is "so that rightful property

7  owners do not have to make a decision as to whether they can afford to recover their property

8  because the attorney fees might exceed the value (or even twice the value) of the property

9  recovered." (Assembly Floor Analysis of AB 381 c. 99, Stats. 2013 [leginfo.ca.gov]- The

10  Court takes judicial. notice of this document) In lhis instance, the mandatory penalty of douh

11  the amount of the value of the property has resulted in a substantial recovery well in excess o

12  actual damage to Petitioner, which may allow payment of a reasonable attorney from the

13  proceeds.

14       Because the Court has ordered that the statutory penalty be paid to the trust, it likely i

15  appropriate that the fees be paid by the trust, which benefited from the relief obtained.  Even

16  though Hilja's share of the trust would be enough to offset the fees, it would be inequitable t

17  require those costs to be borne by Hilja or paid from her share of the trust, with. Kenton

18  receiving his (increased) share of the trust without an offset for the fees.  Indeed, depending

19  the aniount o fa fee determined. to be reasonable, 'bw Co     VVl ⇒⇐     whoth.rJl or p∼t

20  the fee ought to be charged directly to Ken.to   or to his distribution from the trust.

21  *Ill*

22  *fl/*

23  **Ill**

24  *Ill*

25  *Ill*

26  *III*

27  **Ill**

28  *////*

-14-

1    Kenton argues that fees, if sought, should have been proven at trial, and they were not

2  But this is not a case in which attorney fees are merely an element of damages, they are an

3  additional remedy available only to a prevailing party.  The appropriate method is through a

4  motion supported by an appropriate declaration and records.  Since the Court is directing that

5  the fees be paid by the Trust, it is appropriate for the Court to determine that the amount is

6  reasonable.  Attorneys for Hilja and for the trustee are directed to submit a fee motion within

7  thirty days after this decision becomes final.

8

9  Date:  _____f8/1-s/11_____        _____

10                                          Edward G. Weil

11                                          **Judge of the Superior Court**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-15-

EXHIBIT B

ORT-HILLTOP 6190002497

**RECORDING REQUESTED BY:**
Earth Island Institute

**WHEN RECORDED, PLEASE MAIL TO:**
Earth Island Institute
300 Broadway, Suite 28
San Francisco, CA 94133-3312

**DOCUMENTARY TRANSFER TAX :**
See Attached (not to be re rded)

APN: 431-050-004



CONTR COS1 Co Recorder Of.fice
Sl£PHENL. UEIR Clerk-Recorder
DOC- 2005-0443683-00
Acct 11- Old Republic Title
Wedr.esday NOV 16 2005 06:00:00
FEE $1.v., MOD 63 .00 REC $9.00
TCF $4a00
Ttl Pd $19.00        Nbr-0003000a40
                     ENG/R2/1-5
                     W

## GRANT DEED

For good and valuable consideration, the receipt of which is hereby acknowledged, **The Trust for Public Land,** a California nonprofit, public benefit corporation ("Grantor"), does hereby grant. bargain, sell and convey to the **Earth Island Institute,** a California nonprofit corporation ("Grantee"), all the real property situated in the County of Contra Costa, State of California, described at <u>Exhibit A</u> attached hereto and incorporated herein by this refer nce (the "Property").

SUBJECT to existing rights-of-way or easements, of record or in use, for roads, r1 lroads, telegraph, telephone and electrical transmission lines, canals, laterals, ditches, flumes, siphons and pipelines, on, over and across the Property; and

TO HAVE AND TO HOLD, the above granted and described premises, together with all tenements, hereditaments, and appurtenances, including water and water rights, minerals and mineral rights, buildings, structures, improvements and easements, thereto belonging or **appertaining, i f** any, **and any reversions, remainders,** rents, issues, or profits thereof, unto Grantee and its assigns forever.

IN WITNESS WHEREOF, Grantor has executed this instrument this 16th day of August, 2005.

TIIB TRUST FOR PUBLIC LAND,
a California nonprofit public benefit·
corporation

By: _____
Tily Shue, Regional Counsel

EXHIBIT C

PROPERTY ADDRESS

| | |
|---|---|
| **21 LAUREL LN** | **RCHMD** |

**PAY ONLINE AT WWW.CCTAX.US**

431-050-004-8 00

**EARTH ISLAND INSTITUTE**
**2150 ALLSTON WAY STE 460**
**BERKELEY CA        94704**

*SEE BACKSIDE FOR MORE INFORMATION*
*IMPORTANT MESSAGE(S) TO TAXPAYER*

ASterisk (*) next to special tax or assessment below indicates SENIOR exemption may be available. Call number next to asterisk below for further information

**ASSESSEE AS OF JANUARY 1, 2017**

**EARTH ISLAND INSTITUTE**

**PROPERTY ASSESSMENT**

| | |
|---|---|
| LAND | 1,883,993 |
| IMPROVEMENTS | 264,931 |
| PERSONAL PROP | |
| GROSS VALUE | 2,148,924 |
| EXEMPTIONS | |
| WELFARE EXEMPTION | 2,148,924 |
| NET VALUE ON JAN. 1, 2017 | |

| PARCEL NUMBER | BILL NUMBER | TRA | ISSUE DATE | TYPE | CORTAC | DEFAULT # |
|---|---|---|---|---|---|---|
| 431-050-004-8 00 | 17 318681 2 | 08115 | 07/19/2018 | REPRINTED | | |

| SPECIAL TAXES & ASSESSMENTS | | | | AD VALOREM TAXES & ASSESSMENTS | | |
|---|---|---|---|---|---|---|
| **DESCRIPTION** | **CODE** | **INFORMATION** | **AMOUNT** | **DESCRIPTION** | **RATE** | **AMOUNT** |
| MOSQUITO & VECTOR | OV | (925) 867-3400 | 5.58 | 1% COUNTYWIDE TAX | 1.0000 | 0.00 |
| EMERGENCY MEO B | DY | (925) 646-4690 | 10.00 | ADD: | | |
| WCWO-SEWER CHG | GS | (600) 676-7516 | 519.00 | BART | .0063 | 0.00 |
| RICHMOND STORM ORN | IZ | (510) 620-6594 | 32.00 | BART BOND 2016 | .0021 | 0.00 |
| WCCUSD ASSESSMENT | JA | (800) 273-5167 | 72.00 | EAST BAY REG PK BD | .0021 | 0.00 |
| EASTBAY TRAILS LLD | KA | (888) 512-0316 | 5.44 | RICHMD PENSION TAX | .1400 | 0.00 |
| w e e HEALTH-PReL TX | NR | (866) 807-6864 | 52.00 | WEST CC UNIF BO 98 | .0053 | 0.00 |
| | | | | w e e UNIF BOND 2000 | .0184 | 0.00 |
| | | | | WCCUSD 2002 BOND | .0600 | 0.00 |
| | | | | w e e UNIF BOND 2005 | .0600 | 0.00 |
| | | | | WCCUSD 2010 BOND | .0480 | 0.00 |
| | | | | OTHER BONDS/ TAX | .0594 | 0.00 |
| | | | | TOTAL AD VALOREM TAXES | 1.4016 | |
| | | | | ADD: SPECIAL TAXES & ASSESSMENTS | | 6%.02 |
| | | | | DELINQUENT PENALTY | | .00 |
| | | | | DELINQUENT COST | | .00 |
| | | | | LESS: PAYMENTS RECEIVED | | 696.02 |
| **TOTAL SPECIAL TAXES & ASSESSMENTS** | | | 696.02 | **TOTAL AMOUNT DUE** | | 0.00 |

EXHIBIT D



# DECLARATION

I declare as follows:

1. I am the Executive Director of Earth Island Institute (Ell, a California non profit corporation.

2. Ell purchased that real property commonly known as 21 Laurel Lane, El Sobrante, California resulting in grant deed to said property executed on August 16, 2005.

3. Ell has continuously held title to 21 Laurel Lane from the date of granting of deed to the present.

4. Ell is the assessee of property taxes associated with 21 Laurel Lane and pays the total special taxes and assessments.

5. At no time did Ell nor any resident of 21 Laurel Lane receive notice that said property was the subject of litigation involving ownership of this property nor was any notice posted on the property prior to any hearing or trial adjudicating ownership or issues related to ownership.

6. On May 31, 2021, I learned for the first time the Earth Island's property was included as Keading Family Trust property, which is error.

7. I am prepared to testify to the above facts in a court of law if requested to do so.

The foregoing statements are true and correct to the best of my knowledge and made under penalty of perjury according to the laws of the State of California.

Dated: _/la.rr;,,/4 Z'-/ z̶z̶zJ_

_Dai D Phillips_

David Phillips

**Earth Island Institute**
David Brower Center
2150 Allston Way, Suite 460
Berkeley, California 94704

PHONE: 510-859-9100
FAX: 510-859-9097
TAX ID: 94-2889684
SOCIAL: @earthisland

# earthisland.org

Printed on 100% post-consumer waste recycled paper using vegetable-based inks and wind power.

EXHIBIT E

HARTOG, BAER & HAND
A Professional Corporation
David W. Baer, SBN: 99262
Jonna M. Thomas, SBN: 240261
4 Orinda Way, Suite 250-B
Orinda, CA 94563
Tel No.:   (925) 253-1717
Fax No.:   (925) 253-0334
Email:    dbaer@hbh.law
          jthomas@hbh.law
Attorneys for *Petitioner Hilja M. Keading*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF CONTRA COSTA

| | |
|---|---|
| *In the matter of:* | **CASE NO.** |
| KEADING FAMILY TRUST, DATED JANUARY 27, 1998 | **EX PARTE PETITION TO SUSPEND AND REMOVE KENTON KEADING AND APPOINT SUCCESSOR TRUSTEE OF THE KEADING FAMILY TRUST AND ITS SUBTRUSTS, TO CONFIRM TRUST OWNERSHIP OF PROPERTY; FOR INTENTIONAL INTERFERENCE WITH EXPECTED INHERITACE; FRAUD; CONVERSION; AND FOR ELDER ABUSE** |
| HILJA KEADING, | |
| Petitioner, | **[Prob. Code§§ 17200, 4541 and 850]** |
| V. | |
| KENTON W. KEADING, FERNANDO OCHOA, and DOES 1 to 20, | **DATE:  March 15, 2016** |
| Respondents. | **TIME:   9:30 a.m.** |
| | **DEPT:  Room 210, Dept. 14** |

Petitioner Hilja Keading *(Hi/ja)*, co-trustee of the Keading Family Trust dated January 27, 1998 *(Trust)*, is physically fearful of Kenton and unable to administer the Trust with him due to his history of physically, sexually and emotionally abusing her, his felony methamphetamine manufacture, sale and firearm possession conviction history, his refusal to follow the Trust's terms, his attempts to transfer all Trust assets to himself and unknown third parties, and his recent disappearance to Thailand. She petitions the Court for the following ex parte relief:

155576 *2101-001                                  1

(1)   to suspend her co-trustee Kenton Keading *(Kenton),* and pending any contested hearing to approve Hilja's voluntary suspension;

(2)   to appoint Elizabeth "Lisa" Soloway, C.L.P.F. as interim trustee;

(3)   to set aside the deed, dated December 30, 2015 by which Kenton, misrepresenting himself as his the attorney in fact of his father Lewis Keading *(Lewis),* attempted to transfer Trust real property at 60, 21 and 50 Laurel Lane, El Sobrante, California *(Residence)* from his father as trustee to himself. The December 30 2015 deeds and preceding deeds in the chain of title are attached as **Exhibit 1.** Lewis' Durable Power of Attorney appointing Hilja as his agent is attached as **Exhibit 2;**

(4)   to set aside any lease contract signed by Kenton representing himself as the owner of the Residence;

(5)   authorizing Hilja and Lisa Soloway to enter the Residence with civil stand-by assistance of law enforcement to identify and retrieve tangible personal property listed at **Exhibit 3** and to maintain it in the Trust pending hearing; and

(5)   to approve notice and summons service to Kenton at his last known address by U.S. mail and electronic mail, because he has fled to an unknown location in Thailand. *(See,* Prob. Code§ 851.)

Hilja also requests the following relief at a noticed hearing:

(1)   to remove Kenton as co-trustee;

(2)   to approve Hilja's resignation contingent on Kenton's removal;

(3)   to appoint Elizabeth "Lisa" Soloway, C.L.P.F. to succeed as permanent trustee of the Trust and each of its subtrusts;

(4)   to recover from Kenton all real property, a vehicle and investment assets that Kenton attempted to transfer from the Trust to himself and third parties; and

(5)   to hold Kenton liable for damages resulting elder abuse, fraud, conversion

155576 *2101-001

2

**EX PARTE PETITION TO SUSPEND AND REMOVE KENTON KEADING ETC.**

1   and intentional interference with expected inheritance.

2   **I.   SUMMARY OF EMERGENCY CIRCUMSTANCES**

3   Surviving settlor Lewis died on January 4, 2016.  His children Hilja and Kenton

4   are the beneficiaries of the Trust. During Lewis' final months and since his death Kenton

5   has fraudulently attempted to take all the Trust assets for himself. Kenton began his

6   efforts to take his parents' assets for himself after his recent release from a fourteen year

7   prison sentence for methamphetamine manufacturing and sale and for possessing

8   multiple firearms while conducting his operation. *(See, e.g.,* **Exhibit 4,** Contra Costa

9   County Case No. 010328-3.) Emergency relief is necessary to preserve Trust property

10  from destruction, conversion, and potential use in criminal enterprise.

11  Hilja recently discovered that five days before Lewis' death, Kenton secretly

12  executed a deed, falsely representing himself as Lewis' attorney in fact, attempting to

13  transfer the settlers' Residence and adjoining real property from the Trust to himself and

14  Lewis as joint tenants. (See, Exh. 1.) He recorded it four days after Lewis' death with an

15  affidavit of death of trustee, attempting to take the Residence by right of survivorship.

16  Kenton knew that Lewis had appointed Hilja as his attorney-in-fact on September 26,

17  2015 and that he was not Lewis' agent. *(See,* Exh. 2.) No attorney-in-fact had authority

18  to transfer real property from the Trust. Lewis served as trustee of the Trust until his

19  death and, in that capacity, was the only person with the authority to transfer the Trust's

20  real property. (A copy of the Trust and Will are attached as **Exhibits 5 and 6***; see, e.g.,*

21  Exh. 6, Trust, at Art. 3.10, directing that no agent can exercise the settlor's power of

22  revocation or amendment if the exercise would substantially alter the settlor's intended

23  dispositions.)

24  On the weekend of February 27, 2016, Hilja learned through a concerned

25  neighbor that Kenton had fled to Thailand after leasing the Residence to one of his

26  associates, Fernando Ochoa, and, that Kenton had sold the settlors' 2008 Chrysler

27  vehicle, VIN 2C3LA63H28H284774.  The Department of Motor Vehicles (OMV) confirms

28  that the sale occurred.

155576 ·2101-001                                          3

**EX PARTE PETITION TO SUSPEND AND REMOVE KENTON KEADING ETC.**

1      A witness also informed Hilja that Kenton forced Lewis to sign a stock certificate

2  from himself to Kenton while Lewis lay on his deathbed, unable to see what he was

3  signing. That Kenton has fled to Thailand increases the risk that he will dispose of funds

4  that he wrongfully procured.

5      Absent court order, law enforcement cannot assist Hilja to enter the Residence to

6  protect Trust assets or gather financial records that she needs to meet April 2016

7  property and income tax filing deadlines. Hilja or a successor trustee needs access to

8  Trust accounts to pay Trust property and income taxes due in April 2016, homeowners

9  insurance due in June and outstanding debts to her parents' end of life care providers.

10  Without Kenton's suspension or cooperation all Trust accounts will remain blocked.

11  Kenton refuses to pay property taxes and has lost other properties in forced sales

12  resulting from his failure to pay property taxes.   *(See,* Exh. 4.)

13      The Court may set aside the December 30, 2015 deed on an ex parte basis to

14  allow Ms. Soloway to marshal and manage the Residence while litigation is pending.

15  For instance, Probate Code section 17200(b)(2) authorizes the Court to find that the

16  Trust did not allow any person acting as attorney in fact to transfer property from the

17  Trust. Probate Code section 4541 (a) authorizes the Court to determine that Kenton did

18  not hold a valid power of attorney to act for Lewis when he executed the deed.

19      Petitioner further alleges in greater detail as follows:

20                    II.  **THE ESTATE PLAN**

21      1.    Settlers Lewis and Lucille W. Keading *(Lucille),* both now deceased,

22  executed the Trust on January 27, 1998. *(See,* Exh. 6.)

23      2.    Lucille died on September 10, 2015. Lewis died on January 4, 2016.

24      3.    The Trust and its subtrusts are now irrevocable.

25      4.    The beneficiaries of the Trust and its subtrusts are Hilja and Kenton. Hilja

26  and Kenton are the settlers' only children.

27      5.    The Trust nominates Hilja and Kenton to succeed Lewis as co-trustees.

28  *(See,* Exh.6, at Sec. 7.2.)

155576 *2101-001                                        4

6.      The Trust requires that if Hilja and Kenton are unable or unwilling to serve as successor trustees then a new trustee or co-trustees shall be appointed by the Court. (See, Exh.6, at Sec. 7.2.)

7.      By his Will dated January 27, 1998, Lewis named the trustees of his trust as sole beneficiary of his estate. (See, Exh. 5, at Section 2.1.)

8.      The following assets are beneficially owned by the Trust:

      a.  60 Laurel Lane, 21 Laurel Lane and 50 Laurel Lane, El Sobrante, California (see, Exh. 1);

      b.  Charles Schwab Trust Account no. 4962-5504 (see, Exh. 6, Schedule A);

      c.  US Bank Account no. 154300935652 *(see,* Exh. 6, Schedule A); and

      d.  All automobiles, furniture, furnishings, crystal, antiques, appliances, silver, jewelry, coins, paintings, objects d'art, and other items of a tangible, personal nature, owned by the settlors at their deaths *(Id.; see also,* Assignment at Exh. 6, and list of tangible personal property at Exh. 3).

9.      Lewis and Lucille also owned two Schwab joint tenancy account nos. 3789-9944 and 1327-2378. Those accounts collectively hold $84,117.04. Lewis' Will directs that those accounts be distributed to the trustee of the Trust.

### III. KENTON TRANSFERRED OR ATTEMPTED TO TRANSFER THE SETTLORS' RESIDENCE AND OTHER ASSETS FROM THE TRUST TO HIMSELF

10.      Kenton is angry that Hilja is an equal beneficiary with him under the terms of the Trust as amended and believes he is entitled to all of his parents' assets. He has attempted to transfer the Trust property to himself to exclude Hilja from inheriting anything under the Trust.

### A.      Fraudulent Transfer of Title to the Residence.

11.      On January 8, 2016, four days after his father's death, Kenton recorded a deed purporting to transfer to himself and his father, as joint tenants, Lewis' Residence

155576 *2101-001                                          **5**

1   at 60 Laurel Lane, 50 Laurel Lane, El Sobrante, California. *(See,* Exh. 1, deed and legal

2   description.)

3          12.      Kenton executed the deed in secret as his father laid on his deathbed on

4   December 30, 2015.

5          13.      Kenton signed the deed misrepresenting himself as his father's attorney-in-

6   fact. On September 26, 2015, Lewis had executed a Durable Power of Attorney (OPOA)

7   appointing Hilja to act as his attorney-in-fact. *(See,* Exh. 2, DPOA.)

8          14.      Kenton knew that Lewis had appointed Hilja to serve as his attorney in fact

9   when he executed the deed.

10          15.      The Trust terms do not permit a trustee to delegate trustee authority to an

11   attorney in fact. *(See, e.g.,* Exh. 6, Trust, at Art. 3.10 directing that no agent can exercise

12   the settlor's power of revocation or amendment if the exercise would substantially alter

13   the settler's intended dispositions.) Only Lewis, as trustee, had authority to transfer the

14   Trust's real property on December 30, 2015. Kenton has never held sole authority to

15   transfer it at all, much less to himself.

16        **B.**      **Fraudulent Lease and Fraudulent Sale of Vehicle**

17          16.      On Friday February 26, 2016, Hilja requested that the Richmond Police

18   Department send an officer to the 60 Laurel Lane property to perform a welfare check.

19   She made the request after learning from witnesses that Kenton had sold her fathers'

20   Chrysler vehicle, that one of Kenton's associates Fernando Ochoa and others appeared

21   to be living in the Residence, Kenton did not appear to be at the Residence, a tree had

22   fallen down, and that multiple visitors had been coming and going for brief visits.

23          17.      Prior to his disappearance Kenton had been using the Chrysler that Lewis

24   had assigned to the Trust. *(See,* Exh. 6, Schedule A and Assignment.)   The OMV

25   confirmed on February 29, 2016, that Kenton had sold the car. He kept the proceeds for

26   himself.

27          18.      When Officer Walter Patrick arrived at the Residence, he spoke to Mr.

28   Ochoa.   Mr. Ochoa informed Officer Patrick that Kenton would be in Thailand for sixty

1  days.

2       19.     Prior to Kenton's disappearance to Thailand, Kenton informed Hilja that his

3  phone did not work and suggested that she direct correspondence to his email address.

4  Hilja infers that Kenton fled from the United States approximately three weeks ago.

5       20.     When Officer Patrick questioned Mr. Ochoa, Mr. Ochoa told the officer that

6  Kenton drafted a lease agreement for Fernando to live at 60 Laurel Lane. Mr. Ochoa,

7  however, did not produce a copy of the agreement.

8       21.     Mr. Ochoa now drives Kenton's black Honda, license plate 6Z0E743.

9       22.     Neighbors are concerned by the activity they observe at the Residence.

10  Additional individuals appear to be living in the property. An unusual number of

11  individuals come and go from the property for short visits.

12      **C.**    **Title to Securities**

13       23.     A witness informed Hilja that approximately two days before Lewis' death

14  she observed Kenton stand over Lewis' bed and force him to sign over at least one stock

15  certificate to Kenton.

16       24.     On January 8, 2016, Kenton informed Hilja that witnesses signed a

17  document stating that Kenton had not committed elder abuse. Kenton did not allow the

18  witnesses to see the documents that they witnessed Lewis sign. Hilja is informed and

19  believes that the witnesses will repudiate the documents that Kenton tricked them into

20  signing.

21       25.     Hilja is in the process of determining what other assets Kenton took from

22  the Trust or Lewis while Lewis was dying or after Lewis' death.

23                    **IV. SUSPENSION AND REMOVAL**

24       26.     Kenton's self-dealing and attempts to take Trust property command his

25  immediate suspension and removal.

26       27.     Hostility also prevents the co-trustees from administering the Trust

27  together.

28  *II II*

1    **A.    Kenton Refuses To Administer the Trust With Hilja**

2    28.    Kenton has refused and is presently unable or unwilling to communicate

3    with Hilja about the Trust and its administration, and was unable or unwilling to assist in

4    arranging for Lewis' funeral. For instance, after Lewis died Kenton lifted a wheelchair to

5    throw it. Hilja pleaded with him not to do so and he did not. He stormed off from the

6    Residence.  Upon his return he isolated himself in his room, while Hilja communicated

7    with the coroner and made funeral arrangements. Kenton's inability or unwillingness to

8    communicate with Hilja continues as he is in Thailand.

9    29.    Kenton and Hilja orally agreed that they would both resign as trustees and

10   would appoint a private professional fiduciary to administer the Trust.

11   30.    Relying on Kenton's oral representation, Hilja engaged counsel to identify a

12   private fiduciary and to prepare papers necessary to appoint the person counsel

13   identified, Elizabeth "Lisa" Soloway, CLPF, to serve by Hilja's and Kenton's mutual

14   consent.  After Hilja's counsel prepared the papers, Kenton refused to cooperate.

15   31.    Kenton told Hilja that he was instead working with Lewis' counsel Peter

16   Sproul to appoint a successor fiduciary.  But, Peter Sproul informed Hilja's counsel that

17   Kenton had never requested his assistance for that or any other purpose, other than to

18   receive copies of Trust documents.

19   **B.    Kenton's Criminal Activities Render Him an Unfit Candidate to Serve
        In a Fiduciary Role**

20

21   32.    Hilja is physically fearful of Kenton.

22   33.    Kenton is a convicted felon. Recently, Kenton was released from prison

23   after serving a fourteen year felony sentence for methamphetamine manufacture and

24   sale and for possessing firearms in connection with his operation. *(See,* Exh. 4, Kenton's

25   conviction history relating to his methamphetamine operation.)

26   **34.**    Kenton continues to engage in suspicious activity consistent with

27   methamphetamine use, trafficking and production including

28            a.    exhibiting irrational and erratic behavior,

155576 *2101-001                                    8

b.      failing to make eye contact when communicating,

c.      frequently disappearing from his usual residence for long periods without explanation,

d.      making frequent extended trips to Thailand, a country infamous for its drug trade and child sex trade, and

e.      failing to engage in lawful employment.

**C.   Kenton's Sexual, Physical and Emotional Abuse of Hilja Precludes the Possibility of a Cooperative Trust Administration and Renders Him Unfit to Serve**

35.     Kenton persistently physically and sexually abused Hilja beginning when he was nineteen years old and she was ten years old until she became an adult.  Hilja feared the consequences of reporting the abuse and did not disclose it to her parents until she was approximately 28 years old. Kenton responded that Hilja "asked for it" and denied using force. Third parties witnessed some of Kenton's abusive behavior towards Hilja as a child.

36.     Hilja remains physically fearful of Kenton.  Hilja continues to suffer psychological trauma and physiological damage from the abuse requiring ongoing medical intervention. Attempting to communicate with Kenton exacerbates Hilja's physiological symptoms.

37.     Throughout her adulthood Hilja has protected herself from Kenton by avoiding contact with him. She stayed away from him for approximately twenty-five years until her mother became terminally ill in mid - 2015.

38.     In 2015, when Hilja learned that her parents needed elder care and protection from Kenton, Hilja resumed contact with Kenton by necessity. Kenton lived in the settlor's Residence as a squatter as explained further below in the section entitled "Elder Abuse."

39.     The night before Lucille's burial, Kenton stood over his bedridden father screaming at him and demanding removal of Hilja's partner Julie from their "Christian" household. Hilja spoke up to protect her partner from Kenton's verbal assault, Kenton

1    grabbed Hilja, shook her, and attempted to drag her down the hall to continue his

2    demands that Lewis rid the house of the "thing" (her partner) that Hilja brought.

3            40.     Kenton also verbally abused Hilja when she expressed concern over

4    Kenton's mistreatment of her father and mother. For instance he would react to her

5    concerns by demanding that she stay away from the Residence, dismissing her

6    concerns and refusing to speak with her, telling her to "shut up," or stating "you are

7    stupid."

8            41.     Multiple individuals witnessed Kenton's abuse of Hilja and his parents.

9    Others have also experienced his threats and bullying.

10           42.     Kenton is unable or unwilling to communicate about basic management

11   matters without engaging in abuse. For instance, when Hilja attempted to discuss plans

12   for their father's funeral with Kenton he instead engaged in an approximately forty-five

13   minute tirade assaulting her character and demanding that she bow down and beg for

14   forgiveness.

15           43.     Since Lewis death, Kenton has periodically cut off communication with

16   Hilja, refused to respond to administration related correspondence and now disappeared

17   to Thailand without notice.

18           0.      **Lisa Soloway, CLPF Is Prepared to Accept Appointment as Interim
                     and Successor Trustee**

19

20           44.     Hilja resign or stipulate to her and Kenton's joint suspension as trustees to

21   allow a private professional fiduciary to administer the Trust.

22           45.     Elizabeth "Lisa" Soloway has accepted Hilja's nomination to serve.

23           46.     Ms. Soloway's acceptance of trusteeship is attached as ***Exhibit 7.***

24           47.     The Trust entitles each trustee to reasonable compensation without Court

25   order. Ms. Soloway's rate of 1% of the gross trust assets annually is reasonable, subject

26   to any later objection the beneficiaries might raise respecting the performance of her

27   duties as trustee. A copy of Ms. Soloway's fee schedule is attached as ***Exhibit 8.***

28   *II II*

155576 *2101-001                                            10

## V.  HILJA DISCOVERED ELDER ABUSE UPON ARRIVING FROM SOUTHERN CALIFORNIA TO CARE FOR HER PARENTS.

48.     After his release from prison and during their most vulnerable senior years, Kenton occupied Lewis' and Lucille's home as a squatter, obstructed their access to health care services, verbally abused them, chastised them for their frailty, consumed their prescribed dietary supplies, monitored and controlled their communications with third parties, and neglected their hygiene.

### A.     Kenton Accepted Initial Appointment as His Parents' Attorney In Fact and Then Neglected Their Care.

49.     On February 5, 2015, Kenton procured his appointment as the settlors' attorneys in fact.  Thereafter, he neglected their finances, self-dealt with their assets for his personal benefit and concealed financial information from them.  A copy of the superseded DPOA is attached as *Exhibit 10*.  For the reasons detailed below, on September 26, 2015, Lewis appointed Hilja to replace Kenton as his attorney in fact and to protect him from Kenton's financial abuse *(see,* Exh. 2).  He appointed Hilja as his health care agent on the same date. *(See,* Exh. 10.)

### B.     Hilja Discovered Severe Neglect Upon Her Return to El Sobrante

50.     Before 2015, Hilja had been estranged from her family for several years, and visited infrequently.  Kenton's sexual, physical and emotional abuse, his methamphetamine operation, and Lewis' and Lucille's inability to acknowledge or address Kenton's conduct required Hilja to distance herself for self-preservation.  The family's insults of her same-sex relationship further contributed to her need for autonomy.

51.     In June 2015, upon first learning that her mother was suffering from brain cancer, Hilja returned from Southern California to assist her parents in their El Sobrante Residence.

52.     Upon her arrival Hilja found them in unsanitary and unsafe conditions.  Lewis had lost weight and was emotionally and physically exhausted.  He told Hilja that

155576 *2101-001                                        11

1    he was unable to take care of Lucille. Lucille's cognitive abilities had diminished.  She
2    was prone to wander and get lost. Both parents suffered from incontinence.

3    53.    Buckets of stagnant water lay around the home. Toilets were crusted with
4    feces and urine. Lucille's and Lewis' clothing was filthy and stained with feces. Food was
5    rotting in the refrigerator. Electrical outlets were loose.  Appliances were unmaintained.
6    Mold had collected on the washing machine. Papers were stacked on tables, including
7    unopened mail and unpaid bills. Twenty-three phone messages remained unheard,
8    including doctor's attempts to schedule chemotherapy and address other care matters
9    for Lucille.

10    54.    Hilja learned that before her arrival a caregiver had found Lewis alone in
11    his kitchen, confused, standing without pants and unaware of feces on the floor beside
12    him.

13    55.    Kenton returned from a trip to Thailand shortly after Hilja's arrival.
14    Sometime before his trip he had moved into Lucille's and Lewis' Residence.

15    56.    Lewis told Hilja that Kenton had told them that he needed to stay for a
16    couple of months while he built his own home. Lewis told Hilja that Kenton would not
17    leave. Lewis feared confronting Kenton or taking action to require him to leave. Kenton
18    never left and continues living at the Residence as his principal home. He never paid
19    rent or utilities while the settlers were living.

20    57.    Kenton had neglected his parents' bills and neglected his father's request
21    that he set up an automatic bill payment system.

22    58.    Hilja took two leaves of absence from her job as an educator to care for her
23    parents and protect them from Kenton.

24    C.    **Kenton Continued Occupying Lucille's and Lewis' Home and Abusing**
       **Them**
25

26    59.    After Hilja came to assist her parents she observed Kenton control them
27    and their interactions with others, including healthcare workers.

28    60.    Kenton removed and concealed Lewis' estate planning documents, original

155576 *2101-001                                    **12**

stock certificates, and other financial records from Lewis' safe and personal files. On or around September 22, 2015, Lewis asked Kenton to return them. Among others, Kenton refused to return an undelivered Durable Power of Attorney document that nominated Kenton as agent. Lewis feared repercussions if he entered Kenton's room to retrieve the taken documents. Lewis responded to the taking by executing an updated Durable Power of Attorney nominating Hilja, instead of Kenton with the assistance of his counsel Peter Sproul.

61.    Kenton used a baby monitor to listen to and control his father's communications when he was outside of his room.

62.    In her final months Lucille suffered from incontinence. Hilja witnessed Kenton respond to an episode of incontinence by chastising and yelling at Lucille. The night of Lewis' death Kent humiliated him by making gagging sounds when Lewis lost control of his bowels.

63.    Kenton routinely yelled at Lewis while he was bedridden. On multiple occasions Hilja observed Kenton standing over Lewis' bed making demands, accusations, pushing his internet-based healthcare agenda, opinions, and causing Lewis' overall distress and withdrawal. Hilja witnessed Kenton's same bullying behavior towards her dying mother.

64.    Hilja wanted to report the abuse to Adult Protective Services (APS). Though Lewis expressed disgust with Kenton's behavior, he asked her not to report it. Hilja respected his wishes.   Lewis pleaded for Hilja to stay at the Residence with him. She stayed to protect him to the extent that she could without reporting Kenton to APS.

**D.    Kenton Neglected and Obstructed Lucille's and Lewis' Healthcare**

65.    Kenton interfered with Lucille's and Lewis' healthcare. He was hostile to their physicians and healthcare providers.

66.    Hilja arranged for her parents to receive home healthcare services. She paid her parents' expenses from Trust assets otherwise designated for her.

67.    Lewis cancelled home healthcare at Kenton's urging. Kenton complained

1     that it was too expensive.

2         68.    Lewis and Lucille could afford home care, but Kenton did not want it to

3 deplete his inheritance. All the while, he owed Lewis and Lucille $75,000 and never

4 repaid it.

5         69.    Kenton promised that he would attend to nighttime care duties that

6 caregivers would otherwise perform. Kenton then refused to perform many of those

7 duties or to attend to Lewis' medication needs.

8         70.    For example, Kenton refused to assist Lewis to the bathroom. When Hilja

9 pressed the need for him to do so while she could not be in the Residence, Kenton

10 refused. He responded,

11                "Marve died after he fell. If dad dies because he falls down in the
12                bathroom, I am not going to feel bad because he was doing
                something he shouldn't have done. I am not going to follow around
13                behind him."

14         71.    Kenton refused to reposition Lewis as required to treat his stage-3 bedsore

15 and prevent new bedsores from forming.

16         72.    Kenton obstructed Lewis' from receiving available renal diet meal delivery

17 services. Hilja attempted to stock the home with medically recommended foods, but

18 Kenton consumed them. He continued consuming Lewis's and his caregivers food after

19 the caregiver requested he stop.

20         73.    Lewis' cardiologist nearly stopped treating Lewis because Kenton

21 interfered with healthcare visits and insisted that his internet research rather than

22 physician's recommendations should govern Lewis' care.

23         74.    When Lucille's doctor and Lewis determined that the time had come for her

24 to receive hospice care, Kenton rejected their advice.

25         75.    Against Lucille's oncologist's explanation that electrode therapy would

26 "torture" Lucille and that she was not a proper candidate for the therapy, Kenton insisted

27 that she receive it, and bullied Lewis to deny her the comfort care she desperately

28 wanted and needed.

76.     Lucille endured such suffering from Kenton's medical neglect that on several occasions Lucille begged Lewis to shoot her.

77.     Once Lucille finally began receiving hospice, Kenton aggravated and intimidated the care providers. One worker stated that she would end services at Lucille's home if Kenton's behavior continued.

78.     Kenton refused to attend healthcare meetings set up by Sutter Home Health for Lewis's intake.  He rejected Sutter Home Health's nurse's recommendations. He yelled at Lewis for attempting to follow their advice.

79.     Kenton also subjected Lewis' to painful dialysis for his end stage renal failure for months after Lewis begged to stop the treatments. Kenton's refusal required Lewis to spend his last months of life enduring an exhausting regimen of dialysis through a port in his neck because his arm port was unusable.

80.     Both Lucille and Lewis suffered under Kenton's control and bullying behaviors until their deaths.

## VI. JURISDICTION

81.     Jurisdiction and venue is in Contra Costa County. The principal place of administration of this Trust is and will remain in Contra Costa County if the Court appoints Ms. Soloway.  Kenton resides in El Sobrante, California. The principal asset of the Trust, the Settler's residence, is also situated in Contra Costa County.

## VII.   NOTICE

82.     Persons entitled to notice include the following:

a)     Kenton Keading, successor co-trustee and son of decedent, 60 Laurel Lane, El Sobrante, California 94803, or P.O. Box 21476, El Sobrante, California; email: biogenicsphd@gmail.com.

b)     Lisa Soloway, C.L.P.F., nominated successor trustee, 755 Solana Dr., Lafayette, CA 94549;

c)     Fernando Ochoa; trust residence occupant, 60 Laurel Lane, El Sobrante, California.

1    *III/*

2    WHEREFORE, Petitioner requests an Ex Parte order as follows:

3        1.   Immediately authorizing Hilja to notice Kenton via electronic mail and U.S.

4            mail at his last known addresses in accordance with Probate Code section

5            851 and Code of Civ. Proc. section 413.10 (allowing service of an 850

6            Petition summons to a person outside the U.S. by court authorization in a

7            manner reasonably calculated to give actual notice);

8        2.   Finding that notice has been given as required by law;

9        3.   Immediately suspending Kenton as trustee, accepting Hilja's voluntary

10           suspension and approving and appointing Lisa Soloway, C.L.P.F., as

11           interim successor trustee of the Trust and each of its subtrusts;

12       4.   Ordering Kenton to account for his actions as attorney in fact, as trustee de

13           son tort, and as cotrustee for the period beginning on February 2, 2015 to

14           present;

15       5.   Setting aside the deed dated December 30, 2015, and recorded on

16           January 8, 2016 as Contra Costa County Recorder document no. 2016-

17           0004063-00, as void;

18       6.   Voiding any lease contract signed by Kenton Keading as lessor of 60

19           Laurel Lane, El Sobrante, California for lack of property ownership

20           authority;

21       7.   Immediately ordering the current occupants of 60 Laurel Lane, El

22           Sobrante, California, to cooperate in allowing Hilja Keading and Lisa

23           Soloway, or both, to enter the Residence to collect and remove Trust

24           tangible personal property listed at Exh. 3, with civil standby assistance of

25           law enforcement; and

26       8.   Ordering Kenton to return to Lisa Soloway, as trustee any and all assets he

27           removed from the Trust or the Residence, including without limitation, the

28           settlors' stock certificates; estate planning documents; vital records;

1    personal vehicle or proceeds from its sale; and rent received from the

2    Residence.

3    Petitioner requests an additional order after hearing

4    9.    Removing Kenton as co-trustee;

5    10.    Accepting and approving Hilja Keading's conditional voluntary resignation

6          as co-trustee;

7    11.    Appointing as permanent trustee and approving her attached fee schedule,

8          charging 1% of the gross trust assets annually, as reasonable subject to

9          any later objection any beneficiary might raise respecting the performance

10         of her duties as trustee.

11   12.    Finding Kenton liable for damages according to proof for breach of

12         fiduciary duty, physical and financial elder abuse, fraud, conversion,

13         intentional interference with expected inheritance, and wrongfully

14         withholding Trust property;

15   13.    Ordering the current occupants of 60 Laurel Lane, El Sobrante, California

16         to vacate the property within 15 days;

17   14.    Confirming that Lisa Soloway, in her capacity as the interim trustee of the

18         Trust, is the legal owner of the following assets:

19         a.    60 Laurel Lane, 21 Laurel Lane and 50 Laurel Lane, El Sobrante,

20               California *(see,* Legal Description at Exh. 1);

21         b.    Charles Schwab Account no. 49625504 *(see,* Schedule A at Exh. 6);

22         c.    Schwab Joint Tenancy Account Nos. 3789-9944 and 1327-2378;

23         d.    US Bancorp Account No. 59943001 (see, Schedule at A at Exh. 6);

24         e.    US Bank Account No. 154300935652 (see, Schedule A at Exh. 6);

25               and

26         f.    All automobiles, furniture, furnishings, crystal, antiques, appliances,

27               silver, jewelry, coins, paintings, objects d'art, and other items of a

28               tangible, personal nature, owned by Lewis and Lucille Keading at

their deaths *(see,* Schedule A at Exh. 6);

15.  Surcharging Kenton and ordering that he pay restitution, compensatory, and exemplary damages in an amount according to proof for his financial elder abuse, conversion, and breaches of fiduciary duty and excluding him from benefitting from elder abuse recoveries;

16.  Ordering Kenton to pay double the value of property that he took from his parents, the trust, or both in bad faith (Prob. Code§ 859);

17.  Ordering Kenton to pay all prejudgment interest, attorneys' fees and costs in an amount according to proof; and

18.  For such other and further orders as this Court may deem necessary or proper.

DATED:  March 14, 2016

HARTOG, BAER & HAND
A Professional Corporation


By: _____
     Jonna M. Thomas
     Attorneys for Petitioner
     *Hilja M. Keading*

EX PARTE PETITION TO SUSPEND AND REMOVE KENTON KEADING ETC.

EXHIBIT F

1  HARTOG. BAER & HAND
   A Professional Corporation
2  David W. Baer, SBN: 99262
   Jonna M. Thomas, SBN: 240261
3  Andrew R. Verriere, SBN: 264674
   4 Orinda Way, Suite 250-B
4  Orinda, CA 94563
   Tel No.:   (925) 253-1717.
5  Fax No.:   (925) 253-0334
   Email:    *dbaer@hbh.law*
6             *jthomas@hbh.law*
              *auerriere@hbh. law*
7  Attorneys for Petitioner *Hilja M. Keading*

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9               COUNTY OF CONTRA COSTA

10

11 | *In the matter of:* | CASE NO. P16-00402 |

12 READING FAMILY TRUST,          ORDER AFTER HEARING ON
   DATED JANUARY 27, 1998         CROSS-BRIEF REGARDING
13                                TRANSFER OF TRUST
                                  PROPERTY AND FINANCIAL
14 HILJA READING,                 ELDER ABUSE

15     Petitioner,

16 v.                             Date:   June 16, 2017
                                  Time:   1:30 p.m.
17 KENTON W. J<F.ADINC. FERNANDO  Dept.:  14
   OCHOA, and DOES 1 to.20,       Judge: Hon. John H. Sugiyama
18                                Trial Date:  June 28, 2017
       Respondents.
19

20     Petitioner Hilja Keading's and Respond.ent Kenton Keading's Cross-Briefs

21 Regarding Transfer of Trust Property and Elder Abuse *(Cross-Brief)* came on for

22 hearing in Dept. 14 of the above-entitled Court on June 16, 2017, al 1:30 p.m.

23 Petitioner appeared by her counsel, Jonna M. Thomas and Andrew R. Vcrriere, of

24 H,n-tog, B.lcr & Hand. Kenton Keading (Kenton) appeared m pro per.

25     The Court, having r0ad and considered the pclpem suhiniLLed iri cunmction with

2G the Cross-Brief, and having hcnrd and considered the oral arguments of the parties,

27 and good catise appearing therefor, the CourL fiuds <1nd orders as follows:

28

2006◆6·210:-001                                    ]
      OH.DER ON CllO.SS-J.m IlsF HEGARDING TH/\NSFEH OF TH DST PHOPEHTY ,\ND f.'INANCl1\L
                                    ELDER /\BIJSI!:

12

1.   After the hearing began, Kenton orally requested that the Court continue the hearing so Kenton could obtain counsel. This request was denied. Among other reasons, Kenton has had ample notice of the need to hire counsel since his former counsel substituted out on January 10, 2017, but Kenton failed to do so for six months.

2.   The deed dated December 30, 2015, attached as *Exhibit A (Deed)*, regarding real property commonly known as 60, 21, and 50 Laurel Lane, El Sobrante (lhe Proper(y) is invalid and set aside. Title to the Property is vested in Eli7..abeth Soloway, trustee of the Keading Family Trust, dated January 27, 1998 *(lhe Trust)*.

3.   At the hearing, Kenton _unequivocally stated that he believes, concedes, and stipulates that the Deed is invalid, and therefore that title to the Property vests in Elizabeth Soloway, trustee of the Trust.

4.   Notwithstanding Kenton's concession and stipulation at the hearing, which jn and of itself is sufficient to invalidate the Deed and confirm ownership with Elizabeth Soloway, trust.cc, the Court made an independent analysis of the validity of the Deed at the hearing. In addition to Kenton's concesswn and stipulation, each of the following points of law indcpendcntly requires the Deed's invalidation.

   a.   Kenton conceded in his briefing that the Deed is invalid.

   b.   Lewis Kead1ng (J,ewis), ns trustee of the Trust, did not grant Kenton written authority Io execute the Deed. As such, the D( cembcr .l2, 201.5, Durable l>ower of ALtorney (DPA) attached as *Exhibi.t. B*, does not satisfy the statute *of* frauds requirement that ;in ;;,.gent havf! wriLLen authoriLy Io convey real property, as the Property was held by Lewis as ln,ls/ee, not as Lewis individually. Lewis signed the DPA indiviclur.1lly, not ᴴ; trustee of the Trust.

c. The terms of the *DPA* did not contain the express grant of authority required to authorize the following types of property transfers:

1) To change the principal's beneficiary designations (Prob Code§ 4264 (f));

2) To gift a principal's property (Prob Code § 4264(c)); and

3) To create rights of survivorship.  (Prob Code § 4264 (e)).

By executing the Deed Kenton purported to perform each of these unauthorized acts.  Each of these subsections of Probate Code section 4264 independently demonstrates that Renton lacked authority to execute the Deed, and, therefore, the Deed is invalid.

d. The Probate Code and the terms of the Trust did not authorize Lewis to delegate the authority to convey real property from the Trust:

1) Section 3.3 of the Trust requires the trustee to sign any instrument that would substanLially affect the trustee's duties, righ_ts, and liabilities. The Deed would have substantially affected the trustee's duty and right to fund the subtrusts, preserve trust assets and distribute the assets in accordance with the Txust terms, among others.

2) The Trust terms expressly bar changes by attorneys-in-fact that substantially alter the distribution of the estate: "[T]hc power to amend, rvol<e,  or terminate this.trust. .. may be exercised only if distribution of the f.staLe ... is not substantially a tered by the amendment, i·evocation, or tcrminati on ...." (Trust,§ 3.10.)  This tr;insfer would have substantially altered the Trust estate's distri.hntion . .

3) The 'f·rust directed that only the trustee cuuld Lnmfo ı·Trust prop\-;rl.y--not beneficiari.cs and noL setLio rs. ('l'rust ,it § 7.9(8))

14

4)  The Trust required the trustee to retain the Property in the Trust because Lewis used it as his personal Residence. (Trust at § 7.17)

Each of these reasons independently results in the invalidity of the Deed.

5.   Elizabeth Soloway, C.L.P.F., appointed by this Court as successor trustee of the Trust, is confirmed as the title owne1· of the Property legally described as set forth in *Exhibit C;*

6.   This is not a complete adjudication of all of the merits of any of the causes of action contained in Hilja's Petition, including, but not limited to, Hilja's ca\1se of-action pursuant to ProbMe Code section 850 for return of the Property to the Trust, because, among other things, elements of such causes of action, including, but not limited to, damages under Prob. Code § 859 remain to he decided at trial.

7.   The Court defers the issue of whether Kenton's actions in executing the Deed can constitute financial elder ab·use for trial before Judge Weil on June 28, 2017, along with all other undetcrrniuetl factual issues in this matter, including, without limitation, whether the Co11rt should award elder abuse damages, Probate Code section 859 damages and other requested remedies.

IT 18 SO ORDERED.

DATED: ___JUN_2 3 2017___  —

JC.:..J H SUGIYAMA

,JUDGE OF THE SUPERIOR COURT

Approved as to Form:

Renton J{.cading

200646*2101·001

EXHIBIT G

Recording Requested By

*KI.'_,, l(c; ;,/1 '-*

when recorded mail document to:

. ·K'c', r, f t_A b1 t{..

po ox ').1 '-11 c

*EL SOBRANTE, CA 94820*

APN: *t/J /-050--001/ / r,?/-06-0 .006*

.1

```
COHTIV. COSI ρ Co Racorder Olllco
JOSIPII CANCIAMIII .  Clerk-Recorder
DOC-   2016-0004063-00
Friday, JAH 08, 2016  16:19:46
SLR    S10.00 \CEM    S9.50 \MOD    S7.00
REC    S17 .00 \FTC    S6.00 \RED    S3.00
ERO    1.00l
lllPd   SS150   Hbr-0002483634   rrc  I  RD/  1-7
```

Ilbo"l Spaco tor Recorders Ule Only

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
DOCUMENTARY TRANSFER TAX Is$ llQltT' \8 .tT ,Uc, 1{1J0/1o/r<,t;<i!Q{..i}

[ ] computed on full value of property conveyed, or
[ ] computed on full value of items or encumbrances remaining al limo of sale,
Unincorporated area   [ ] City of _ _ _ _ _ _ _ _ _ _

FOR A FULL VALUABLE CONSIDERATION. receipt of which Is hereby 3cknowledged, If'v/S    (?.

*f<[AP;NC,, 7 t.Us'1ft' or- 1/JE /([Ai)11v& Flft'i?l  Y TRU5?: Otta:/>* j't\NVLJR)'.'2/, tff(;

hereby GRANT(s) to */. "i:tv(f C. f:'ff,,J)r-11, A"Y1)  Kt/'fr:f/ 4l, l(C;J,/6   /t,f:(O1i{I Tc/(A'(73"*

the following described real property in the County of _ {)OAIJ??fl  CCX:yA _ _ _ _ _ _ , State of California.

S E E  *D<'f!IP/h",AI' ./f7TIlcnLf.1>*

Dated: *DECEMBER 30 2015* _ _ _ _ _ _        .. *cJeO< crk LJ / ,/1 fi.. &dl;A*

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

*LtLvls C ftAJtd& 91d(i.qctf tfp;y'b /l'4*

rrtr1ev tla,TlC(a) d Gr.1110,r.;

┌─────────────────────────────────────────────────────────────────────┐
│ A notary public-o, olher otncer complol;n thl• rortlfic.atr. verifies only rho ldenmy ol fle lOdMoual who signed lho c.Jocumenl lo which lhis │
│ cortlfocole is n1tachod. and not lho tNlhfulnc.ss, occu,ocy, or volldily of lhol documel. _ _ _ _ _ _ _ _ _ _ _ _ _ │
└─────────────────────────────────────────────────────────────────────┘

On *a.6JD \S* _ _ _ _ _ _ J _ _ before me. (\\"f.'O.J _ Ul \9
_ _  _ . Notary Public, person3lly appeared _ _ _ _ _ \oc o _ _ _ _ proved lo mo on
the basis ol saUsfactory evidence *to X* u,c porson,cs) whoso nah\e ;;i;;e-ubs ribed   to t11e-Within Insll\Jmenl and
ackn01,vlcdged to me lhol hc/she,'il"°Y-cxccU!cd the some h hl-r-authorizod   c:opacity{.   and that by his/>auihoir
i_gnaturcs(«on the ins:rurncnt the persan,M, or rho onttty 11pon bP.half of which the person).)1 acted, executed the
I strumenl. I cortify under PE JAL Y OF PERJURY under lhe laws ol lhe Slate of Cal!fornia lhol the foregoing parogmph is
true .ind cnrrcct.

WITNESS my hand and official seal.

Signature _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

```
CORINA DIGRAZIA
Commission # 2024352
Notary Public - California
Contra Costa County
My Comm. Expires May 17, 2017
```

MAJL TAX STATL.1'>\(NT5 TO PM TY SHOWN CN TIIE rou.ow1N G LINE:  F .Jo PArlT'( s o SIIOVJ/I, MAJL AS DIRECTED ABOVE.

Name                    SkCOl Addr                    CityS1<fle&Zjp

EXHIBIT "1"

\\
Property one

Those parcels o.f land in the County of Contra Costa,. St.u'l:e of·
California, described as follows:

PARCEL ONE

Portion o.f Lot 25, as designated on the map en·ti.tled. "Map of Rancho
El Sobrante, accompanying and .formin a part of the'final report of the
Referees in Partition o.f said Rancho , which map. was filed lll the office
of the Recorder of the County of Contra Costa, State.of California, on
March 14, 1910, descri ed as follows:

Beginning on the northwest line of the parcel of land-described in
the deed o.f tru5t made by John G. Nelson, et ux, to trustee for The
Mechan1c3 Bank o·J:Rich.inond, recorded July 17, 1950 in Volume 1595 of
Official Records, at page 274, at the most easterly corner of the parcel
or land described as ·Parcel.One iri the.deed 'from Ra;I.ph ʷ. Johnson, et
me, to William F. Bottoms, et ux, re.corded January, 6, 1953 in Volume
2051 o:r Off':l.cial Records, at page lJt6; thence from said·point of begi'nh'.in.
along the exterior lines of s.aid Bottoms parçel (2051 OR 146), as follows
North 54  11 ¹ 30" west4 93.86 feet; north 23  51 ¹ 30" we·at, 106,7 feet;
north Tl 28 ¹ east, 19. 1 f'eet; north 28 .26 ¹ 30" eu:1t, 19 ;95 .feet and
no:r.th 29'l 49¹ west, uo.09 f'eet to the.north.-line of the parcel of land
described as Parcel Qlle in ·the deed from John G. Nelson" ct ux, to,.Ralph
W, Johnson, et u.x recorded Apri1 10, J:950 1.n Volume 1535 of o.rn.cial
Records, at pap;e 45; thence alone; the .general northerly line o.r said;
Johnson parcel.as i'ollows: North .89  3'7¹ east;, 55,:50 feet; north 61 ` .ʸ
07' east, 84 .30 feet· and south .35 .38 ,,·30• ¬ea:3};, .76:38 feet to ·an· angle.-:
poill;t therein; ·thef:Ce south 35  38J .;·, …ⓐ.s,:: ,,.:'80 ·!,'ee·t;',thence  so 'ther y·
in a direct, ·11ne 'to tl'ie ·northwest corn!!r: ol  saio)ueac:I of.:trust·p?ræ:i: ¹
(1595 OR 2,74).·;·thence. nouth 30 .:·.36•¬:;30'.ʷe·t', .:along·::·thc'.northwesv .;t: lje
of said aeed ·.'o.ftrust·parcel,. (1595·•.Qlr.27ll:)-, ··1,:1;3: 5 .feet to the point of
0 -j- in ·.

PARCEL TWO·

"A right of' way (no't to be.exclusive)" cre·ated in rel'erence to the
Dr'emises in the deed :from Ralph W. Johnson, et ux, ʟo Sheldon School
Dintrict o.r Contra Costa County, dated. November .13, 1951· und recorded·
December 19, 1951 in Volume 1867 of Official Recorcl3, at page. 562, '.'for
use an a roadway f:or vehicles o.r all kinda, pc:tleljtrianl'\ and an:l.mals,.
for water, gaa, oil and.se er pipe linen,.and for telephone, electric.
:U.ght and power 1:l.neo, together with the neceosary polen. or· conduit11 .
to carry sa.id lines over a portion of Lot· 25, CD· designated on _the map
entitled ·"Map o1· the Ran.cha ¬El S'obra·nte, accompa ny1·ng and forming :! part
of the .final report o*f:* the Referees in Partition ɑ· said Rancho", which·
map wan filed in the o.f.fice:of the Recorder of the County f Contra Qosta
State o.f California, on March 14, 1910, being a ncrip of land 5o·reet 1n
ddth dcocribcd an rnllows:··

Beginn.1ng a l, the northwr.r.t cornor or the 0 3;:;5 of an acre parcel

−1−

or land des ribed as ?a reel One in the dee-1 from ;Joseph B. Jenkins to
Olney R, M9rse, et ux, dated May 11, 1949 and recorded May 24, 1949-in
Volume 1391. of 0.ff⁴ci l Records, at page 98; thence f'rom said Point or
beginning· south 69  20¹ east along the northeast line of said Morse par-
cel, 118 fe t to the nost easterly corner thereof; thence south 21° 16¹
west along the sou!hc Mt line of said Moree parcel and along the direct
extenaion. south 21  J..c'we st there::;r,  304.14 .feet; 'thence south 69° 201
east, 445. 8 6 feet; th·.•,1cc south 77  06¬ east, 156 ,27 .feet to the center
line of May Road; t!Y:::œ north 15  55' east along said center line, · 50. 0E
feet; thence north 7 .° 06 ¹ west, 155.51 feet; thence north 69° 201 west,
391,94 **feet**; thence north.21  16¹ east, 304.14 **feet**;  thence north 69°·20¹
west, 168 :feet to ıı point which bears north 21° 16¹ east, 50 :feet rrom
the point o.f beginning; thence south 21° -16' went, 50 feet to the point
or beginning'.'

                         PJ\RCEL THREE

        A right. or way (not to be exclusive) a::ian appurtenance to Parcel
One above, .for use as a roadway for vehiclea of ull kinds, pedestrians
and animals, for \'lc.'.tergas, oil and sewer plpe linen, and :for .t.elephone,
electric light and power lines, together \1lth the n,ecessary poles ·o
conduits to carry s2id lines over a portion of Lot 25, as'designated on
the map entitled "hap of the Rancho El Sot;rante, accompanying rind form:1.ng
a part of the .final report of the Re:rereef:I in Partition or said Rancho";
which map l-7ús filed in the office of the Recorder or the County of ·contra
Costa, State o-J:Calif'Ot'n:l.a, on March 14,. 1910, being a strip or· land 25
feet in width, desci•ibed as follow::i:

        ·· Beginning at the point des:lgnated as Station "1¹' in t!)e description
of' Parcel One in the deed .from Ralph W. Johnson, et ux, to Will.1.am F.
Bottoms, et u.x, recorded January 6, 1953 in Volume 2051' of Official
Records, at page 1113; thence from said point oi' beginning  south' 82° 24¹
30 ¹¹ east,  34.5 :feet; thence north 77  29.' oaot, .178,42 :feet to an angle
point .in th west line of the  arcel 0£ la d deacribed in the deed from
Relph W, Johnson, et ux, to Sheldon School District of  ontra Coot
County,  da t c Nove:-,ber 13, 1951 and recorded DecE!mber 19, 1951 in Volume
1867 or Of i ial Records, at page 562; thence north 21  16¹ east along
said west lin::, 30, 0 8 feet; thence? south 77  29' , est, 190.72 feet;, thenc•
north 82  21:' 30 ¹¹ we t, 15.e8 .feet t-0 ci pnirt "'hlch bears north 26  59'
ea::it I'ronl th<::point or .beginning; thence sol,.;th26'' 59' west to tr:iepoint
or bcginnini;.

PARCZL FOUR


.A right of way (not to be exclusiv ) ns an appurtenance to Parcel One· clbov , for use. as a roadway for vehi'cles o.r all kinds, pedestrians . and ani ,12ls, for.water _ga::i, oil and sewer·pipe lines and..for telephoz:i.e, electric light and power lines, together with the necessary poles or condu:Lts· to carry sDid lines ·over a port: on of ·L t 25, as design·a te d on the map entitled ."Map o i'the 'Rancho El SoI.:>rante, accompanying and .forming a part .cf the· .final r port of the Refer es in Partition of.·said .Rancho'.! ·; which m2.;:;was filed i.:-t:":.eoffice of thz Recorder of 'the :.Cow:lty .of ·'contra Co::ta, State o::.Calii'ornia; on March 1.4, 1910, being a·s.trip'oi' land-25, eet in wj_dth, the south line o.r whlcl:1,1 ·:!escribed_as fo llowa:.:.

Beg1nn.1ng at the point designated. :u Station "A" in the .ct ·scrlptlon of Parcel One 1.1 the· deed .from Ralph W ..JoJ-o:ison, et ·u:x:,to William F..' Bottoms, ct ux, recorded January 6, 1953-in VolU1'T\e 2051 of Official· Records, · 2 t page lL\3; thence from said ;;>olnt of beginn.i north ·82 24 1' 30 ", ,.,est, 97 ,85 .feet t.o-the east line o ' Parcel One abov.':!.,:·

The e.Duterly te:rminuu of said strl;:- 'is•the west 'line. •o'-rsaid . Bottoms parce.1 (2051 O!" lll3) and the westerly terminus .thereof 1 .the east line of Parcel One above.

-3-

20

£XHIB!T nA"

PA.JP £ /\/Y TLVC.

50 Laurel Lane, El Sobrante, Contra Costa County California
Contra Costa County Assessor's Parcel No. <131-050-006

All that real property situated in El Sobrantc, Contra Cosca Cowi.ty,
State of California, described as follows:

### PARCEL ONE

A portion of Lot 25, as designated on the map entitled "Map of Rancho
El Sobrante, accompanying and forming a part of the final report of
the Referees in Partition of said Rancho", which map was filed in the
office of the Recorder of the County of Contra Costa, State of
California, on March 11, 1910, described as follows:

Beginning at Station "A", in.the description of Parcel One in the Deed
from Ralph w. Johnson et ux, to William F. Bottoms, et u.x, recorded
January 6,, 1953, in Volume 2051 of Official Records, at Page 143;
hence from said point of beginning N 26" 59' E, 06.71'; hence N 11•
36' 30" E, 73.76'; hence N 9• 08' 40" W, 84.06'; hence N 65° 25' JO"
E, 107.32'; hence S 89° 20• E, 78.91'; hence S 35• 30' JO" £, 90';
hence southerly in a direct line to the Northwest corner of said Deed
of Trust Parcel (1595 OR 271); hence N 82° 21' )O" E, 97.A5' to
Station "A", the point of beginning.

### PARCEL TWO

"A right of way (not to be exclusive)" created :in reference to the
premises in the deed from Ralph W. Johncun, et ux, to Sheldon School
DisLrict oE Contra Costa county, d.:ll:ed November 13, 1951 and recorded
December 19, 1.951 in Volume 1867 of Off.i.cial Pecord!.., ar. page 562.
"for use as a roadway for vehiclea of all kinds, pec.lentrians nnd
animals, for water, gos, oil and sewer pipe lines, and for telephone,
electric light. and power lines, together with the necesGar:y poles or
conduits to carry said lines over a porlion of Lot 25, as designated
on the map entitled "Map of the Rancho El Sobrnnte, accompanying and
furmin  a part of the final report of th RefelPrs in Partition c[
said Ra.ncho", which map was filed in the oi:Cicc,, of the Hecorc.ler of the
County of Contra Costa, State of Cali(orni;i, on M.irch 14, 191U. betng
a strip of land SO feec in width described  o follo o,

Beginning at the no-rt.hwest corner: of the o. 365 o/ ;in acre parcel of
lnnd described as Parcel One in the deed !:ram Jo::.qrh B. Jenkinc 1:0
Olney R. Morse, et ux, dated May 11, 1949 and recorded May 21, 1949 in
Volume 1391 of O((icial Records, at page 90; thence from c.,id point of

beginning south 69" 20' east along the northeast line of said Morse
parcel, 118 feet to the most easterly corner thereof; thence south 21·
16' west along the southei.lst line of said Morse parcel and along the
direct extension south 21· 16' west thereof, 301.11 fee 1 thence south
69˚ 20' eaRt, 145.R6 feet; thence south 77˚ 06' eaat, 156.27 feet to
the center ine of May Road; thence north 1s· 55' east along said
center line, 50.06 feet; thence north 77· 06' east, 155.Sl feet;
thence north 69· 20' west,, 391.91 feet; thence north 21· 16' east,
.301.11 feet; thence nqrth ⊖9˚ 20' west, 168 feet to a point which
bears north 21˚ 16' east, so Eeet from the point of beginning; thence
south 21· l.G· west, SO feet to the poi.nt. of beginning."

## PARCEL THREE

A right of way (not to be exclusive) as an appurtenance to Parcel One
above, for use as a roadway for vehicles of all kir.ds, pedestrians and
animals, for water, gas, oil and aewer pipe lines, and for telephone,
electric light and power lines, together with the necessary poles or
·conduits to carry said lines over a portion of Lot 25, as designated
on the map entitled "Map of the Rancho li:lSobrante, accompanying and
forming a part of the final report of the Referees in Partition of
said Rancho", which map wac filed in the office of the Recorder of .the
County of Contra Costa, State of California, on March 1'l, 1910, being
a strip or land 25 feet in width, described s follows:

Beginning at t:he point clcsignat:ed as Station"/\" in the dcccription of
Parcel One in the deed from Ralph W. Johnson, et W<, to William F.
Bottoms, et ux, recorded Jvnu ry 6, 1 53 in Volume 2051 of Officjal
Records, at page 143; thence from said point of beginning south 02·
24' 30" east, 3-1.5 feet; thence north 77· 29' east, 178.42 feet to an
angle point in the west line of the par.cr.l of land described in the
deed from Ralph w. Johnson, et ux, to Sheldon School District of
Contra Costa County, dated November 1.3, 1951. aiid recorded December 19,
1951 in Volume 1067 of Official Records, at page 562; thence north 21'
16' easl: along said west: line, 30.08 feet; thence souc.h 77" 2.9' west,
190.72 feet; thence north 02˚ 2<1' 30" west:, 15.88 feet to a point
which bears north 26" 59' e.ist from c:he point of beginning; thence
south 26" 59' west: to the point of begirulln9.

## PARCEL FO!JR

A right of way (not to he exclusive) .:,:,.n ,lppurtenoncc to Parcel One
abov(:, fot· use ilS a roadlvay [Or. vehicles ot ull l<ir<.ls, petlestrianc and
animals, for ,ater, g<ls. oil ,ind· sew<>r pipe lines ,"lrd for te.lephone,
electric lighi-. und power li.nes, lD<(P.t:het· wiu, 1:he ncceorrnry poles or
conduits to carry said line:. over a portion of Lot 25, as designated
on the map entitled "Mnp of: ::.he R;incho 1':J:,ol)r;inte, .:iocmpany"ing and
forming a pare of the final repo t c[ the M.fcrecs in Partltion o(
said Hancho", which mop wos filed in the office of .he Recor.der Œ the
County o( ConLri.l Co;;ta, St3te of' caJi[u,ni.;, ui: Marr:h 1l, 1910, befng

a strip of land 25 feet in width, the south line of which is described aʒs follows:

Beginning at t:he point designated as Station "l\" in the description or **Parcel** One in the deed f.rom **Ralpn** w. Johnson, et u.x, to William I:'. Bottoms, et \l.X, recorded January 6, **195J** in Volume **2051** of Official Records, at ·page 143; thence from said point of beginning north 02• **24'  JO"** o;est, **97. 85** feet **to** the east line of Parcel One **above.**

The easterly terminus of gaid strip is the west line of said Bottoms parcel (2051 OR 143) and the wegterly terminus thereof is the eaot line of Parcel One above.

RND  OF  OOCO"HIl.NT

END OF DOC

2

EXHIBIT B

1  HARTOG, BAER & HAND
2  A Professional Corporation
   David W. Baer, SBN: 99262
3  Jonna M. Thomas, SBN: 240261
   4 Orinda Way, Suite 250-B
4  Orinda, CA 94563
   Tel No.:   (925) 253-1717
5  Fax No.:   (925) 253-0334
6  Email:   dbaer@hbh.law
            jthomas@hbh.law
7  Attorneys for *Petitioner Hilja M. Keading*

8              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                      **COUNTY OF CONTRA COSTA**

10

11 *In the matter of:*                    | CASE NO.

12    KEADING FAMILY TRUST,               | **EX PARTE PETITION TO SUSPEND**
      DATED JANUARY 27, 1998              | **AND REMOVE KENTON KEADING**
13                                        | **AND APPOINT SUCCESSOR TRUSTEE**
14 _____    | **OF THE KEADING FAMILY TRUST**
                                          | **AND ITS SUBTRUSTS, TO CONFIRM**
15 HILJA KEADING,                         | **TRUST OWNERSHIP OF PROPERTY;**
                                          | **FOR INTENTIONAL INTERFERENCE**
16        Petitioner,                     | **WITH EXPECTED INHERITACE;**
                                          | **FRAUD; CONVERSION; AND FOR**
17 v.                                     | **ELDER ABUSE**
                                          | **[Prob. Code §§ 17200, 4541 and 850]**
18 KENTON W. KEADING, FERNANDO
   OCHOA, and DOES 1 to 20,               | **DATE:   March 15, 2016**
19                                        | **TIME:   9:30 a.m.**
        Respondents.                      | **DEPT:   Room 210, Dept. 14**
20 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ '  |

21

22        Petitioner Hilja Keading *(Hilja),* co-trustee of the Keading Family Trust dated

23 January 27, 1998 *(Trust),* is physically fearful of Kenton and unable to administer the

24 Trust with him due to his history of physically, sexually and emotionally abusing her, his

25 felony methamphetamine manufacture, sale and firearm possession conviction history,

26 his refusal to follow the Trust's terms, his attempts to transfer all Trust assets to himself

27 and unknown third parties, and his recent disappearance to Thailand. She petitions the

28 Court for the following ex parte relief:

155576 *2101-001                                1

**EX PARTE PETITION TO SUSPEND AND REMOVE KENTON KEADING ETC.**

1  (1) to suspend her co-trustee Kenton Keading *(Kenton),* and pending any

2     contested hearing to approve Hilja's voluntary suspension;

3  (2) to appoint Elizabeth "Lisa" Soloway, C.L.P.F. as interim trustee;

4  (3) to set aside the deed, dated December 30, 2015 by which Kenton,

5     misrepresenting himself as his the attorney in fact of his father Lewis

6     Keading *(Lewis),* attempted to transfer Trust real property at 60, 21 and 50

7     Laurel Lane, El Sobrante, California *(Residence)* from his father as trustee

8     to himself. The December 30 2015 deeds and preceding deeds in the

9     chain of title are attached as ***Exhibit 1.*** Lewis' Durable Power of Attorney

10     appointing Hilja as his agent is attached as ***Exhibit 2;***

11  (4) to set aside any lease contract signed by Kenton representing himself as

12     the owner of the Residence;

13  (5) authorizing Hilja and Lisa Soloway to enter the Residence with civil stand-

14     by assistance of law enforcement to identify and retrieve tangible personal

15     property listed at ***Exhibit 3*** and to maintain it in the Trust pending hearing;

16     and

17  (5) to approve notice and summons service to Kenton at his last known

18     address by U.S. mail and electronic mail, because he has fled to an

19     unknown location in Thailand. (See, Prob. Code§ 851.)

20  Hilja also requests the following relief at a noticed hearing:

21  (1) to remove Kenton as co-trustee;

22  (2) to approve Hilja's resignation contingent on Kenton's removal;

23  (3) to appoint Elizabeth "Lisa" Soloway, C.L.P.F. to succeed as permanent

24     trustee of the Trust and each of its subtrusts;

25  (4) to recover from Kenton all real property, a vehicle and investment assets

26     that Kenton attempted to transfer from the Trust to himself and third

27     parties; and

28  (5) to hold Kenton liable for damages resulting elder abuse, fraud, conversion

**EX PARTE PETITION TO SUSPEND AND REMOVE KENTON KEADING ETC.**

1    and intentional interference with expected inheritance.

2    **I.   SUMMARY OF EMERGENCY CIRCUMSTANCES**

3    Surviving settlor Lewis died on January 4, 2016.  His children Hilja and Kenton

4    are the beneficiaries of the Trust. During Lewis' final months and since his death Kenton

5    has fraudulently attempted to take all the Trust assets for himself. Kenton began his

6    efforts to take his parents' assets for himself after his recent release from a fourteen year

7    prison sentence for methamphetamine manufacturing and sale and for possessing

8    multiple firearms while conducting his operation. (See, *e.g.,* **Exhibit 4,** Contra Costa

9    County Case No. 010328-3.) Emergency relief is necessary to preserve Trust property

10   from destruction, conversion, and potential use in criminal enterprise.

11   Hilja recently discovered that five days before Lewis' death, Kenton secretly

12   executed a deed, falsely representing himself as Lewis' attorney in fact, attempting to

13   transfer the settlers' Residence and adjoining real property from the Trust to himself and

14   Lewis as joint tenants. (See, Exh. 1.) He recorded it four days after Lewis' death with an

15   affidavit of death of trustee, attempting to take the Residence by right of survivorship.

16   Kenton knew that Lewis had appointed Hilja as his attorney-in-fact on September 26,

17   2015 and that he was not Lewis' agent. *(See,* Exh. 2.) No attorney-in-fact had authority

18   to transfer real property from the Trust. Lewis served as trustee of the Trust until his

19   death and, in that capacity, was the only person with the authority to transfer the Trust's

20   real property. (A copy of the Trust and Will are attached as **Exhibits 5 and 6***; see, e.g.,*

21   Exh. 6, Trust, at Art. 3.10, directing that no agent can exercise the settler's power of

22   revocation or amendment if the exercise would substantially alter the settler's intended

23   dispositions.)

24   On the weekend of February 27, 2016, Hilja learned through a concerned

25   neighbor that Kenton had fled to Thailand after leasing the Residence to one of his

26   associates, Fernando Ochoa, and, that Kenton had sold the settlors' 2008 Chrysler

27   vehicle, VIN 2C3LA63H28H284774.  The Department of Motor Vehicles *(OMV)* confirms

28   that the sale occurred.

1    A witness also informed Hilja that Kenton forced Lewis to sign a stock certificate

2    from himself to Kenton while Lewis lay on his deathbed, unable to see what he was

3    signing. That Kenton has fled to Thailand increases the risk that he will dispose of funds

4    that he wrongfully procured.

5    Absent court order, law enforcement cannot assist Hilja to enter the Residence to

6    protect Trust assets or gather financial records that she needs to meet April 2016

7    property and income tax filing deadlines. Hilja or a successor trustee needs access to

8    Trust accounts to pay Trust property and income taxes due in April 2016, homeowners

9    insurance due in June and outstanding debts to her parents' end of life care providers.

10   Without Kenton's suspension or cooperation all Trust accounts will remain blocked.

11   Kenton refuses to pay property taxes and has lost other properties in forced sales

12   resulting from his failure to pay property taxes.   (See, Exh. 4.)

13   The Court may set aside the December 30, 2015 deed on an ex parte basis to

14   allow Ms. Soloway to marshal and manage the Residence while litigation is pending.

15   For instance, Probate Code section 17200(b)(2) authorizes the Court to find that the

16   Trust did not allow any person acting as attorney in fact to transfer property from the

17   Trust. Probate Code section 4541 (a) authorizes the Court to determine that Kenton did

18   not hold a valid power of attorney to act for Lewis when he executed the deed.

19   Petitioner further alleges in greater detail as follows:

20                               II.  **THE ESTATE PLAN**

21   1.    Settlers Lewis and Lucille W. Keading *(Lucille),* both now deceased,

22   executed the Trust on January 27, 1998.  (See, Exh. 6.)

23   2.    Lucille died on September 10, 2015. Lewis died on January 4, 2016.

24   3.    The Trust and its subtrusts are now irrevocable.

25   4.    The beneficiaries of the Trust and its subtrusts are Hilja and Kenton. Hilja

26   and Kenton are the settlers' only children.

27   5.    The Trust nominates Hilja and Kenton to succeed Lewis as co-trustees.

28   (See, Exh.6, at Sec. 7.2.)

155576 *2101-001                           4

6.      The Trust requires that if Hilja and Kenton are unable or unwilling to serve as successor trustees then a new trustee or co-trustees shall be appointed by the Court. *(See,* Exh.6, at Sec. 7.2.)

7.      By his Will dated January 27, 1998, Lewis named the trustees of his trust as sole beneficiary of his estate. *(See,* Exh. 5, at Section 2.1.)

8.      The following assets are beneficially owned by the Trust:

      a.  60 Laurel Lane, 21 Laurel Lane and 50 Laurel Lane, El Sobrante, California *(see,* Exh. 1);

      b.  Charles Schwab Trust Account no. 4962-5504 *(see,* Exh. 6, Schedule A);

      c.  US Bank Account no. 154300935652 *(see,* Exh. 6, Schedule A); and

      d.  All automobiles, furniture, furnishings, crystal, antiques, appliances, silver, jewelry, coins, paintings, objects d'art, and other items of a tangible, personal nature, owned by the settlers at their deaths *(Id.; see also,* Assignment at Exh. 6, and list of tangible personal property at Exh. 3).

9.      Lewis and Lucille also owned two Schwab joint tenancy account nos. 3789-9944 and 1327-2378. Those accounts collectively hold $84,117.04. Lewis' Will directs that those accounts be distributed to the trustee of the Trust.

**III. KENTON TRANSFERRED OR ATTEMPTED TO TRANSFER THE SETTLORS' RESIDENCE AND OTHER ASSETS FROM THE TRUST TO HIMSELF**

10.      Kenton is angry that Hilja is an equal beneficiary with him under the terms of the Trust as amended and believes he is entitled to all of his parents' assets. He has attempted to transfer the Trust property to himself to exclude Hilja from inheriting anything under the Trust.

**A.      Fraudulent Transfer of Title to the Residence.**

11.      On January 8, 2016, four days after his father's death, Kenton recorded a deed purporting to transfer to himself and his father, as joint tenants, Lewis' Residence

at 60 Laurel Lane, 50 Laurel Lane, El Sobrante, California. *(See,* Exh. 1, deed and legal description.)

12.     Kenton executed the deed in secret as his father laid on his deathbed on December 30, 2015.

13.     Kenton signed the deed misrepresenting himself as his father's attorney-in-fact. On September 26, 2015, Lewis had executed a Durable Power of Attorney (OPOA) appointing Hilja to act as his attorney-in-fact. (See, Exh. 2, DPOA.)

14.     Kenton knew that Lewis had appointed Hilja to serve as his attorney in fact when he executed the deed.

15.     The Trust terms do not permit a trustee to delegate trustee authority to an attorney in fact. *(See, e.g.,* Exh. 6, Trust, at Art. 3.10 directing that no agent can exercise the settler's power of revocation or amendment if the exercise would substantially alter the settler's intended dispositions.) Only Lewis, as trustee, had authority to transfer the Trust's real property on December 30, 2015. Kenton has never held sole authority to transfer it at all, much less to himself.

**B.     Fraudulent Lease and Fraudulent Sale of Vehicle**

16.     On Friday February 26, 2016, Hilja requested that the Richmond Police Department send an officer to the 60 Laurel Lane property to perform a welfare check. She made the request after learning from witnesses that Kenton had sold her fathers' Chrysler vehicle, that one of Kenton's associates Fernando Ochoa and others appeared to be· living in the Residence, Kenton did not appear to be at the Residence, a tree had fallen down, and that multiple visitors had been coming and going for brief visits.

17.     Prior to his disappearance Kenton had been using the Chrysler that Lewis had assigned to the Trust. (See, Exh. 6, Schedule A and Assignment.)   The OMV confirmed on February 29, 2016, that Kenton had sold the car. He kept the proceeds for himself.

18.     When Officer Walter Patrick arrived at the Residence, he spoke to Mr. Ochoa.   Mr. Ochoa informed Officer Patrick that Kenton would be in Thailand for sixty

1   days.

2       19.     Prior to Kenton's disappearance to Thailand, Kenton informed Hilja that his

3   phone did not work and suggested that she direct correspondence to his email address.

4   Hilja infers that Kenton fled from the United States approximately three weeks ago.

5       20.     When Officer Patrick questioned Mr. Ochoa, Mr. Ochoa told the officer that

6   Kenton drafted a lease agreement for Fernando to live at 60 Laurel Lane. Mr. Ochoa,

7   however, did not produce a copy of the agreement.

8       21.     Mr. Ochoa now drives Kenton's black Honda, license plate 6Z0E743.

9       22.     Neighbors are concerned by the activity they observe at the Residence.

10  Additional individuals appear to be living in the property. An unusual number of

11  individuals come and go from the property for short visits.

12  **C.    Title to Securities**

13      23.     A witness informed Hilja that approximately two days before Lewis' death

14  she observed Kenton stand over Lewis' bed and force him to sign over at least one stock

15  certificate to Kenton.

16      24.     On January 8, 2016, Kenton informed Hilja that witnesses signed a

17  document stating that Kenton had not committed elder abuse. Kenton did not allow the

18  witnesses to see the documents that they witnessed Lewis sign. Hilja is informed and

19  believes that the witnesses will repudiate the documents that Kenton tricked them into

20  signing.

21      25.     Hilja is in the process of determining what other assets Kenton took from

22  the Trust or Lewis while Lewis was dying or after Lewis' death.

23                          **IV. SUSPENSION AND REMOVAL**

24      26.     Kenton's self-dealing and attempts to take Trust property command his

25  immediate suspension and removal.

26      27.     Hostility also prevents the co-trustees from administering the Trust

27  together.

28  *II II*

155576 ·2101-001                              7

A.    **Kenton Refuses To Administer the Trust With Hilja**

28.    Kenton has refused and is presently unable or unwilling to communicate with Hilja about the Trust and its administration, and was unable or unwilling to assist in arranging for Lewis' funeral. For instance, after Lewis died Kenton lifted a wheelchair to throw it. Hilja pleaded with him not to do so and he did not. He stormed off from the Residence.   Upon his return he isolated himself in his room, while Hilja communicated with the coroner and made funeral arrangements. Kenton's inability or unwillingness to communicate with Hilja continues as he is in Thailand.

29.    Kenton and Hilja orally agreed that they would both resign as trustees and would appoint a private professional fiduciary to administer the Trust.

30.    Relying on Kenton's oral representation, Hilja engaged counsel to identify a private fiduciary and to prepare papers necessary to appoint the person counsel identified, Elizabeth "Lisa" Soloway, CLPF, to serve by Hilja's and Kenton's mutual consent. After Hilja's counsel prepared the papers, Kenton refused to cooperate.

31.    Kenton told Hilja that he was instead working with Lewis' counsel Peter Sproul to appoint a successor fiduciary.   But, Peter Sproul informed Hilja's counsel that Kenton had never requested his assistance for that or any other purpose, other than to receive copies of Trust documents.

B.    **Kenton's Criminal Activities Render Him an Unfit Candidate to Serve In a Fiduciary Role**

32.    Hilja is physically fearful of Kenton.

33.    Kenton is a convicted felon. Recently, Kenton was released from prison after serving a fourteen year felony sentence for methamphetamine manufacture and sale and for possessing firearms in connection with his operation. *(See,* Exh. 4, Kenton's conviction history relating to his methamphetamine operation.)

**34.**    Kenton continues to engage in suspicious activity consistent with methamphetamine use, trafficking and production including

a.    exhibiting irrational and erratic behavior,

155576 ·2101-001                                         8

b.      failing to make eye contact when communicating,

c.      frequently disappearing from his usual residence for long periods without explanation,

d.      making frequent extended trips to Thailand, a country infamous for its drug trade and child sex trade, and

e.      failing to engage in lawful employment.

**C.   Kenton's Sexual, Physical and Emotional Abuse of Hilja Precludes the Possibility of a Cooperative Trust Administration and Renders Him Unfit to Serve**

35.   Kenton persistently physically and sexually abused Hilja beginning when he was nineteen years old and she was ten years old until she became an adult. Hilja feared the consequences of reporting the abuse and did not disclose it to her parents until she was approximately 28 years old. Kenton responded that Hilja "asked for it" and denied using force. Third parties witnessed some of Kenton's abusive behavior towards Hilja as a child.

36.   Hilja remains physically fearful of Kenton. Hilja continues to suffer psychological trauma and physiological damage from the abuse requiring ongoing medical intervention. Attempting to communicate with Kenton exacerbates Hilja's physiological symptoms.

37.   Throughout her adulthood Hilja has protected herself from Kenton by avoiding contact with him. She stayed away from him for approximately twenty-five years until her mother became terminally ill in mid - 2015.

38.   In 2015, when Hilja learned that her parents needed elder care and protection from Kenton, Hilja resumed contact with Kenton by necessity. Kenton lived in the settlor's Residence as a squatter as explained further below in the section entitled "Elder Abuse."

39.   The night before Lucille's burial, Kenton stood over his bedridden father screaming at him and demanding removal of Hilja's partner Julie from their "Christian" household. Hilja spoke up to protect her partner from Kenton's verbal assault, Kenton

1    grabbed Hilja, shook her, and attempted to drag her down the hall to continue his

2    demands that Lewis rid the house of the "thing" (her partner) that Hilja brought.

3        **40.**     Kenton also verbally abused Hilja when she expressed concern over

4    Kenton's mistreatment of her father and mother. For instance he would react to her

5    concerns by demanding that she stay away from the Residence, dismissing her

6    concerns and refusing to speak with her, telling her to "shut up," or stating "you are

7    stupid."

8        41.     Multiple individuals witnessed Kenton's abuse of Hilja and his parents.

9    Others have also experienced his threats and bullying.

10       42.     Kenton is unable or unwilling to communicate about basic management

11   matters without engaging in abuse.  For instance, when Hilja attempted to discuss plans

12   for their father's funeral with Kenton he instead engaged in an approximately forty-five

13   minute tirade assaulting her character and demanding that she bow down and beg for

14   forgiveness.

15       43.     Since Lewis death, Kenton has periodically cut off communication with

16   Hilja, refused to respond to administration related correspondence and now disappeared

17   to Thailand without notice.

18       **D.    Lisa Soloway, CLPF Is Prepared to Accept Appointment as Interim
              and Successor Trustee**

19

20       **44.**     Hilja resign or stipulate to her and Kenton's joint suspension as trustees to

21   allow a private professional fiduciary to administer the Trust.

22       45.     Elizabeth "Lisa" Soloway has accepted Hilja's nomination to serve.

23       46.     Ms. Soloway's acceptance of trusteeship is attached as ***Exhibit*** 7.

24       47.     The Trust entitles each trustee to reasonable compensation without Court

25   order. Ms. Sotoway's rate of 1% of the gross trust assets annually is reasonable, subject

26   to any tater objection the beneficiaries might raise respecting the performance of her

27   duties as trustee. A copy of Ms. Soloway's fee schedule is attached as ***Exhibit 8***

28   *II II*

155576 *2101-001                                      10

## V.  HILJA DISCOVERED ELDER ABUSE UPON ARRIVING FROM SOUTHERN CALIFORNIA TO CARE FOR HER PARENTS.

48.     After his release from prison and during their most vulnerable senior years, Kenton occupied Lewis' and Lucille's home as a squatter, obstructed their access to health care services, verbally abused them, chastised them for their frailty, consumed their prescribed dietary supplies, monitored and controlled their communications with third parties, and neglected their hygiene.

### A.      Kenton Accepted Initial Appointment as His Parents' Attorney In Fact and Then Neglected Their Care.

49.     On February 5, 2015, Kenton procured his appointment as the settlors' attorneys in fact.  Thereafter, he neglected their finances, self-dealt with their assets for his personal benefit and concealed financial information from them. A copy of the superseded DPOA is attached as *Exhibit 10.* For the reasons detailed below, on September 26, 2015, Lewis appointed Hilja to replace Kenton as his attorney in fact and to protect him from Kenton's financial abuse *(see,* Exh. 2). He appointed Hilja as his health care agent on the same date. (See, Exh. 10.)

### B.      Hilja Discovered Severe Neglect Upon Her Return to El Sobrante

50.     Before 2015, Hilja had been estranged from her family for several years, and visited infrequently.  Kenton's sexual, physical and emotional abuse, his methamphetamine operation, and Lewis' and Lucille's inability to acknowledge or address Kenton's conduct required Hilja to distance herself for self-preservation.  The family's insults of her same-sex relationship further contributed to her need for autonomy.

51.     In June 2015, upon first learning that her mother was suffering from brain cancer, Hilja returned from Southern California to assist her parents in their El Sobrante Residence.

52.     Upon her arrival Hilja found them in unsanitary and unsafe conditions. Lewis had lost weight and was emotionally and physically exhausted.  He told Hilja that

**EX PARTE PETITION TO SUSPEND AND REMOVE KENTON KEADING ETC.**

1   he was unable to take care of Lucille. Lucille's cognitive abilities had diminished.   She

2   was prone to wander and get lost. Both parents suffered from incontinence.

3        53.    Buckets of stagnant water lay around the home. Toilets were crusted with

4   feces and urine. Lucille's and Lewis' clothing was filthy and stained with feces. Food was

5   rotting in the refrigerator. Electrical outlets were loose.  Appliances were unmaintained.

6   Mold had collected on the washing machine. Papers were stacked on tables, including

7   unopened mail and unpaid bills. Twenty-three phone messages remained unheard,

8   including doctor's attempts to schedule chemotherapy and address other care matters

9   for Lucille.

10        54.    Hilja learned that before her arrival a caregiver had found Lewis alone in

11   his kitchen, confused, standing without pants and unaware of feces on the floor beside

12   him.

13        55.    Kenton returned from a trip to Thailand shortly after Hilja's arrival.

14   Sometime before his trip he had moved into Lucille's and Lewis' Residence.

15        56.    Lewis told Hilja that Kenton had told them that he needed to stay for a

16   couple of months while he built his own home. Lewis told Hilja that Kenton would not

17   leave. Lewis feared confronting Kenton or taking action to require him to leave. Kenton

18   never left and continues living at the Residence as his principal home. He never paid

19   rent or utilities while the settlors were living.

20        57.    Kenton had neglected his parents' bills and neglected his father's request

21   that he set up an automatic bill payment system.

22        58.    Hilja took two leaves of absence from her job as an educator to care for her

23   parents and protect them from Kenton.

24   C.   **Kenton Continued Occupying Lucille's and Lewis' Home and Abusing**
         **Them**

25

26        59.    After Hilja came to assist her parents she observed Kenton control them

27   and their interactions with others, including healthcare workers.

28        60.    Kenton removed and concealed Lewis' estate planning documents, original

1    stock certificates, and other financial records from Lewis' safe and personal files. On or

2    around September 22, 2015, Lewis asked Kenton to return them. Among others, Kenton

3    refused to return an undelivered Durable Power of Attorney document that nominated

4    Kenton as agent. Lewis feared repercussions if he entered Kenton's room to retrieve the

5    taken documents. Lewis responded to the taking by executing an updated Durable

6    Power of Attorney nominating Hilja, instead of Kenton with the assistance of his counsel

7    Peter Sproul.

8        61.    Kenton used a baby monitor to listen to and control his father's

9    communications when he was outside of his room.

10       62.    In her final months Lucille suffered from incontinence. Hilja witnessed

11   Kenton respond to an episode of incontinence by chastising and yelling at Lucille. The

12   night of Lewis' death Kent humiliated him by making gagging sounds when Lewis lost

13   control of his bowels.

14       63.    Kenton routinely yelled at Lewis while he was bedridden. On multiple

15   occasions Hilja observed Kenton standing over Lewis' bed making demands,

16   accusations, pushing his internet-based healthcare agenda, opinions, and causing

17   Lewis' overall distress and withdrawal. Hilja witnessed Kenton's same bullying behavior

18   towards her dying mother.

19       64.    Hilja wanted to report the abuse to Adult Protective Services (APS).

20   Though Lewis expressed disgust with Kenton's behavior, he asked her not to report it.

21   Hilja respected his wishes.  Lewis pleaded for Hilja to stay at the Residence with him.

22   She stayed to protect him to the extent that she could without reporting Kenton to APS.

23       **D.    Kenton Neglected and Obstructed Lucille's and Lewis' Healthcare**

24       65.    Kenton interfered with Lucille's and Lewis' healthcare. He was hostile to

25   their physicians and healthcare providers.

26       66.    Hilja arranged for her parents to receive home healthcare services. She

27   paid her parents' expenses from Trust assets otherwise designated for her.

28       67.    Lewis cancelled home healthcare at Kenton's urging. Kenton complained

1     that it was too expensive.

2         68.     Lewis and Lucille could afford home care, but Kenton did not want it to

3     deplete his inheritance. All the while, he owed Lewis and Lucille $75,000 and never

4     repaid it.

5         69.     Kenton promised that he would attend to nighttime care duties that

6     caregivers would otherwise perform. Kenton then refused to perform many of those

7     duties or to attend to Lewis' medication needs.

8         70.     For example, Kenton refused to assist Lewis to the bathroom. When Hilja

9     pressed the need for him to do so while she could not be in the Residence, Kenton

10     refused. He responded,

11
12
13
> "Marve died after he fell. If dad dies because he falls down in the bathroom, I am not going to feel bad because he was doing something he shouldn't have done. I am not going to follow around behind him."

14         71.     Kenton refused to reposition Lewis as required to treat his stage-3 bedsore

15     and prevent new bedsores from forming.

16         72.     Kenton obstructed Lewis' from receiving available renal diet meal delivery

17     services. Hilja attempted to stock the home with medically recommended foods, but

18     Kenton consumed them. He continued consuming Lewis's and his caregivers food after

19     the caregiver requested he stop.

20         73.     Lewis' cardiologist nearly stopped treating Lewis because Kenton

21     interfered with healthcare visits and insisted that his internet research rather than

22     physician's recommendations should govern Lewis' care.

23         74.     When Lucille's doctor and Lewis determined that the time had come for her

24     to receive hospice care, Kenton rejected their advice.

25         75.     Against Lucille's oncologist's explanation that electrode therapy would

26     "torture" Lucille and that she was not a proper candidate for the therapy, Kenton insisted

27     that she receive it, and bullied Lewis to deny her the comfort care she desperately

28     wanted and needed.

76.     Lucille endured such suffering from Kenton's medical neglect that on several occasions Lucille begged Lewis to shoot her.

77.     Once Lucille finally began receiving hospice, Kenton aggravated and intimidated the care providers. One worker stated that she would end services at Lucille's home if Kenton's behavior continued.

78.     Kenton refused to attend healthcare meetings set up by Sutter Home Health for Lewis's intake. He rejected Sutter Home Health's nurse's recommendations. He yelled at Lewis for attempting to follow their advice.

79.     Kenton also subjected Lewis' to painful dialysis for his end stage renal failure for months after Lewis begged to stop the treatments. Kenton's refusal required Lewis to spend his last months of life enduring an exhausting regimen of dialysis through a port in his neck because his arm port was unusable.

80.     Both Lucille and Lewis suffered under Kenton's control and bullying behaviors until their deaths.

## VI. JURISDICTION

81.     Jurisdiction and venue is in Contra Costa County. The principal place of administration of this Trust is and will remain in Contra Costa County if the Court appoints Ms. Soloway. Kenton resides in El Sobrante, California. The principal asset of the Trust, the Settler's residence, is also situated in Contra Costa County.

## VII.   NOTICE

82.     Persons entitled to notice include the following:

    a)    Kenton Keading, successor co-trustee and son of decedent, 60 Laurel Lane, El Sobrante, California 94803, or P.O. Box 21476, El Sobrante, California; email: biogenicsphd@gmail.com.

    b)    Lisa Soloway, C.L.P.F., nominated successor trustee, 755 Solana Dr., Lafayette, CA 94549;

    c)    Fernando Ochoa; trust residence occupant, 60 Laurel Lane, El Sobrante, California.

1   *II I/*

2       WHEREFORE, Petitioner requests an Ex Parte order as follows:

3       1.    Immediately authorizing Hilja to notice Kenton via electronic mail and U.S.

4             mail at his last known addresses in accordance with Probate Code section

5             851 and Code of Civ. Proc. section 413.10 (allowing service of an 850

6             Petition summons to a person outside the U.S. by court authorization in a

7             manner reasonably calculated to give actual notice);

8       2.    Finding that notice has been given as required by law;

9       3.    Immediately suspending Kenton as trustee, accepting Hilja's voluntary

10            suspension and approving and appointing Lisa Soloway, C.L.P.F., as

11            interim successor trustee of the Trust and each of its subtrusts;

12      4.    Ordering Kenton to account for his actions as attorney in fact, as trustee de

13            son tort, and as cotrustee for the period beginning on February 2, 2015 to

14            present;

15      5.    Setting aside the deed dated December 30, 2015, and recorded on

16            January 8, 2016 as Contra Costa County Recorder document no. 2016-

17            0004063-00, as vo ;

18      6.    Voiding any lease contract signed by Kenton Keading as lessor of 60

19            Laurel Lane, El Sobrante, California for lack of property ownership

20            authority;

21      7.    Immediately ordering the current occupants of 60 Laurel Lane, El

22            Sobrante, California, to cooperate in allowing Hilja Keading and Lisa

23            Soloway, or both, to enter the Residence to collect and remove Trust

24            tangible personal property listed at Exh. 3, with civil standby assistance of

25            law enforcement; and

26      8.    Ordering Kenton to return to Lisa Soloway, as trustee any and all assets he

27            removed from the Trust or the Residence, including without limitation, the

28            settlors' stock certificates; estate planning documents; vital records;

**EX PARTE PETITION TO SUSPEND AND REMOVE KENTON KEADING ETC.**

1   personal vehicle or proceeds from its sale; and rent received from the

2   Residence.

3   Petitioner requests an additional order after hearing

4   9.   Removing Kenton as co-trustee;

5   10.   Accepting and approving Hilja Keading's conditional voluntary resignation

6   as co-trustee;

7   11.   Appointing as permanent trustee and approving her attached fee schedule,

8   charging 1% of the gross trust assets annually, as reasonable subject to

9   any later objection any beneficiary might raise respecting the performance

10   of her duties as trustee.

11   12.   Finding Kenton liable for damages according to proof for breach of

12   fiduciary duty, physical and financial elder abuse, fraud, conversion,

13   intentional interference with expected inheritance, and wrongfully

14   withholding Trust property;

15   13.   Ordering the current occupants of 60 Laurel Lane, El Sobrante, California

16   to vacate the property within 15 days;

17   14.   Confirming that Lisa Soloway, in her capacity as the interim trustee of the

18   Trust, is the legal owner of the following assets:

19   a.   60 Laurel Lane, 21 Laurel Lane and 50 Laurel Lane, El Sobrante,

20   California *(see,* Legal Description at Exh. 1);

21   b.   Charles Schwab Account no. 49625504 *(see,* Schedule A at Exh. 6);

22   c.   Schwab Joint Tenancy Account Nos. 3789-9944 and 1327-2378;

23   d.   US Bancorp Account No. 59943001 *(see,* Schedule at A at Exh. 6);

24   e.   US Bank Account No. 154300935652 *(see,* Schedule A at Exh. 6);

25   and

26   f.   All automobiles, furniture, furnishings, crystal, antiques, appliances,

27   silver, jewelry, coins, paintings, objects d'art, and other items of a

28   tangible, personal nature, owned by Lewis and Lucille Keading at

155576 *2101-001

17

EX PARTE PETITION TO SUSPEND AND REMOVE KENTON KEADING ETC.

their deaths *(see,* Schedule A at Exh. 6);

15.    Surcharging Kenton and ordering that he pay restitution, compensatory, and exemplary damages in an amount according to proof for his financial elder abuse, conversion, and breaches of fiduciary duty and excluding him from benefitting from elder abuse recoveries;

16.    Ordering Kenton to pay double the value of property that he took from his parents, the trust, or both in bad faith (Prob. Code§ 859);

17.    Ordering Kenton to pay all prejudgment interest, attorneys' fees and costs in an amount according to proof; and

18.    For such other and further orders as this Court may deem necessary or proper.

DATED:  March 14, 2016

HARTOG, BAER & HAND
A Professional Corporation

By: ................................
. Jonna M. Thomas
Attorneys for Petitioner
*Hilja M. Keading*

**EX PARTE PETITION TO SUSPEND AND REMOVE KENTON KEADING ETC.**



1   KONSTANTINE A. DEMIRJS (SBN 240089)
    DEMIRLS & MOORE
2   2121 N.CaliforniaBlvcl.,Suitc290
    Walnut Creek, California 94596
3   Telephone: (925) 974-3360
    Facsimile: (925) 455-2403
4   Email: kosta@dcmirismoore.com

5   Attorneys for Respondent.
    Dr. Kenton Keading. PhD, bcm:ticiary and named co-trustee

6

7                   SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                      FOR THE COUNTY OF CONTRJ\ COSTA

9   In the matlei· of:                    CASE NO. MSPl 6-00402

10  THE KEAD!NG FAMILY TRUST'.           DR. KENTON KEAD1NCi'S OBJECTION
                                         AND Rl:'.Sl'ONSE TO HJLJA KEADING'S
11                                       /'.X /¹ARTL PETITION TO SUSPEND AND
                                         REMOVE KI NTON KEADJNO AND
12  _____          APPOI NT SUCCESSOR TRUSTL-T OF THE
                                         KEADINn FAMfLY TRUST AND ITS
13  HILJA KEADfNG                         SUBTRUSTS, TO CONFIRM TRUST
                                         OWNERSlflP OF PROPERTY; FOR
14          Petitioner,                   JNTENTION/\L INTERFERENCE \VITH
                                         EXPECTED IN!IERJTANCE; FRAUD;
15  Vs                                    CONVERSION;AND FOR ELDER ABUSE:
                                         REQUEST FOR SANCTJONS AC:iAINST
16                                        1-IJLJA KEADING UNDFR CCP §128.5
17  KENTON W. KEAD!NG, FERNANDO
    OCHOA, and DOES 1 to 20,             Date:  5/12/2015
18                                       Time:  9:00 a.m.
            Respondents.                 Dept:  14
19                                       Judge: IIon. Judge John H_ Sugiyama

20                          I.     **INTRO])UCTION**

21

22  I.      Dr. Kenton Keading, PhD objects and responds to his sister, 1Iilja Keading's improper and

23  defective '·emergency" ex partc Petition that was filed withm1t proper nolice to him, when she knew

24  he was out of the country on a trip :md would be returning (he did not ·'disappear").  Ililja sand-

25  bagged Kenton lo draw first blood.  Her intent appears lo be driven to deprive him or his property

26  rights v,rithout proper procedural due process of law and gain a strategic advantage in her pre-

27  meditated litigation.

28

                    Oljection and Response to Ex Pmte Petition
                                    - 1 -

1            Hilja has hidden and distorted many facts in an attempt to vilify Kenton and assassinate his

2    character.  Kenton alleges that Hilja had a strained relationship with their parents, lewis and Lucille

3    Keading, the settlors of the Keading Family Trust, for about 20-years primarily beJause of her

4    absence from them, creating feelings of abandonment, combined with philosophicli conflicts,

    arguments, and lifestyle choices culminating in homosexuality to which both $pare+$ were

7    fundamentally opposed.  Hilja bas opportunistically attempted to $i_{gn}$ore her absence from the

8    family.  Hilja, and no one else, chose to leave her parents and distance herselfbothlphysically and

9    spiritually from her parents.

10           The evidence will show that Hilja is angry and vindictive.   Kenton bas evidence to refute

11    all of Hilja's unfounded claims at trial. Hilja's actions are motivated by misplaced anger, retribution

12    for a relatively small inheritance culminating in a hidden agenda of self-enrichmell perpetrated by

13    outright lies and the concomitant punishment of her brother, if successful. This is /he story of a

14    disgruntled and displaced daughter who embarks on a last hour mission to restore her inheritance,

15    but whose hidden agenda comes to the surface via an exposed email which once arin causes the

1e    table to be turned against her.  The facts at trial will show that the disputed legal 9atters never were

17    anywhere near an "emergency" or exigent and the relief obtained violated Kenton's rights under the

18    Constitution of the United States of America and State of California.  Upon careful review of her *ex*

19

20    *parte* Petition and the evidence presented herein, Kenton alleges that it will $beco+$ clear to the

21    Court that Hilja intentionally and willfully misled this Court and that her acts cons,titute an abuse of

22    process the *ex parte* orders should be vacated.  Consequently, Kenton seeks sanctions under Code

23    of Civil Procedure Section 128.5 against Hilja for attorney's fees and costs.  The snctions are

24    based upon Hilja's unfounded claims, bad-faith acts, and include, but are not limitld to additional

25

26    damages for her willful abuse of the judicial process, interference with Kenton's quiet enjoyment of

27

28    real property, and compensatory damages as a result of forcing him to make oversl as itinerary

changes. The Court should order Hilja to properly file an underlying petition and P,roperly notice

the matter for a hearing as required by law if she wishes to pursue her claims any Jrther. Kenton

alleges that Hilja has personally attacked him with defamatory and inaccurate statements that she

knows to be untrue in a *sworn pleading,* in the *public record.* This case is nowher near as dramatic

as Hilja is portraying it to be. All relief grᵃted on the basis of Hilja's improper J parte Petition

should be overturned.1 Hilja should be surcharged for breach of fiduciary duty and held

accountable for the wᵃᵗ te she has incurred to the Trust and to Kenton. Because this matter is

contested, none of the pleadings before the Court by Hilja can be received as evid+ce.2 Kenton

will be exercising his right to present evidence and testimony at an evidentiary heᵏⁱng as permitted

under Probate Code section 1022; *Estate of Lensch* (2009) 177 Cal.App.4[th] 667, 618; *Estate of*

*Bennett v. Smith* (2008) 163 Cal.App.4[th] 1303, 1308-1309; *Evangelho* v. *Presoto* (1998) 67

Cal.App.4[th] 615; and *Fraysher v. Fraysher* (1956) 47 Cal.2[nd] 131.


**II.     FACTUAL BACKGROUND**

1.     On January 27, 1998, the settlors executed the Trust.3

2.     Over the course of the next two decades, they rarely spoke or heard from Ilja,     who

estranged herself from them after heartfelt abandonmeᵘl and lifestyle choices con#ary to her

upbringing.

3.     On October 31, 2011, the settlers executed a notarized Joint Amendment of Joint Living

---

i *See* January 9, 2016 handwritten letter from Hilja to Kenton attached as Ex. "A." Kenton has no issue with Elizabeth Soloway acting as successor trustee. Kenton and Hilja were working together to select a professioᵃl  trustee and Hilja knew Kenton was interviewing people. Hilja's attempt to portray Kenton as refusing to agree to a ᵖrofessional is untrue.

2 *See* Probate Code section 1022. "An affidavit or verified petition shall be received as evidence when offered in an uncontested proceeding under this code."

3 A true and correct copy of the 12/22/2015 DPOA is attached as Exhibit 6 to Hilja's Petition.

1    Trust.[4]  The Amendment provides that the beneficiaries of the Trust are Kenton and Hilja.  The

2    dispositive provisions state that Hilja gets the Bancorp Investments and Kenton gets "the remainder

3    of property assets, including all vehicles, furnishings, etc."

4        4.      On February 5, 2015, the settlers signed what appears to be an undated amendment to the

5    Trust (although undated by the settlers, it is notarized on February 5, 2015).[5]  The terms are

6    otheiwise identical to the October 31, 2011 amendment.  Hilja's relationship with her parents

7    remained disjointed without attempts by her to reconcile.

8

9        5.      Thereafter in 2015, after Lucille Keading was recovering from surgery of brain cancer, Hilja

10   appeared at the Keading residence.  Hilja thereafter visited and stayed at the family home living

11   with the settlors for a period of months and with Kenton who had been residing there for a year.

12   Kenton is informed and believes that sometime thereafter attorney Peter Sproul was contacted and

13   changes to her parents' estate planning were made.

14

15   6.       On September 10, 2015, Lucile Keading died.

16   7.       On September 29, 2015, Hilja and Lewis executed a du'able power of attoley prepared by

17   Peter Sproul.[6]

18

19   8.       On October 8, 2015, Lewis Keading executed an Amendment to the Trust  repared by Peter

20   Sproul and notarized by Mr. Sproul.[7]  Interestingly, *no allocation of assets appear} to have been

21   done prior to the amendment and is admitted in the preamble.*  The amendment purparts to amend

22   the February 5, 2015 amendment.

23   9.       On December 8, 2015, Hilja wrote a self-serving email on her parents' computer entitled,

24

25   _____

     [4] A true and correct copy of the 10/31/2011 Amendment is attached as Ex. "B."

26   [5] A true and correct copy of the 2/5/2015 DPOA is attached to Ex. I to Hilja's Petition.

     [6] A true and correct copy of the 9/26//2015 DPOA is attached to Ex. 2 to Hilja's Petition.

27   [7] A true and correct copy of the 10/6/2015 Amendment is attached to Ex. 1 of Hilja's Petition.

28

1  "urgent need for bad ass probate atty."  In that email, Hilja reaches out to an attorney-friend of hers,

Jeffrey Linden, plotting, amongst other things, to obtain vengeance upon Kenton I h a she vilifies;

and states is a danger to her.[8]  Kenton is informed and believes the email was likelt left by Hilja on

4  the family computer without logging out, which Lewis Keading later became awt 1 of.

10.     Following Lewis Keading's discovery of Hilja's true motives, Lewis K e a d l g began to

7  attempt to undo all acts that provided her any authority and to protect himself and h s son Kenton

8  from Hilja.

9  11.     On December 12, 2015, Lewis Keading executed a notarized uniform statutory form power

10  of attorney providing all powers authorized by law to Kenton.[9]

11  12.     On December 19, 2015, Lewis Keading, aware of Hilja's December 8, 2015 email, drafted a

declaration under penalty of perjury, witnessed by two disinterested persons statinJ without

14  equivocation that he was of sound mind, no duress, and that he was never abused bl Kenton.[10]

15  13.     On December 30, 2015, Kenton by way of his authority under the valid oedernber 12, 2015

16  power of attorney for Lewis Keading transferred assets in the Trust to Lewis Kead· g and Kenton

17  Keading as joint tenants and the instruments were recorded on January 8, 2016 - h did so at the

18  direction of Lewis Keading.[11]

19

20  14.     On January 2, 2016, Kenton by way of his authorily under the valid Decem er 12, 2015

21  power of attorney for Lewis Keading, executed an amendment to the trust that n a + d a successor

22  trustee, Connie Kruse and her alternate as Linda Benta.[12]  In the event neither coul d serve, then the

23

24  ────────────

[8] A true and correct copy of the 12/8/15 email from Hilja to Jeffrey Linden is attached as Ex. "C."

25  [9] A true and correct copy of the 12/12/2015 DPOA is attached as **Ex. "D."**

26  [10] A true and correct copy of the 12/19/2015 Declaration is attached as Ex. "E."

[11] *See* Ex. 1 to Petition of Hilja.

27  [12] A true and correct copy of the 1/2/2016 Amendment is attached as Ex. "F."

28

1    Court would appoint a successor trustee.

2    15.    On January 4, 2016, Lewis Keading died.

3
4    16.    The next day, on January 5, 2016, Kenton alleges Hilja knowingly and interionally violated

5    California law and breached her fiduciary duties owed to Lewis Keading and Kent1n when she

6    **wrote two checks as power** of **attorney** for **Lewis Keading."**

7    17.    On January 9, 2016, Hilja wrote a rather polite and amicable letter to K e n t 1 stating they

8    had a conversation on January 8, 2016 and agreed on matters.14

9
10   18.    On March 9, 2016, Hilja's attorneys sent out an improper notification by t  stee to Kenton -

11   as co-trustee of the Trust.15  The notification was defective and, amongst other things, signed only

12   by one co-trustee and not both; falsely stated that the address of the place, of business and

13   administration of the T st   is the law office of Hilja's _attorneys in Orinda, CA (sh lives in Los

14   Angeles and Kenton lives in Contra Costa County) contrary to the provisions of Probate Code

15   sections 17002 and 17005; did *not* state or provide a complete copy of the terms of the trust; and the

16   requirement for the warning was not done as required by law. 16

17
18   19.    Less than a week later on March 15, 2016, Hilja's attorney appeared *ex parte* in Contra

19   Costa County Superior Court to obtain *ex parte* orders concerning the Trust and allbged to wanting

20   the unilateral removal and possession of trust property from the residence.  Kenton was not

21   personally provided notice as co-trustee and was out of the country at the time and unable to appear.

22
23
         ### III.    LEGAL ARGUE  NT
24

25   _____

26   [13] *See* Probate Code section 4152 the authority of an attorney-in-fact terminates at the principal's death.  A true and correct copy of the January 5, 2016 checks written by Hilja is attached as Ex. "G."

27   [14] *See* **Ex. "A."**

     [15] A true and correct copy of the 3/9/2016 notification is attached as Ex. "H."

28   [16] *See* Probate Code section 16061.7 and *see also Harustak* v. *Wilkins* (2000) 84.CaLApp.4[th] 208.

A.     **Defects in Pleadings: No Underlying Petition, Improper Notice, and Emergency Circumstances Were never Present.  Hilja should be Instructed to re-flea separate, properly noticed, Probate Code Section 17200 Petition.**

20.     The Petition fails to comply with the requirements for *ex parte* relief under falifomia Rules of Court, rule 3.!202(c) as no affirmative factual showing, based on personal knolledge of *irreparable harm, immediate danger,* or any other statutory ground has been demonstrated.  None has been demonstrated.  Furthermore the *ex parte* Petition fails to comport with thj legal requirements for petitioning the Court as *there is no underlying petition to support the ex parte relief requested for* <u>suspension</u> *and without an u derlying petiti.on for* ___ *t ef m orary* emoval *orders made ex parte must be terminated forthw1th and can be mdefimte.* [17]  Nohe ls lillproper as Hilja has failed to properly provide notic  as required by law to all trustees and beleficiaries. [18]  In lieu of filing costly demurrer litigation, which this Court and most courts have a dJdain for, Kenton requests this Court instruct Hilja to re-file, a separate proper pleading, by providinJ notice to all persons entitled to notice by law under Section 17203 of the Probate Code in com liance  with the Trust instrument and the amendments that are presumed valid.

21.     Hilja has what is beginning to look like a habit of crying out like in the mo!ie Chicken Little that the sky is falling, when nothing remotely in the galaxy of an emergency exists  Since the Court issued its orders *ex parte* based on .the inaccurate and unfounded allegations of Hi! a, not much has

---

[17] See **Pmbate** Code sections **15642** aad **17200.** Thoso **statutory** oodese"ionmqui,, that, potitj focremov,I by, party be done by a *petition* to under: Probate Code section 17200 and that 30-days prior notice of the petition be provided under Probate Code section 17203.  A court may suspend a trustee only *pending* a petitio  for removal *see* Probate Code section 15642(e). Here there is no petition for removal- there is a haphazard "combb" *ex parte* petition for suspension and removal, which is improper and must be pied separately..Hilja cannot bypass pf. ocedural safeguards in such a sloppy manner and cannot avoid noticing those entitled to notice as a matter oflaw.  Hilja has no prior finding on the 1/2i2016 Trust amendment and cannot put the cart before the horse.  The Court has no choic  but to send her back to "start" and order her to refile a proper petition.

[18] *See* Probate Code section 17293 and Hilja's Petition.  Notice *was.not* sent to the named successor trustees -  Connie Kruse or Linda Benta and therefore notice is defective.  *See also* **Ex.** "F."

1    actually changed in the administration of the Trust.  Things are basically status quo except an in

2    home inventory was done and some personal property items were removed under the order.  Kenton

3    and Ms. Soloway continue to pay bills and cooperatively work together - while Hilja tries to

4    pressure things from outside.  As stated above, Kenton agreed and is in agreement Lith a

     professional fiduciary as 'trustee.  His only opposition to Ms. Soloway is that her •tointment is out

7    of order, not complying with the dictates of his father's wishes as stated in the J a n u k 2, 2016

8    amendment to the Trust.  In fact, before t k e x parte petition was filed, Kenton ha  already

9    contacted Connie Kruse, who finally rejected the proposal after the court order app intment of Lisa

10   Soloway.  It is Kenton's preference that the dictates of the amendment be followed by invitation to

11   Linda Benta to be successor trustee, then should that fail, as per the directive of th  amendment, the

12   Court's appointment of Ms. Soloway be reinstated.

13

14   22.      Contrary to the unfounded defamatory sworn statements by Hilja no crimin  1enterprise of

15   any kind has been reported as occurring at any of the Trust's real properties.  Hilja Ld Ms. Soloway

16   have entered the properties and neither has notified Kenton of any concerns.  The         concerns that
                                                                                        Joly
17   Hilja has raised, through her attorney, have been concerning some $5.00 doves an  some de

1a   minimus valued bonsai trees.  In fact, Hilja has tried to pressure Ms. Soloway and    attorney to go
                                                                                        r r
19   in ex parte to remove such items from the home based on f r atic, unfounded allegations that birds

20   were dying and that the plants were not properly cared for.  Such allegations have L e n investigated

21   by Ms. Soloway who has communicated with Kenton and been found to be untrue and nowhere

22   near exigent or necessitating any type of court involvement.

23

24   23.      Hilja's mandate for an "accounting" from Kenton prior to ever even reque ting one as

2s   required under Probate Code section 16060 et seq. or for an attorney in fact acco,ting is

26   premature.  The Court should therefore vacate its ex parte orders and reissue an order to appoint

27

28   Linda Benta as successor trustee as per the dictates of the amendment to Trust dated January 2,

2016, and then, should Ms. Benta fail/refuse to accept the appointment, to continue with Lisa

Soloway.   If Hilja wants an accounting then she must act reasonably and request one in writing first

before petitioning for orders, much less doing so *ex parte* with improper notice.   To request equity

one must do equity and come with clean hands.   Hilja should be held liable for abuke of process and

Kenton reserves his right to file suit against her such actions, including the aforementioned.   Hilja

should be found liable for breaching her fiduciary duties owed to Kenton as a co-trustee and

beneficiary including:

> *Duty of loyalty -  Probate Code section 16002;
>
> * Duty to act impartially - Probate Code section 16003;
>
> * Duty to preserve Trust property and avoid waste - Probate Code section 16006; and
>
> * Duty to take *reasonable* steps and use reasonable care and skill in administering the
>
> Trust- Probate Code Section 16040.

Furthermore, Hilja has failed to account for any of her purported acts as attorney in fact for

Lewis Keading or as co-trustee, yet she asks for such "relief" from Kenton.   Accoraingly, to the

extent Kenton is ordered to account without any prior written request or prior notice, then Hilja

should be ordered to account for all of her acts as attorney in fact and as co trustee to this Court and

Kenton in accordance with Probate Code section 1060.

**B.    At all times Kenton has acted in Good-Faith and at the Direction of Lewis Keading**

22.    Hilja has falsely accused Kenton of "secretly" deeding property to himself and changing

Lewis Keading's estate planning.   In fact, all acts by Kenton were done as authorized by Lewis

**Keading and done in good-faith   None of Kenton's acts violated the terms of the Trust.**

23.    Hilja improperly argues that Kenton's act as attorney-in-fact for Lewis Keading to deed

Trust property in joint tenancy to Lewis Keading and Kenton was in violation of the terms of the

Trust and that he mispresented himself as attorney in fact.  She is wrong and she is the one misrepresenting facts to the Court.

24.     As previously cited, on December 12, 2015, Lewis Keading executed a valid power of attorney.[19]  The power of attorney revokes all prior powers of attorney.

24.     Hilja also improperly cites *part* of Section 3.10 in a misleading manner and argues that an attorney-in-fact cannot exercise the settlor's *power of revocation or amendment if the exercise would substantially alter the settlor's intended dispositions.* [20]

*25.*     Hilja fails to cite to the beginning part of Section 3.10 that allows *all* other acts of a settler to be done by an attorney in fact of the settlor:

> Any right or power that either settlor could exercise personally under the terms of this instrument, *including the power to amend, revoke, or terminate any trust created by this instrument may be exercised for and in behalf of that settlor by any attorney in fact who, at the time of the exercise, is duly appointed and acting for that settlor under a valid and enforceable durable power of attorney executed by that settlor under the Uniform Durable Power of Attorney Act, or any successor statute ...* "

25.     Here, it cannot be understated, *Kenton did not amend or revoke the trust* in the instant action so Section 3.10 does not even apply in this regard.  Kenton, acting under a valid power of attorney, as attorney in fact, transferred trust property in joint tenancy to Lewis Keading and himself as joint owners - which he was authorized to. do under the power of attorney his father provided him, which included real property transactions and trust transactions.  *Arguendo,* even if Kenton somehow did amend the Trust (which he didn't do) then under the October 31, 2011 Amendment there was no dispositive change as he was entitled to all Trust real property.  Absent a petition to determine the validity of the purported *undated* Amendment, there is no Amendment to the Trust that changes the fact that the real property goes to Kenton.  There is no interference with inheritance by Kenton - the

---

[19] *See* **Ex. "D."**

[20] *See* Petition 6:10-15.

1    only interference is being perpetrated by Hilja.

26.    Furthermore, Hilja's false and defamatory claims that Kenton "fraudulentlyj' leased and sold

4    a vehicle is completely unfounded.  Again, as previously stated, the valid and stan ng  amendment

to the Trust allocates all property other than Bancorp Investments to Kenton.  Secohd!y, title to the

vehicle was never vested in the Trust.  Lewis Keading executed release of title to ⁴enton who had a

7    right to dispose of same vehicle as he pleased.

8    27.    Hilja's allegation•tliat Kenton somehow forced Lewis to sign docwnents ( + c k certificate

9    and declaration against elder abuse) and that unnamed "witnesses" will testify to support her claim

1O    is utterly false.  Hilja's claim is based on the testimony of an unnamed and unverijable source.

11

12    Hilja's attempt to plead with anonymity of sources is a bad-faith sporting tactic and prevents

13    Kenton from having his procedural due process protected.  *Hilja should be compe!j'ed to amend her*

14    *petition to state the names of witnesses.*

15    28.    In summary, all of Hilja's claims *assume* facts not in evidence, rely on hemk_a_y of unnamed

16    "witnesses," and contain multiple levels of inadmissible hearsay.  Hilja *assumes* an undated Trust is

11

somehow valid and that the subsequent amendments to that undated Trust are somehow valid.  If

1a

19    the undated Trust amendment is not valid, then Hilja has zero basis for any of her 6laims.  Even if

20    the undated Trust amendment is valid, Hilja has *not* contested the power of attornel that authorizes

21    Kenton to transfer real property and conduct trust transactions and her claims still rust fail as a

22    matter of law.  Instead of proceeding in the improper and clandestine manner Hilj  has done so far,

23    she must proceed by way of properly noticing her petition, identifying witnesses, and if she wishes

24    to contest the real property transfer -  then she must proceed by quiet title action, which she has also

25    failed to do. Accordingly, her Petition should be denied.

26

27

28    C.    **Kenton Should Not be  uspended  or Removed because he was Alreadl' in Agreement**

**with a Successor Trust - and Hilja Acknowledged as Much.**

29.     Hilja was aware that Kenton was willing to cede the trusteeship to a professional fiduciary and stated so in writing.[21]

30.     On March 9, 2016, Hilja had her attorney send out a defective notification Jy trustee - knowing Kenton would not get it as he was out of the country.  At that time Kentoihad already notified Connie Kruse of his power of attorney, amendment to Trust dated January   , 2016, and invited her to be successor trustee.

31.     Less than a week later her attorney ran to court *ex parte* to suspend and re7ove Kenton.

32.     The fact that Hilja sand-bagged Kenton is an example of the sporting tactics and bad-faith intent she has to mislead the court to gain some type of advantage in litigation.  Hilja's false allegations concerning the administration of the Trust do not warrant a response o l e r than a blanket denial as false and misleading.

33.     Because the request for suspension and removal is moot it should be summarily denied as a matter of law.

**D.     Hilja's Allegati ns  of Elder Abuse by Kenton are Unfounded and in B!d-Faith.  Hilja Should be Sanctioned for Kenton's Attorney's Fees and Costs Under Gode of Civil Procedure Section 128.S for having to Defend Against such Frivolous tcgations.**

34.     In perhaps a subliminal move, Hilja buries the purported lead and lists her most serious allegations for elder abuse last, at the very end of her petition.

35.     Kenton denies all such frivolous allegations and under Code of Civil Procedure Section 128.5 requests the Court order Hilja pay his attorney's fees and costs in defending such unfounded

---

[21] *See* January 9, 2016 letter from Hilja to Kenton attached to **Ex: "A"**

1   and frivolous allegations.

2   36.    It is interesting that Hilja admits to being estranged from her family, visiting rarely and yet is

3   able to make such severe abuse claims.  It is telling that she fails to state that *Hilja admits she did*

4   *not make any reports to the police or APS and even lived with the settlors and Kenton at their home*

:   *when visiting*- although she purports [rim to be some violent, predatory, monster,'[  It is even more

7   telling about the extent of her absurdities in telling her fiction story given that zero caregivers called

8   the police or APS even though the family had caregivers and they are mandated reporters of elder

9   abuse.

10  37.    Last, but not least, after allegations of elder abuse were brought forward to the attention of

11  Lewis Keading, he made clear first the definition of elder abuse as per California Penal Code and

12  then unequivocally denied that such ever occurred to himself or his wife to his best knowledge via

13
14  verified statement of fact, witnessed by two in<:iividuals who knew him personally.  Kenton alleges

15  that Hilja deliberately, intentionally, and/or recklessly made such false and misleading statements to

16  the Court and such statements amount to perjury and defamation of character.

17  38.    Additionally sanctions are in order.  Kenton alleges that Hilja intentionally acted in bad-

18  faith, knowing or with reason to believe that it would be impossible for Kenton to make a timely

19  response to the *ex parte* Petition, thus manipulating the judicial process with prejudice to Kenton.

20  *At* the core of our judicial system is that it is an adversarial one where both parties are given equal

21  opportunity and due process of the law to present their respective stories to be adjudicated by a trier

22  of fact who decides the outcome.  When due process is intentionally violated, suctction must not

23
24  go unchecked; to do so would make our sense of fair play and the judicial process    absurdity.

25  Kenton denies all such frivolous allegations and under Code of Civil Procedure Section 128.5

26
27  --------

28  [22] *See* Petition 13: 19-22.  Hilja would have the court believe that she is both scared and frightened f her brother and yet
willing to stay in the same house as.him when he is purportedly abusing her parents as she does no ing about it.

1   requests the Court order Hilja pay his attorney's fees and.costs in defending such unfounded and

2   frivolous allegations.

3

4

IV.   **AFFIRMATIVE DEFENSES**

5       To the extent Kenton asserts the following separate and distinct defenses to the *Ex parte*

6   Petition:

7

8                    **FIRST AFFIRMATIVE DEFENSE**

9              **(Failure to state a claim upon which relief may be granted)**

10  1.      As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted

11  therein, the *Ex parte* Petition fails to state facts sufficient to constitute a cause· of action.

12

13                   **SECOND AFFIRMATIVE DEFENSE**

14                           **(Standing)**

        2.      As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted

15  therein, Hilja lacks standing to obtain any of the relief requested.  Hilja suffered no injuries or

16  damages.  Lewis and Lucille Keading are the real parties in interest and neither have suffered any

17  injuries or damages.  Hilja Keading is not a trustee and has resigned.  She is not an administrator or

18  executor of either Lewis Keading or Lucille Keading's estates and no probate has been opened.

19

20                   **TIDRD AFFIRMATIVE DEFENSE**

21                   **(Statute of Limitations)**

        3.      As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted

22  therein, Hilja is time-barred from obtaining any of the relief requested because the applicable time

23  limits to file suit for each cause of action have expired.

24

25                   **FOURTH AFFIRMATIVE DEFENSE**

26                           **(Waiver)**

27

28

4.     As a separate and distinct defense to the *Ex parte* Petition and each cause o  action asserted therein, Hilja is barred from obtaining any of the relief requested because she has waived any right to obtain such relief.

### FIFTH AFFIRMATIVE DEFENSE
#### (Laches)

5.     As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted therein, Hilja is barred from obtaining any of the relief requested because she bas unreasonably delayed bringing action timely without good cause for the delay.

### SIXTH AFFIRMATIVE DEFENSE
#### (Estoppel)

6.     As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted therein, Hilja's claims are barred by the doctrine of estoppel, based on Hiija's own bonduct and actions.

### SEVENTH AFFIRMATIVE DEFENSE
#### (Unclean Hands)

7.     As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted therein, Hilja is barred from obtaining any of the relief requested because she has f iled to do equity and now seeks equity.

### EIGHTH AFFIRMATIVE DEFENSE
#### (Consent)

8.     As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted therein, Hilja is barred from obtaining any of the relief requested because Lewis K ding   and Lucille Keading consented to the acts alleged in each cause of action.

### NINTH AFFIRMATIVE DEFENSE
#### (Accord and Satisfaction)

9.      As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted therein, Hilja is barred from obtaining any of the relief requested because the gifts and benefits provided to Kenton were the result of an accord and satisfaction.

### TENTH AFFIRMATIVE DEFENSE
### (Set Off)

10.      As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted therein, Hilja is barred from obtaining any of the relief requested because Kenton as provided caregiving services, loans, and other benefits that outweigh the value of any alleged damages purported by Hilja and should be set off against the •value of services, loans, and other benefits .rendered by Kenton.

### ELEVENTH. AFFIRMATIVE DEFENSE
### (Unjust Enrichment)

1L      As a separate and distinct defense to the *Ex parte* Petition arid each cause of action asserted therein, Hiija is barred from obtaining any of the relief requested because Hilja received benefits that would result in Hilja receiving more money than entitled to.

### TWELFTH AFFIRMATIVE DEFENSE
### (Illegality)

12.      As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted therein, Hilja is barred from obtaining any of the relief requested because Hilja is suing Kenton against the express wishes of Lewis Keading and Lucille Keading, the settlors and principals who are the subject of her claims.

### THIRTEENTH AFFIRMATIVE DEFENSE
### (Attorney's fees award notpermissible)

13.      As a separate and distinct defense to the *Ex parte* Petition and each cause at action asserted therein, Hilja is barred from obtaining attorney's fees awards because they are not permissible.

### FOURTEENTH AFFIRMATIVE DEFENSE

**(Punitive damages not permissible)**

14.     As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted therein, Hilja is barred from obtaining punitive damages because they are not permissible.

### FIFTEENTH AFFIRMATIVE DEFENSE
**(Impossibility)**

15.     As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted therein, Hilja is barred from obtaining relief because it would be impossible to supersede the estate plan, directives, and wishes of Lewis Keading to replace them with those of her own post death.

### SIXTEENTH AFFIRMATIVE DEFENSE
**(Failure to join an indispensable party)**

16.     As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted therein, Hilja is barred from obtaining any of the relief requested because she know that Connie Kruse and Linda Benta are named successor trustees and she has failed to notify them or name them as parties.  She cannot just bypass named successor trustees without proper notice and/or joining them as parties as required by law.

### SEVENTEENTH AFFIRMATIVE DEFENSE
**(Failure to preserve tonfidentiality)**

17.     As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted therein, Hilja is barred from obtaining any of the relief requested because she has improperly obtained and disclosed private and Constitutionally protected information of Kentdn without his consent or permission:

### EIGHTEENTH AFFIRMATIVE DEFENSE
**(No damages/no actual injury)**

18.     As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted therein, Hilja is barred from obtaining any of the relief requested because Lewis, Lucille, and Hilja Keading and the Trust have suffered no damages and no actual injury.

## NINETEENTH AFFIRMATIVE DEFENSE
### (Speculative damages)

19.    As a separate and distinct defense to the *Ex parte* Petition and each.cause of action asserted therein, Hilja is barred from obtaining any of the relief requested because the damages sought are completely speculative in nature and no actual amount is stated.  Her intentional tort claims, including, but not limited to elder abuse and fraud claims must be argued with specificity.

## TWENTIETH AFFIRMATIVE DEFENSE
### (Contributory Negligence)

20    As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted therein, Hilja is barred from obtaining any of the relief requested because she knew or should have known about Kenton's conduct and acts as well as the conduct and acts of Lewis and Lucille Keading, as well as other caregivers and took no legal action to protect Lewis and Lucille Keading while they were alive.

## TWENTY FIRST AFFIRMATIVE DEFENSE
### (Financial Abuse and Breach of Fiduciary Duty)

21.    As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted therein, Hilja is barred from obtaining any of the relief requested because she has chmmitted financial and breached het fiduciary duties owed to Lewis Keading and Kenton.

## TWENTY SECOND AFFIRMATIVE DEFENSE
### (Undue Influence)

22.    As a separate and distinct defense to the *Ex parte* Petition and each cause of action asserted th rein, Hilja is barred from obtaining any of the relief requested because she has J e r t e d undue influence over Lewis Keading through isolation, indoctrination, and stating falsitiel to him about Kenton in an attempt to gain control over Lewis Keading and increase her share in he Trust and estates of Lewis Keading and Lucille Keading.

## TWENTY THIRD AFFIRMATIVE DEFENSE
### (Parol Evidence Rule)

23.    As a separate and distinct defense to the t'x *parte* Petition and each cause of action asserted therein, Hilja is barred from obtaining any or the relief requested because the express estate planning instruments of Lewis and Lucille Kcading control, are unambiguous, and are the express desires of the settlors.

### TWENTY FOURTH AF'FIRMATIVE DEFENSE
### (Right to add additional affirmative defenses)

24.    Kenton reserves the right to add additional affirmative defenses that may arise at a future date.

### V.    PRAYER

WHEREFORE, Kenton prays for relief as follows:

1.    For an order dismissing Hilja's *ex parte* Petition with prejudice;

2.    For an order instructing Hilja's to file any petition for Probate Code section 17200 relief in compliance with the legal and notice requirements by statute;

3.    For an order of sanctions against Hilja under Code of Civil Procedure section 128.5 awarding Kenton his reasonable attorney's foes and costs of suit in defending against her fr.ivolous *ex parte* Petition; and

4.    For any other relief the Coul1 deems necessary and proper.

Dated:    May 5, 2016                    DEMIRIS & MOORE

By _____

K©NSTANTINE A. DEMIRIS
Attorneys for Respondent, Dr. Kenton Keading, PhD.

PROOF OF SERVICE

*In the Maller ⬭the Keading Family Trust.*
*Case/I:* MSP16-00402. *Contra Costa County Superior Court*

     Tam over the age of 18 years, employed in the county of Contra Costa, and not a party to the within action; my business address is 212 1 N. California Blvd., Suite 290, Walnut Creek, CA 94596.

     On May 5, 2016, I served the following:

DR. KENTON KEADING'S OBJECTION AND RESPONSE TO HJLJA KEJ\DINU'S EX *PARTE* PETITJON TO SUSPEND AND REMOVE KENTON KEADTNG AND APPOTNT SUCCESSOR TRUSTEE OF THE KEADrNG FAMILY TRUST AND ITS SUBTRUSTS, TO CONFIRM TRUST OWNERSHIP OF PROPERTY; FOR INTENTIONAL INTERFERENCE WITH EXPECTED INHERITANCE; FRAUD; CONVERSJON; AND FOR. ELDER. ABUSE

on the parties in said action by US Mail addressed as follows:

     Jonna Thomas
     Hartog. Baer & HanJ
     Attorneys for Hilja Keading
     4 Orinda Way, Suite 250-B
     Oî nda, CA 94563

     Oliver Bray
     Bray & Greenwood
     Attorneys for Lisa Solo·way
     736 Ferry Street
     Martinez, CA 94553

     l declare under penalty of perjury wlder the laws of the State of California that lbe foregoing is true and correct.

     Executed on May 5, 2016 at Walnut Creek, California.

     Konstantine A. Demiris

1              **VERIFICATIO::--;**

2         L Kenton Keadrng mn a Petitioner in 1his proceeding.  I have read the foregoing Petition and

β   knl)\\ the contents 1hcrcoi.  The amc  ls true of my O',n knO\\ledge. except as to tho5c matters

4   wh;,h arc therein stated ,,n ;nfornmtion and belief. and as to rh,isc matters.  ! believe to be ,rue.


7      Signed this Aprl!   _1/_  20:6 at   _,C>tl_,(1,6-A;_  _/;1//ƒj1_ _,4Iv[)_

8                                          City                State

9

10        r dcchm: under the penally of perjury under the l::iw  of the State of California that the

11   foregoing is true and correct.

12

13

|4ll

15                                    _Kenton Keading_

16                                    Kenton Keading

17

18

191

20

21

22  I

23  j

24

251

26

2711

2811

EXHIBIT "A"

Dear Kent :!/9/ZcJ/ b

"I O\V),1 IJ'of v':") h O/"YI-€ . C.o n Ie c( nd :r Clec1V0?1 H e ..houJ„2 ot YJ_ pi-f.pw-U -f'h Wied/ -fo;Jt +hf lunc:h-eul Si I Ifa 1/c_. Q (.ea h- Ge!'„/ f-;Z_ y 6lf .

! w.e ClfJre e.e( y :sl-ef'?iat:J 1 J11 '1 A pn it?1 k f;1d c; 4Ylj -h flccn J .Je -t0ml ..s) tcr-/-ll{! --H1cy you {l11t( + a g . cD--tnt. S/e,eg; (?, 711/' besf t,'.,t[V fr; f Yo ( e e a -A f1 here. 7 CtWI h tl pPf 17) -Bi,,;r {I( S pd v„1 le f!o{u Ct a ry an c{ UAll V!ttl//.j7e +t-zoi ,q

luoit/ d //){( iv fv ((DW. dcd t tu Ms t?ii,,/ (:Cl!,–/t<.e_ , Vt)/ '5.i? 'ID, cf--ftl/m, ItJ 1.,1,,{ff/ k I ofC:;,, lufh 1b p DS? , l:J//; 0--, o+ cwf.m 1 17 v111 !'!'l rs-1dp///h « I l1111 Is 6fl -f!/1 e__ pmprY!J

-:Vi 7Pvt J-q f i o Vf fv( +v, (>Pi_k_ /If (( ( dcrh 11, +- hf{ p VblD'j,n )\{!__?W(OV/// -f d'Clof 5' CcrJeS) fir€- hors P[ I„ cttvl ell( -l-11.f' fz./irn I h1r /J.; a rfU,•()rJC:„ Sb, fu ffs_, Shi tua r lj, c..VJ,n 4; hrr= l{;d ,,.-P„ C{tu/ t1Il Jha ;fe f/11,[' /oh el1.ch VDMVJ 't',yee.p+ fa, +hf roaf/// you C{K .'5lee.. p 115tn, 1 h1W aIn, p lt„6foqrze. t ( Yv!<511J j f_l})-1!..,/ /)f: Lu€. {(rr vPPt!._;p{ fv o(IL,1off 'ui,0'7fl l{q I/lr Ci.11„{ -fh I vi ct, t'l.p( -f/1t:;lf IS tdli(,,f- j_ /.v/r;-17 1?)/J.f) //1.e Vcifue lf3.cuiy)! ob;et!J you DI'- + lu,1,1f Ohte. ll he S11b+meLJ il? 111 +ite -fvt Cf I 11111H111/ e4-d,1 tJ ttc; IJ,o11 Id htJ{'tf. reLe1 'e4 /ilJVI f:/5/z, Ir Ji1 le, p/f.#r;, o(c, nvf iYmovY cm!1 tkhu fn, 11/1 +llc Ifeat&

T Jv-1/k., 0cGl of +11-f f1-/-t,: h?'Jftn l 11J -/tee 01I/s. W:•1 ht!iM /I Yv[;p f:. Y',/1[/)11 llYld dtf,/( I. Iftr_,(f_, civcJ. tudle.I, t1tur 11v ch<ck:s: i.t/111L-h +-he/1e IJ( trK. 1lu iNwff K use ,q lole. :f. tui I/ o(eI/tier -/11{1{'.e +71/Vl/'p +v1/,lf f,·d /JICt /1 VlJ If lJ/l'ld'jr}r;µJ/l.Vl...__ u k (( i L"1/J\.

EXHIBIT "B"

# Joint Amendment of Joint Living Trust

1. This Joint Amendment of Joint Li ing Trust is made on /c::/2,/2°ii _____
   _____  _Lucille W. Reading_____
   grantors, to the _trust estate_ and _Central Trust Sav____
   Joint Living Trust dated _&k :f1-.12-19 1998 .IL_

2. The grantors modify the original trust as follows:
   _Beneficiaries :_
   _1. _____ (_____ to receive_
   _Five thousand dollars. ($5000.)_
   _2. Hilja Reading, to receive Bancorp Investments._
   _3. Kenton Reading to receive remainder of property assets,_
   _including all vehicles, furnishings, etc._

3. All other terms and conditions of the original Joint Living Trust remain in effect without
   modification. This Joint Amendment, including the original Joint Living Trust, is the entire
   Joint Living Trust as of this date. The grantors have signed this Joint Amendment on the
   date specified at the beginning of this Joint Amendment.

4.

_____          _Lucille W. Reading_____
Signature of Grantor                      Signature of Grantor
_Lewis C. Karatie_                        _Lucille W. Reading_
Printed Name of Grantor                   Printed Name of Grantor

### Notary Acknowledgment

State of Calif _____
County of _(12uJ/t p_____)

On   1()/3(/bcJt(_____before me., _NG"i:ri/.1..(14f1.)... 1 Pr.l&l ___
personally appeared _Lewis (/AICK, Kal arba Att.C:/1K2 :-<Afie.s is e.TC(ho_
who proved to me on the basis of satisfactory evidence o be the person(s) whose name(s is/art!
subscribed to the within instrument and acknowledged to me that he/she/they executed thf same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the i: Jrnent
the person(s), or the entity upon behalf of which the person(s) acted, executed the ins.......
rnt.

I certify under PENALTY OF PERJURY under the laws of the State of Cal.ifornia that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

M. E. ZAMORA
COMM. #1830894
Notary Public . California
Contra Costa County
My Comm. Expir s Jan. 13, 2013

EXI-IIBIT "C"

12/14/2015.                              Gmail - urgent need for bad ass probate:.., ·"'

G🜨1                                          hilja keading <hiljakeading@gmail.com>

## urgent need for bad ass probate atty

- 8 messages

**hilja keading** <hiljakeading@gmail.com>                    Tue, Dec 8, 2015 at 7:58 PM
To: jeffreylinden@outlook.com

Hi Jeffrey!
Together again. *"May day", "May day."* - remember that message?:)

I need the best ·bad-ass, take-no-prisioner Probate Attorney that I can find who is willing to litigate if necessary, and will not put up with the antics of my brother; a homophobic felon who has manipulated and engaged in every literal category of elder abuse with his parents. If the attorney is a Lesbian - all the better; in fact I prefer it. My ·mother passed away in Sept., my father is ;;ibout to pass aw ay, and I need som one to represent me on every level so I do not have to interact with my brother in any way. He is dangerous to me.

**I will need** someone who **will be** able to work with me in terms of the retainer- possibly a lower retainer **up** front in exchange for a higher percentage in the end. I am unfamiliar with what kind of negotiations may be possible.

I hope you are well. And 1 nope this is unfortunate msg brings me to see you.
Love
Hilja

**Jeffrey Linden** <jeffreylinden@outlook.com>              Wed, Dec 9, 2015 at 3:08 PM
To: hilja keading <hiliakeading@gmail.com>

Hi, ilja!·

Boy do I remember that message!

I'm sorry to hear about your mom, dad & brother.  Very sorry.

I don't practice in that areg, but Levitt Quinn comes to mind.  They're a non-profit law firm near downtown.  They do family law on a sliding scale.  I SUflgest :talkin9 to them first.  If probate if a bit far afield for· them, perhaps they can provide you with a r ferral.  I would mention the ₃dang rous" and "elder abuse" part .to the'Il right.off the bat.  They have a sterling reputation and are very well conn₃cted.  They came highly recommended to me.  Recently I sent a client to them to handle a marital dissolution (divorce) for him and they ·have been quite on the ball (after his first attorney from the Gay   Lesbian Center fumbled the case).

My family's probate attorney passed away, but I texted a few colieagues to see if they know someone good.  I'll holler if they have suggestions.

For now, why not call Levitt Quinn?  (Actually, I think that you have to go to their office to discuss the matter i  person on a Thursday or Friday.).  Let me know how it goes.

*Bon courage!*

Big love,

EX.HIBIT "D"

# UNIFORMSTATUTORYFORMPOWEROFATTORNEL

(California Probate Code Section 4401)

**NOTICE:** THE POWERS GRANTED BY THIS DOCUMENT ARE BROAD AND S · EPING. THEY ARE EXPLAINED IN THE UNIFORM STATUTORY FORM POWER OF A ORI'HW ACT (CALIFORNIA <u>PROBATE CODE SECTIONS 4400-4465).</u> THE POWERS LIS11fD IN THIS DOCUMENT DO NOT INCLUDE ALL POWERS THAT ARE AVAILABLE UNDER\'fHE PROBATE CODE. ADDITIONAL POWERS AVAILABLE UNDER TIIB PROBATE roDE MAY BE ADDED BY SPECIFICALLY LISTING THEM UNDER THE SPECIAL INSTRUCffIONS SECTION OF THIS DOCUMENT. IF YOU HAVE ANY QUESTIONS ABOUT THESE POWERS, OBTAIN COMPETENT LEGµ ADVICE. THIS DOCUMENT DOES NOT AUTHOR\IzE ANYONE TO MAKE MEDICAL AND OTHER HEALTH-CARE DECISIONS FOR Y(!)U. YOU MAY REVOKE THIS POWER OF ATTORNEY IF YOU LATER WISH TO DO s o.

ALL POWERS CONFERRED UPON THE AGENT in this UNIFORM STATUTORY F \ RM POWER OF ATTORNEY shall also function completely as a DURABLE POWER OF ATTORNEY within all circumstanc s set forth herein:

I, _Lewis C. K£JltJ11ib_____, *(PRJNCIPAL)* **APPOINT=**

_µkf\\1TON  J'I    JQ:D./r/6_____ (NAME)

_c:..o J.f/OtFl  i/1117CJ5ai1Rlvv1r; G4_ CADDREss)

_____

_(51~)778-2875_____ (PHONE NUMBER[s])

_____

*[name and address o fthe person appointed, or of each person appointed i fyou want to desig nate more than one]* as my AGENT (attorney-in-fact) to act for me in any lawful way with respect to the following initialed subjects:

TO GRANT ALL OF THE FOLLOWING POWERS, INITIAL THE LIN'E IN FRONT OF (N) AND IGNORE THE LINES IN FRONT OF THE OTHER POWERS.

TO GRANT ONE OR MORE, BUT FEWER THAN ALL, OF THE FOLLOWING POWERS, INITIAL THE LINE IN FRONT OF EACH POWER YOU ARE GRANTN G.

TO wmIBOLD A POWER, DO NOT INITIAL THE LINE IN FRONT OF IT. YOU MAY, BUT NEED NOT, CROSS OUT EACH POWER WITHHELD.

INITIAL:

__ (A)    Real property transactions.

    __ (B)    Tangible personal property transactions.

    __ (C)    Stock and bond transactions.

    __ (D)    Commodity and option transactions.

    __ (E)    Banking and other financial institution transactions.

    __ (F)    Business operating transactions.

    __ (G)    Insurance and ann!lty transactions.

    __ (H)    Estate, trust, and other beneficiary transactions.

    __ (I)    Claims and litigation.

    __ (J)    Personal and family maintenance.

    __ (K)    Benefits from the Social Security Administration, Medicare, Medicaid, or other governmental programs, or civil or military service.

    __ (L)    Retirement plan transactions.

    __ (M)    Tax matters.

    _L.C.L_ (N)    ALL OF THE POWERS LISTED ABOVE.

YOU NEED NOT INITIAL ANY OTHER LINES IF YOU INITIAL LINE (N).

**SPECIAL INSTRUCTIONS:**

ON THE FOLLOWING LINES YOU MAY GIVE SPECIAL INSTRUCTIONS LIMITING OR EXTENDING THE POWERS GRANTED TO YOUR AGENT.

(A)    _[!/rnl(·lj( f/llX f/&J<T(·1 CfRS ⪖ a/oi⪕ tvfl&j ,Plwc:ffiL_

    _(5 ilMA.l.l. E OR, _t_11/cAJAc.l.TlfT(b —m.])a -S"Ci. ff.t Po/).m 6<-r:51_

_THAT Bε:vr::p;r ḊiRΣCTℒY 012 ᴧ fJlk.ccᴦι.℩ c11/lt:£. ᴧlvl:1 ε1J,ᴧ𝒓𝓽.𝓵!_

_OR IN THE FUTURE THE AGENT._ ⌇⌇⌇⌇⌇⌇⌇⌇⌇⌇⌇⌇ .

(B)    **DURABLE POWER OF ATTORNEY**

    1.    This Uniform Statutory Form Power of Attorney shall at all times be legally interpreted and relied upon as a Durable Power of Attorney (also known herein as a "Power of Attorney") for all reasons set forth within the entirety of this document.  Any provision of this document which is




challenged by a third party as ineffective shall not affect the remaining provisions herein; all remaining provisions shall remain in full force and effect, within all governing periods of this document.

## (C)   AUTHORIZATION TO USE PHOTOCOPIES:

1.      Only **ONE ORIGINAL** of this Uniform Statutory Form Power of Attorney    as been executed.  The Agent specified in this instrument is authorized to make photocopies of this instrument and any attached documents (such as certificates of im;:apacity attached as necessary) as friquently and in such quantities as the Agent deems appropriate.  Each photocopy shall have the sanle force and effect as the original, and all parties dealing with the Agent herein are authorized to rely fully on any such photocopy showing the Principal's signature thereon.

2.      A copy of a Uniform Statutory Form Power of Attorney, setting forth specifically within, a Durable Power of Attorney, shall be certified in accordance with California Probate Code Section 4307; and shall have the same force and effect as the original, so long as the attach d certification is effectuated by 1), an authorized notary public in California; 2) an attorney a thorized to :practice law in C ifo    a ; and 3) an official of the st te or of a political s bdivision    is thorized to make such certification, who states that the certifymg .person has examined the orginal 1:ili'orm Statutory Form Power of Attorney and that the copy is a true and correct copy of the original Uniform Statutory Form Power of Attorney. *CA Probat  Code Section 4307(c); see CA Govt. Code Section 8205(a)(2) and (4).*

## (D)   ADDITIONAL POWERS APPLICABLE HEREIN:

1.      An Agent under a Uniform Statutory Form Power of Attorney, on the date efecuted or upon a subsequent date which adheres to all legal formalities under California law, can modify, revoke, or terminate a trust as provided for in the Principal's trust document only with express auth !rity granted in this Uniform Statutory Form Power of Attorney instrument;

2.      The Agent designated in this Uniform Statutory Form Power of Attorney ma  reject, disclaim, or make payment from, an estate, a trust or another fund only with the express co  sent by the Principal herein;

3.      The power of an Agent under this Uniform Statutory Form Power of Attorney with regard to insurance, annuity, and retirement plan transactions; and other beneficiary transacions, can be changed only by the express consent of the Principal herein;

4.      This Uniform Statutory Form Power of Attorney requires notification to the Principal herein that this Uniform Statutory Form Power of Attorney does not include all of the powers under the California Probate Code; and

5.      This Uniform Statutory Form Power of Attorney provides that the authority of an Agent with respect to family maintenance is not dependent on any other grant of authority for the Agent herein to make gifts on the Principal's behalf, and is also not limited by any limitation placed on the Agent's authority to make gifts on the Principal's behalf.

*LCK*

UNLESS YOU DIRECT OTHERWISE ON THE LINE ABOVE, THIS POWER OF ATTORNEY IS EFFECTIVE IMMEDIATELY AND WILL CONTINUE UNTIL IT IS REVOKED.

This Power of Attorney will continue to be effective even though I become incapacitated.

STRIKE THE PRECEDING SENTENCE IF YOU DO NOT WANT THIS POWER OF ATTORNEY TO CONTINUE IF YOU BECO:ME INCAPACITATED.

(E)   **EXERCISE OF POWER OF ATTORNEY WHERE MORE THAN ONE AGIDNT IS DESIGNATED** ⸗|: £ŧ''⸜ |: ꓥLꓶ₋ ⫝̸ꓶ10Z ꓞC!( s ꓥ̸ꓔꓔc>ꓲꓲ'ꓲꓲꓲꓲ)'S,

If! have designated more than one agent, the agents are to a c t - - - - - - - - + - -
                                                           *["separately" or "jointly"]*

INITIAL: _ _ _ _

IF YOU APPOINTED MORE THAN ONE AGENT AND YOU WANT EACH AGENT Tp BE ABLE TO ACT ALONE WITHOUT THE OTHER AGENT JOINING, WRITE THE WOIµ) "SEPARATELY'' IN THE BLANK SPACE ABOVE.  IF YOU DO NOT INSERT ANY WORD IN THE BLANK SPACE, OR IF YOU INSERT THE WORD "JOINTLY," THEN ALL OF YfU R AGENTS MUST ACT OR SIGN TOGETHER.

I agree that any third party who receives a copy of this document may act under it according to the specific provisions set forth in the Special Instructions section herein, above.  A third party may seek identification.  Revocation of this Power of Attorney is not effective as to a third party until the third party has actual knowledge of the revocation.  I agree to indemnify the third party for any claims that arise against the third party because of reliance on this Power of Attorney.

Signed on _____2C't:tn B Z/< _ 1 2_____, 201$ at _____RiCtflr)cYv{j_____, qalifornia.

*fl*

_____
*[signatu lv J(*                                    *b*

_____
PRINCIPAL *[print name]*

BY ACCEPTING OR ACTING UNDER THE APPOINTIvIENT, THE AGENT (AITO    IY-IN-FACT) ASSUMES THE FIDUCIARY AND O'fHER LEGAL RESPONSIBILITIES OF\    AGENT UNDER THIS UNIFORM STATUTORY FORM POWER OF ATTORNEY.

STATE OF CALIFORIA                    )
                                      )
COUNTY OF ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒        )


O n ‒ ‒ ‒ ‒ ‒ ‒ ‒        ‒ 2013, before me _____          , Notary Public

*[name and title of officer],* personally appeared _____‒____    ‒

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
*[Signature of Officer]*

*[Officer's Seal]*

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Contra Costa_                    )

On _Dec. 12, 2015_ before me, _Tiffany Mitchell (notary public)_
           Date                              Here Insert Name and Title of the Officer

personally appeared _Lewis C. Reading_
                                    Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person f whose name M is/a.,e. subscribed to the within instrument and ac nowledged *to* me that he/shelth€y executed the} a m e in his/herithe!r authorized capacity(iesy, and that his/herl#leir signaturept' on the instrument the pirson..{gj, or the entity upon behalf of which the person acted, execu1ed the instrument.

I certify under PENALTY OF PERJURY under he laws of the State of California that the foregoing plragraph is true and correct.

WITNESS my hand and official seal.

Signatur _____

/ Signature of Notary Public

Place Notary Seal Above

------------------ **O P T I O N A L** ------------------

*Though this section is optional, completing this Information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Doc ,u    __J:t._**

Tliie or Type of Document: _ __0__ _____ Document Date: 4_12.12.15_

Number of Pages: ___    er(s)  Other Than Named Above: _YZ D-6c- - c_

**Capacity(ies) Claimed by Signer(s)**

Signer's N a m e : - - - - - - , - - - - - - - -       Signer's Name: _____
□ Corporate Officer - Title(s): _____ _          □ Corporate Officer - Title(s): - - - - - , - - - + - - -
□ Partner -  D Limited  D General                 □ Partner -  D Limited  D General
D Individual       D Attorney in Fact             D Individual       D Attorney in Fact
D Trustee          D Gu rdian or Conservator      D Trustee          D Guardian or Conservator
0  Other: _ _ _ _ _ _ _ _ _ _ _                   D  Other: _ _ _ _ _ _ _ _ _ _
Signer Is Representing: _ _ _ _ _ _ _ _ _ _       Signer Is Representing: - - - - - - - + - - -

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

# ENDOF OC

EXHIBIT "E"

# DECLARATION

I, the undersigned, declare as follows:

My son, Kenton Keading, has not committed any acts of abuse, either physical or mental to myself, and to the best of my knowledge to my now deceased wife, Lucille Keading, his\mother. On the contrary, Kenton has always been actively supporting and caring of myself and his mother.   Regarding 'elder abuse', I have read and understand California Penal Code Section 368, citing in part here:

> "  (b)  (1) Any person who knows or reasonably should know that a
> person is an elder or dependent adult and who, under circumstances or
> conditions likely to produce great bodi.ly harm or death, willfully
> causes or permits any elder or dependent adult to suffer, or inflicts
> thereon unjustifiable physical pain or mental suffering, or having
> the care or custody of any elder or dependent adult, willfully causes
> or permits the person or health of the elder or dependant adult to
> be injured, or willfully causes or permits the elder or dependent
> adult to be placed in a situation in which his or her person or
> health is endangered, is punishable by imprisonment in a county jail
> not exceeding one **yea.z**, or **by** a fine not to exceed six thousand
> dollars ($6,000), or by both that fine and imprisorunent, or by
> imprisonment in the state prison for two, three, or four years."

It is my firm belief that my son, Kenton Kead.ing, never willfully or otherwise, committed any acts or omissions that constitute 'elder abuse' as defined above.  Furthermore, It Is my Jelief that at no time was I so confused, medicated, mentally or physically impaired or incompetent such that I was unable to understand or report criminal conduct or to testify in court proceeding on my own behalf.  I would not hesitate to report elder abuse to the proper authorities had my son or any other individual committed such acts.

Being of sound mind, I make this statement of my own free will, under no duress.

I make this declaration to the best of my knowledge and understanding under penalty of perjury according to the laws of the State of California.

_____

Lewis C. Keading, declarant

Date: _____

_____ , witness

_____ , witness

EXHIBIT "F"

# Joint Amendment of Joint Living Trust

1. This Joint Amendment of Joint Living Trust is made on _Februar. 2, 2016_
   (date), by _LEWIS KEADING_ and _LUCILLE / KEADING_,
   grantors, to the _KEADING FAMILY TRUST_ and _____
   Joint Living Trust dated _JAN 27, 1998_.

2. The grantors modify the original trust as follows:

   _Successor Trustee to be Connie Kruse or should Ms. Kruse decline
   or be unable to continue then Lino's Banta or should Mr. Banta
   decline or be unable to continue then a new trustee to be
   appointed by the court. Appointment to take effect upon written,
   acceptance. The successor tryste so appointed replaces co-trustees
   Kenten Keading and Hilja Kerding jointly._

3. All other terms and conditions of the original Joint Living Trust remain in effect without
   modification. This Joint Amendment, including the original Joint Living Trust, is the entire
   Joint Living Trust as of this date. The grantors have signed this Joint Amendment on the
   date specified at the beginning of this Joint Amendment.

4.

_Lewie Keady by KENTEN V KEADING POA_      _____
Signature of Grantor                       Signature of Grantor
_LEWIS KEADING_                   _____
Printed Name of Grantor             Printed Name of Grantor

**Notary Acknowledgment**

State of California
County of ____(JrilTCl  Co';)±pi_____)

On ___\ \ 2-\ \ I(? _____ before me, _('q-\ hl?il\  A, (ip.{20/_ , ho\--itlQ, yvtt?I IC
personally appeared _____Kenten Keading_ ( "0 P.)_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed t e same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the ins ument
the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the
foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signarure _____ _C_ _____,

CATHERINE A. GUERRA
Commission # 1970170
Notary Public - California
Contra Costa County
J.?.;=

EXHIBIT "G"

Print Images



**U.S. Bank Confidential Communication**

Requested by: Gina Lopez

This check Image.contains confidential Information. If you print this image, please store It In a secure place to avoid unauthorized usage of this information. Increased security awareness when discarding or destroying this document is recommended.

| Item #1 | | |
|---|---|---|
| **Account No.:** 154300935652 | **Check No.:** 2312 | **Sequence No.:** •008052493281 |
| **Amount:** $240.00 | **Routing No.:** 121-12267 | **Date:** 01/11/2016 |

**Front:**

LEWIS C KEADING
LUCILLE W KEADING TTE
KEADING FAMILY TRUST
60 LAUREL LN
H. SOBRANTE   CA  94803-3.25

90-m,/1211,            2312

o,m i/s/20⅟

PAY TO THE ORDER OF _Wilson + Katzer_                    $ 240.

_Two hundred Jourty dollars_ & 00/100 DOLLARS

**usbank.** All of us serving you®

MEMO _____            _M. Keading P.o.n. for Lewis Keading_

⑈121122676⑈ 154300935652⑈ 2312

**Back:**

seg. 19                    Jr              a

:Batch: 246045

pt   0 / 08/16

Seq: 00029 01/08/16
BAT:246045 CC: 3188000893
WT:01 LTPS;Jacksonville PT
BG:ET Sobrante BC CA

PAY TO THE ORDER OF
BANK OF AMERICA
FOR DEPOSIT ONLY
WILSON & KRATZER MORTUARIES
BELLS CHAPEL LOC # 204
0013909062559

. Prmt Images.                                                                                    Page 1 of 1

## U.S. Bank Confidential Communication                              ◆ **bank.**

Requested by: Gina Lopez

This check Image contains confidential Information. If you print this Image, please store it in a secure place to avoid unauthorized usage of this Information. Increased security awareness when discarding or destroying this document is recommended.



| Item #I | | |
| --- | --- | --- |
| **Account No.:** 154300935652 | **Check No.:** 2311 | **Sequence •No:** 008653242438 |
| **Amount:** $308.50 | **Routine No.:** 12h2267 | **Date:** 01/06/2016 |

EXHIBIT "H"

0-3/101201.'s 'rau 13115 __ FAX  32     5900 SUPER COPY & PRINTING                 @002/003

**Tll◊,g..EADJNG FAMILY TRUST**
**D,ATED JANUARY 27, 1998**

**NOTIFICATION BY TRUSTEE UNDER PROBATE CODE**
**SECTION 1,6061.7**

LEWIS C. KEADING and LUCILLE W. KEAOING, both now deceased, were· the settlors and trustees of The Keading Family 'frust dated January 27, 1998 (the 1.'rust), as amended **on** FebrulllY ·s, 2015 and October 8, 2015.  qle Tmst and. its subtrusts are .now irrevocable.   Pur-suant to the terms of the Trust, KENTON KEADINO and HILJA KEADING are the currently ac·g successor co-trustees of the Trust. Under Probate Code Section 16061.7(a)(1) **the co-trustee** HILJA KEADINO hereby·notifies **you of the** following:

1,    **The** names, addresses end telephone numbers of **the, $\lОСе$$or, co-trustees are as follows:

Hilja Keading                          Kenton Kea.ding
c/o Hartog, :Baer & Hand               60 Laurel Lane
4 Orinda Wey, Ste 250-B                El Sobrante, CA 94803
Orinda, CA 94563                       (510)778-2875-
(323) 533-Q312

2.    The address of the principal · **place** of ·business **of** the administration of **the Trust is as follows:**

c/o Hartog, Baer & Band, APC
4 Orinda Way,, Suite 250B
Orinda,CA  94563

3.    You are entitled to r ceive  a true and complete copy of the terms of the Trust, and attached to this Notifica'i on is a copy of said 'rrust and its amendments.

4,    **You may not bring aa. action to 9ontest the Truat more th'an 120 day6 from the date this notification is served upon you or 60 from the day on which a copy or the terms or the Trust is oualic,@ 9l' personally. delivered to you Jn response• to your request during that 1 0- day period·, whichever f  later,**

5. **Additional** information **required to be given to the beneficiaries** by  e ·express terms of the Trust:  None.

Dated: _____*/·3l*___, 2016            _____
                                        HII.JAIN o,
                                        **Successor Co-Trustee**

155176•2101-001

## PROOF OF SERVICE

I, David Loofbourrow, certify and declare as follows: I am employed in the County of Contra Costa in the State of California. I am over the age of eighteen years and not a party to this action. My employment address is 4 Orinda Way, Suite 250-B, Orinda, CA 94563. On March 15, 2016, I caused to be served the foregoing document described as:

### NOTIFICATION BY TRUSTEE UNDER PROBATE CODE SECTION 16061.7

by delivering a true copy thereof to the interested parties as follows in the manner as follows:

Kenton Keading
pO Laurel Lane
El Sobrante, CA 94803

Kenton Keating
P. 0. Box 21476
El Sobrante, CA 94803

| | |
|---|---|
| | BY MAIL: By enclosing a true copy thereof in an envelope addressed as shown before sealing the same and placing the sealed envelope for collection and mailing on the date and at the place shown in the Service List attached hereto following the ordinary business practices of my employer Hartog, Baer & Hand, P.C. I am readily familiar with the business practices of Hartog, Baer & Hand, P.C. for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid. |
| | BY FACSIMILE TRANSMISSION: By transmitting pursuant to CCP §1013(e) from the facsimile machine of Hartog, Baer & Hand, P.C. to the facsimile numbers shown in the Service List attached hereto. The said facsimile machine complied with California Rules of Court, Rule 2003, and no error was reported by said machine. |
| | BY FEDERAL EXPRESS: By enclosing a true copy thereof in a sealed envelope or package with delivery fees marked "Bill to Sender" and depositing the same before 5:30 p.m. on said date in a box or other facility regularly maintained by Federal Express. J am familiar with Federal Express's method of collection and processing. Envelopes and packages are picked up by Federal Express from the location of my deposit on or before 5:30 p.m. on the day of deposit. |
| | BY PERSONAL SERVICE: By causing a true copy thereof to be delivered to the person(s) shown on that day. |
| | BY ELECTRONIC TRANSMISSION PURSUANT TO AGREEMENT OF COUNSEL: By electronically mailing a true copy thereof to each of the electronic addresses shown above. No error in transmission was reported. |

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on March 15, 2016, at Or;nda, California.

David Loofbourrow

155176*210 laOOl

1

2

3

4          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

5             IN AND FOR THE COUNTY OF CONTRA COSTA

6

7    IN RE KEADING FAMILY TRUST          )        NO. P16-00402

8                                        )
                                         )
9                                        )
     HILJA KEADING,                      )        STATEMENT OF DECISION
10                  Petitioner,          )
                                         )
11                                       )
                                         )
12   KENTON KEADING, et al.,             )
                                         )
13                  Respondents.         )
                                         )
14   ─────────────────────────────────── )

15       **I.   BACKGROUND AND PROCEDURAL IDSTORY**

16          This matter came before the Court on the Petition of Hilja Keading raising a number

17   claims arising from the trust of Lewis and Lucille Keading, including appointment of a

18   successor trustee, confirmation of ownership of the residence commonly described as 60, 50,

19   and 21 Laurel Lane, El Sobrante, and claims for fraud, conversion, and elder abuse.  In March

20   of 2016, Elizabeth Soloway (a professional fiduciary) was appointed by the court as successor

21   trustee, and she ultimately joined in the portion of the petition seeking confirmation of the real

22   property to the trust.  Trial was held on June 28-30, with closing arguments on July 3, 2017.

23   Closing briefs were provided, and the matter was deemed submitted on July 18, 2017.

24          On July 28, 2017, the Court issued a Tentative Decision and Proposed Statement of

25   Decision, pursuant to CRC 3.1590(c)(l).  Hilja Keading did not object, but requested a

26   clarification of the description of the residence (which has been made).  Kenton Keading

27   objected.  The objections are addressed either specifically, or simply through making

28   appropriate changes in the text.  If an objection is not addressed, it is overruled,

                                        -1-

## II. FACTS

### A. Background

Lewis and Lucille Keading ("the Parents") lived long lives as husband and wife, and had two children, Kenton, now 65, and Hilja, now 56.  Lucille died on September 10, 2015, and Lewis died on January 4, 2016.  In January of 1998, the parents had executed a family trust that, in essence, divided their assets among the children after the death of both parents.

Over time, however, while the Parents were alive, they began to provide more assistance and assets to Kenton, owing in some respects to helping to alleviate the consequences, of his felony convictions that resulted in imprisonment for nine years.  In the meantime, they provided nothing to Hilja, due to a period of estrangement that resulted from their lack of acceptance of her sexual orientation. On October 31, 2011, they amended the trust to give Hilja a specific gift (a Bancorp investment account), and made Kenton the residual beneficiary of the remainder of the trust.  In the fall of 2014, however, Hilja and her parents reconciled, and Hilja began to see her parents more.  Nonetheless, on February 5, 2015, the parents executed another trust amendment essentially restating the teffilS of the 2011 amendment (perhaps due to concerns about its validity).   On the same day, Lewis, acting in his individual capacity only, granted a power of attorney to Kenton.

### B. Summer and Fall of 2015

In June of 2015, Lucille was diagnosed with a brain tumor.  Hilja then came back to the parents' home, and began spending most of her time there, taking care of her parents physically, cleaning and organizing the home, and organizing finances and medical care.

From June through September 10, Lucille's condition deteriorated rapidly.  Kenton lived elsewhere, and actually was out of the country during much of that spring.  After his return from Thailand, he visited the home frequently, including some overnight stays; thus, the parties dispute whether he "lived there."

After Lucille's death on September IO, Lewis's health began to deteriorate.  He began to require semi-weekly kidney dialysis treatments.  He required ongoing in-home care.  Other care was provided by Hilja, by Connie Warner (a long-time friend of Lewis and Lucille), and

1   eventually, by an employee of a home health care agency, Kim Terry.  At one point, Kenton

2   began staying overnight to take the 8pm to 8am "shift" of watching over his father, who

3   required some degree of supervision even when sleeping at night.

4         On September 26, 2015, Lewis executed a document granting a Durable Power of

5   Attorney to Hilja.  At about the same time, Lewis decided that he wished to "equalize" the

6   assets that his children would receive on his death.  Therefore, on October 8, 2015, he executed

7   an "equalizing amendment" to his trust, providing in essence that, rather than splitting

8   remaining assets equally, assets should be divided in order to result in a net equalization, after

9   allowing for the assets that Kenton had obtained over time.  It specifically noted that the

10  Parents had lent Kenton $75,000, and addressed the previous failure to fund either of the

11  "subtrusts" created in the original trust document.  The evidence, including testimony of the

12  drafting attorney, Peter Sproul, indicated that Lewis was lucid, unpressured, and fully

13  informed, when he executed this amendment.  More to the point, Kenton has not challenged the

14  validity of the amendment, and therefore its validity will not be questioned in this proceeding.

15        There was a great deal of testimony concerning Lewis's care in the last weeks of his

16  life.  Hilja and Connie claim that Kenton was at times neglectful of Lewis, at other times

17  intimidated and berated him.  Kenton denies it.  Kim Terry, a home health care worker who

18  was often present in the home, saw no abuse.  Two managers of home health care agencies

19  (David Green and Karen Wells), testified that their workers are "mandated reporters," but no

20  abuse was ever reported.  While there were difficulties associated with Lewis's deteriorating

21  health, the evidence does not show any physical abuse or neglect.

22        **C.  The Power of Attorney, the "No Elder Abuse" Declaration, and the Transfer of**

23            **the Residence.**

24        From December 8 to 14, Hilja made a short trip back to her home in Los Angeles.  On

25  December 8, she sent an intemperate e-mail to an attorney indicating that she was looking for

26  an attorney who would pursue Kenton aggressively for claimed elder abuse.  (This email may

27  have been a privileged attorney-client communication, but Hilja waived any privilege by

28  deliberately including it in her binder of exhibits submitted to the Court for the trial,

-3-

1  notwithstanding her later claim of privilege.)   According to Kenton, Hilja must have left this

2  message open on a computer in the home, because he found it merely by pressing a keyboard

3  key while the computer was in sleep mode.  According to Hilja, the message was sent while she

4  was in Los Angeles, and Kenton could have obtained it only by hacking into her account.

5       However Kenton caine by the email, he promptly shared it with his father, who was

6  understandably upset.  According to Kenton, Lewis said "I have misjudged your sister" and "I

7  have made a big mistake," and he wished to change the disposition of his estate.

8       According to Hilja, after she returned from Los Angeles, she discussed the email with

9  Lewis, and he was upset-because it suggested that she would call Adult Protective Services

10  about Kenton's treatment of Lewis-but he said "it didn't change anything."

11       Whether Kenton came by the document properly or not, it makes sense that its contents

12  would make Lewis upset, and concerned about what would happen after his death.  On

13  December 12, 2015, while Hilja was still in Los Angeles (and thus before she had spoken with

14  Lewis about the email), Kenton took Lewis to a UPS store, where the new power of attorney

15  designating Kenton as the attorney-in-fact was executed and notarized.  Hilja, however,

16  testified that the initials purporting to be Lewis's on the individual pages of the document are

17  not his initials.

18       On December 19, 2015, Lewis executed a document stating that he had not been the

19  victim of elder abuse, which included quotations from the statutory definition of the term.

20       Why?  According to Kenton, once he explained to Lewis that he feared that Hilja would

21  trump up criminal elder abuse charges against him, which might result in his return to jail,

22  given his prior record, Lewis agreed to sign the declaration.  The general contents were Lewis's

23  idea, but Kenton added the references to the statute.  Lewis fully understood the document and

24  agreed to it.  When Lewis signed it, it had a blank cover sheet over the signature page, because

25  he did not want other people in the home to see it.  Lewis saw it and knew its contents.  Two

26  people, Scott Maskell and Kim Terry, signed it as witnesses to Lewis's signature.

27       According to Kim Terry, there was a blank cover sheet over the document.  She noted

28  that the document was composed at the computer by Kenton, who made various changes to it.

-4-

1   She stated that Lewis said, "I wrote it," which she found difficult to understand, because she

2   had just seen that Kenton had drafted the document himself on the computer  (Thus, she

3   inferred that Lewis may have thought he was signing something different from what he actually

4   did sign.)

5        Scott Maskell, a neighbor who also witnessed the signing, also said that it was covered

6   such that Lewis could not see what he was signing.  But according to him. Lewis said "I wrote

7   it," confirmed that it concerned his estate, and seemed to know what he was doing.  Mr.

8   Maskell also stated that Lewis confirmed that his estate was in order.  Assuming this to be

9   correct, it is not clear what it meant.  Hilja interprets this as a confirmation of the equalizing

10  amendment from October.  But at that point, Lewis already had signed the new power of

11  attorney making Kenton his attorney-in-fact, although Kenton had not yet purported to transfer

12  the residence.

13       On December 30, 2015, acting under the power of attorney, Kenton executed a deed

14  transferring the family residence (the primary asset of the trust), out of the trust and to Lewis

15  and Kenton in joint tenancy, with right of survivorship.  While the validity of this transfer was

16  disputed for some time, as of June 16, 2017, Department 14 of this court found that the transfer

17  was not valid for a number of reasons unrelated to elder abuse claims.  Kenton has stipulated

18  that the transfer was not valid, and that the house remains an asset of the trust.

19       On January 1, 2016, Lewis transferred over to Kenton 99,678 shares of stock in

20  Freedom Motors.  The stock was purchased some years ago for $1 per share, but no one

21  produced any evidence of its current value, or whether it even can be sold.  Lewis's signature is

22  barely legible.

23       On January 2, 2016, Kenton, using his power of attorney, executed an amendment to the

24  trust that changed the trustees from he and Hilja to be Connie Kruse, or as a successor trustee,

25  Linda Bonta.

26       **C.  Actions After Lewis's Death.**

27       The parties also dispute the whereabouts over some of the personal property that was in

28  the home at Lewis's death.

Hilja left the residence on January 9, 2016, and Kenton has had possession of it since. For a period of time, he rented the premises to Fernando Ochoa, a long time gardener, for a nominal sum, plus some landscaping maintenane . Kenton is still in possession of the house.

Subsequently, the Court appointed Lisa Soloway, a professional fiduciary, as the trustee. She has only entered the premises when she has an order allowing it, because of Kenton's possession of the premises. She did not ask for rent or seek to oust him from possession because of the cloud on title created by the deed. This has made it difficult to administer the trust, i.e., inventory, value, and sell the personal property, and sell the residence.

Finally, after Lewis's death, Kenton sold Lewis's 2008 Chrysler for $8,500 and kept the funds.

**ID. LEGAL CLAIMS**

Hilja challenges the following actions taken by Kenton: (1) execution of the power of attorney on December 12, 2015; (2) the ..No Elder Abuse" declaration on December 19, 2015; (3) transfer of the residence on December 30, 2015 (and subsequent retention of possession); (4) transfer of the Freedom Motors stock on January I, 2016; (5) the change in trustees on January 1, 2016; (6) disposition of personal property after January 3, 2016; (7) sale of the 2008 Chrysler. She alleges that these actions constituted both a bräc h of fiduciary duty and statutory undue influence.

**A. Breach of Fiduciary Duty**

Hilja claims that Kenton's actions constituted a breach of fiduciary duty. Based on the relationship between Kenton and Lewis, and the nature of the transactions (to create a gift to Kenton, at Hilja's expense), there is a presumption of undue influence, and Kenton bears the burden of proving that the transaction was fair and free from undue influence or fraud. *(Solon v. Lichtenstein* (1952) 39 Cal.2d 75, 81; *Estate of Sarabia* (1990) 221 Cal.App.3d 599, 605.)

Once the power of attorney was signed, Kenton had a **duty "to** act solely in the **interest** of the principal and to avoid conflicts of interest." {Probate Code§ 4232(a).) This does not, however, prohibit all actions that also benefit the attorney-in-fact. (Probate Codes 4232(b).)

1    Under this theory, the execution of the power of attorney itself would not constitute the

2    violation, but rather the subsequent property transfers would constitute the violation.

3        A.   Statutory Elder Abuse.

4            1.   Standing.

5        Kenton argues that Hilja has no standing to raise an elder abuse claim.  A statutory

6    petition under Probate Code section 850 may be brought by "any interested person" under

7    Probate Code section 48, which includes a beneficiary.  *(Estate of Migliaccio* v. *Midland Nat'l*

8    *Life Ins. Co.* (2006) 436 F.Supp.2d 1095, 1100 [wife of trust or that was beneficiary of trust was

9    an interested party]; *Estate of Lowrie* (2004) 118 Cal.App.4th 220, 227 [Welfare and Institutions

10   Code§ 15657.3(d) allows elder abuse action by personal representative, "or if none, to the

11   person or persons entitled to succeed to the decedent's estate."]; *Estate of Girardin* (2012) 55

12   cal.4th 1058, 1062 (beneficiaries of trust could sue for breach of fiduciary duty after death of

13   settlor].)  While it is correct that ordinarily civil claims on behalf a trust cannot be brought by a

14   beneficiary, that requirement does not apply to statutory claims under the Probate Code.  *(Saks*

15   *v. Damon Raike* & *Co.* (1992) 7 Cal.App.4th 419, 422.)  In addition, the current trustee, Ms.

16   Soloway, joined in the petition to remove Kenton as trustee and to confirm the trust's

17   ownership of the residence.

18           2.   Taking

19       Kenton argues that there is no "taking" here because the transfer of the house was void,

20   and thus of no legal effect, as found by Judge Sugiyama on June 16, 2017, and as not contested

21   by Kenton.  The fact that the transfer ultimately was found to have no legal effect does not

22   change the fact that Kenton claimed that it was effective and used the transaction in order to

23   maintain possession and control of the premises.  The fact that he erred in his execution of the

24   transaction is hardly a defense.  *(Bon.figli v. Strachan* (2011) 192 Cal.App.4th 1302, 1316

25   [allegation of a real property transfer executed pursuant to an invalid power of attorney

26   constitutes elder abuse wider the statute] *Mahan v. Charles W. Chan Ins. Agency, Inc.* (2017)

27   12 Cal.App.5th 442, 461-462 [actions that reduced value of child of elder's interest in a trust

28   deprived the elder of a property right by damaging right to dispose of property].)

### 3.  Definition of Undue Influence

Under Welfare and Institutions Code section 15610.30(a)(3), undue influence means "excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity."  It then sets out three factors to be considered: (1) vulnerability of the victim; (2) the influencer's apparent authority; and (3) the actions or tactics used by the influencer.  With respect to actions or tactics, the provision specifically provides that the court may consider "[i]nitiation of changes in personal or property rights, use of haste or secrecy in effecting those changes, effecting changes at inappropriate times and places, and claims of expertise in effecting changes." (§ 15610.30(a)(3)(C).)  The court also may consider "the equity of the result, which includes "any divergence from the victim's prior intent or course of conduct or dealing[.]" (§ 15610.30(a)(4).)  An inequitable result, however, is not sufficient by itself to prove undue influence. (§ 15610.30(b).)

### IV. CONCLUSIONS BASED ON THE EVIDENCE

The transfer of the home to joint tenancy with Kenton and the transfer of the stock represented a substantial change in the disposition of property from that contemplated by the equalizing trust executed just two and a half months before.  Why the change of heart, if there was one?  In this instance, Lewis was wlnerable.  He was physically **ill** even before he stopped dialysis.  He was distressed about the end of his own life, and grieved the loss of his wife.  While Kenton did not have substantial authority over Lewis, he **had** some veneer of expertise due to actions that he and Lewis had taken to transfer and manage assets while Kenton was in prison.  He was caring for Lewis, at least some of the time.  There is no evidence, however, that he isolated Lewis or made Lewis solely dependent on him.

Lewis was generally upset by the email, but that does not entirely explain the change in the disposition of assets.  Kenton took advantage of the message and its effect on Lewis, and used it as part of the exertion of substantial undue influence over Lewis.  This led to the execution of the power of attorney on December 12, 2015, and the deed to the home.

The tactics used by Kenton indicate undue influence: Once he obtained Lewis s "agreement" to sign a power of attorney, he took Lewis to a local UPS store, quickly, and

-8-

1   without anyone else's knowledge.  The very fact that the document in question was a power of

2   attorney, rather than an actual change to the trust is significant.  Rather than simply making one

3   change in the disposition of property, it purported to give Kenton full authority to sign anything

4   on Lewis's behalf.

5         Kenton testified that he did not even know of the equalizing amendment at this time, but

6   simply transferred the residence in order to keep the property "out of probate."  Of course,

7   since the property was in a trust, rather than disposed of in a will, it would not go through a

8   formal probate in any event.  Moreover, if Kenton's testimony that Lewis was upset about the

9   email were correct, presumably Lewis would have told Kenton about the equalizing

10   amendment.

11         While the Court is hesitant to determine what generally might be called "inequitable" as

12   between siblings given the history of this family, the changes made by Kenton are inequitable

13   in this context.  The last clear, lucid, considered disposition of the trust was to equalize the

14   distribution between Hilja and Kenton.  Kenton's actions dramatically changed this in his

15   favor, giving him the major asset, the home.  This was not equitable.

16         Despite the attention given to it by the parties, the "no elder abuse declaration" is not

17   critical here.  It has no binding legal effect.  It serves only, at best, to give us either a window

18   into Lewis's state of mind, or into Kenton's efforts to manipulate Lewis, or both.  Viewing the

19   facts most favorably to Hilja, it is meaningless because Lewis actually had no idea what he was

20   signing.  Even viewed in the light most favorable to Kenton, Lewis still was extremely ill and

21   tired.  He was emotionally swayed by the prospect that his son could be charged with

22   something that would land him back in prison.  Not wanting his son to return to prison is one

23   thing, but changing his disposition of assets to favor his son dramatically is another.

24         Accordingly, the Court finds that Hilja has proven by a preponderance of the evidence that

25   the durable power of attorney was the result of elder abuse.  The transfer of the residence,

26   executed only by virtue of the power of attorney, also was the result of elder abuse (in addition

27   to its other deficiencies), and a breach of Kenton's fiduciary duty to his father.  The transfer of

28   stock was executed by Lewis himself, but suffers from the same deficiencies as the power of

-9-

1    attorney.  Lewis was ill and grieving-and getting more ill by the day.  It is not valid. The

2    transfer of the residence also was a breach of fiduciary duty.  (As to the breach of fiduciary

3    duty, since the evidence proved elder abuse, *a fortiori* it proves that Kenton violated his

4    fiduciary duty, even if Kenton did not have the burden of proof on that issue.)

5       Since the "no elder abuse" declaration has no legal effect, the Court makes no finding as to

6    its "validity."  Since the appointment of the professional fiduciary, the change in the trust to

7    change trustees is no longer an issue.  Finally, despite much dispute about the disposition of

8    personal property, neither Hilja or the Trustee have sought any specific relief.

9       With respect to the transfer of the 2008 Chrysler, no justification for the transfer has been

10   presented.  Accordingly, the Court orders Kenton to repay $8,500 to the trust.

11   V.  REMEDIES

12      A.  Non-Monetary Relief

13      Toe transfer of the residence already has been declared invalid.  The successor trustee is

14   entitled to immediate possession of the residence, i.e. the premises commonly known as 60, 50,

15   and 21  Laurel Lane, El Sobrante, California.

16      The transfer of the stock in Freedom Motors is declared invalid.  The Court notes,

17   however, that the evidence is not clear as to whether it is an asset of the trust, or was Lewis's

18   separate property.  The trustee may need to move to confirm the stock as an asset of the trust, if

19   she concludes that is necessary and appropriate.

20      While there was evidence presented concerning the personal property in the residence,

21   Hilja has not requested any specific relief related to that issue.  Since the current trustee will be

22   given possession of the premises, it will be up to her to address proper inventory of the personal

23   property, including whether any property was disposed of in such a manner that it does not

24   belong to the trust.  When Kenton vacate·s the premises, he is not to take any of his parents' or

25   the trust's property with him.

26      Hilja requests that, pursuant to Probate Code section 259, Kenton be deemed to have

27   predeceased his parents under Probate Code section 259.  To do this, the Court would be

28   required to find, inter alia, that neglect or financial abuse "has been proven by clear and

-10-

1  convincing evidence[.]" (Probate Code§ 259(a)(l).)  In this case, however, the Court finds

2  that the material facts have been proven by Hilja only by a preponderance of the evidence.

3  Accor¹ ngly, this request is denied.

4    **B. Statutory "Damages"**

5      **1. Value of the Property**

6      Hilja seeks a recovery of the property, **plus** double its value, pursuant to Section **859.**

7  Kenton argues that there was been no damage, and therefore there should be no award.  First,

8  the Court notes that section 859 actually does not refer to "damages" at all, but provides that

9  where a person has "taken, concealed, or disposed of the property…through the commission of

10  elder or dependent adult financial abuse…the person shall be liable for twice the value of the

11  property recovered."  This is in addition to any other remedies available.  *(Id.)*  This

12  presumably would include any actual damages.

13      The parties **have** stipulated the Laurel Lane residence has a value of $761,665, and that

14  its rental value is $2,500 per month.

15      The only evidence submitted as to the value of the stock in Freedom Motors was the

16  purchase price, which was $1 per share.  This would make the transferred shares worth nearly

17  $100,000, but there was no evidence of their value today.  Since they have not been liquidated,

18  the Court can simply order that the shares be returned to the trust, or to Lewis's estate.  If they

19  belong to the **trust,** the successor trustee may have to determine their value in order to properly

20  distribute trust assets.

21      **2. Doubling of Value of Property**

22      The "double damages" liability is created by Probate Code section 859, which provides

23  that where property has been taken "by the use of undue influence in bad faith or through the

24  commission of elder…financial abuse as defined in Section 15610.30 of the Welfare and

25  Institutions Code, the 13on   shall be liable for twice the value of the property covered by an

26  action under this part."  Kenton argues that there is no bad faith here, and that bad faith is

27  required for an award of statutory damages under this section.  The provision, however, states

28  that damages shall be awarded where property is taken by "undue influence in bad faith" *or*

1  financial elder abuse under section 15610.30.  The court also notes that the application of the

2  "double damages" liability to financial elder abuse under Welfare and Institutions Code section

3  15610.30 was deliberately added to the statute in 2013, and therefore appears to be a deliberate

4  expansion of the liability, made with no reference to a requirement of bad faith.  (Stats., 2013,

5  c. 99 (A.B. 381), Assembly Floor Analysis, July 1, 2013 [leginfo.cagov].)  Since the Court has

6  found the statutory elder abuse, the damages provision applies, without a finding of bad faith.

7  (In *Estate of Young* (2008) 160 Cal.App.4th 62, 89-90, the court indicated that a finding of bad

8  faith was required, but it was decided before the 2013 amendments.)

9       The next issue is whether the award of double of the value of the property is mandatory

10  or discretionary.  The statute provides that where property is taken through the commission of

11  elder or dependent financial abuse as defined in Welfare and Institutions Code section

12  15610.30, "the person ***shall be*** liable for twice the value of the property recovered by an action

13  under this part . . . .  " (emphasis added.)  In contrast, the person *"may, in the court's*

14  ***discretion,*** be liable for reasonable attorney's fees and costs." {Emphasis added.)  The word

15  choices ("shall be" versus "may, in the court's discretion"), appear to differentiate the

16  mandatory and discretionary nature of the award of double damages and the award of

17  attorney's fees and costs.

18       This treatment of the provision has been upheld by the Court of Appeal in *Estate of*

19  ***Kraus*** (2010) 184 Cal.App.4th 103, 118.  In that case, a party transferred roughly $197,000 in

20  funds (in a manner that was void), and was ordered to repay the funds, plus the statutory double

21  amount of about $394,000.  The court referred to the provision as a Hmandatory statutory

22  penalty *(Id.,* at 118, emphasis added), and also noted that because the statutory penalty is not

23  the equivalent of punitive damages, the party's financial ability to pay and overall financial

24  condition were not relevant.  (Jd.)  (See also ***Hill*** v. ***Superior*** *Court* (2016) 244 Cal.App.4th

25  1281, finding that the Section 859 penalty is not the equivalent of punitive damages, and does

26  not require a similar showing.)

27       Accordingly, based on the stipulated value of the property, the mandatory statutory

28  penalty under Probate Code section 859 is imposed in the amount of $1,523,330.  (Any

-12-

1  perceived harshness is mitigated **by** the fact **that** since the money is paid to the trust, Kenton in

2  essence gets half of his money back.)  In objecting, Kenton asserts that the stipulated value of

3  the property is no longer accurate, and that in any event, the value should be measured by the

4  difference between the fair market value of the property with unclouded title and the value with

5  a void or voidable transfer impairing its value.  Section 859, however, requires an award of

6  "twice the value of the property recovered," not a hypothetical determination of the temporary

7  loss in value caused by the respondent's actions.

8       In addition, based on the $8,500 value of the 2008 Chrysler, the Court orders an

9  additional penalty of $17,000.

10      Because the items in question belonged to the trust, the payments are to be made to the

11 trust.  The Court understands that this results in Kenton in essence receiving half of his

12 payment back, but this is consistent with the statute.

13      **3.  Additional Compensatory Damages**

14      Because the statute provides that the statutory penalty is in addition to all other

15 remedies, the Court must consider an additional award of actual damages.  The conveyance,

16 and Kenton's defense of it until June of 2017, however, did interfere in the successor trustee's

17 ability to administer the 1rust and deprive the trust of potential rental value of the premises from

18 January of **2016** to the time of trial.  Based on the $2,500 per month rental value, the trust was

19 deprived of $45,000 by Kenton's wrongful withholding of possession of the property.  The

20 Court concludes, however, that the statutory penalty is more than adequate compensation for

21 this loss and does not award any additional compensatory damages.

22      **4.  Punitive Damages**

23      Hilja seeks punitive damages based on clear and convincing evidence of oppression,

24 fraud, or malice, pursuant to Civil Code section 3294(a) and Welfare and Institutions Code

25 section **15657**.5.  The court does not find **that** oppression, fraud, or malice have been proven **by**

26 **clear and convincing evidence.  Accordingly, the request is denied.**

27

28

1      5.  Attorney Fees

2         Section 859 also gives the court discretion to award attorney fees in a case in which

3 elder abuse is found.  In exercising its discretion, the Court has reviewed the legislative history

4 of the 2013 amendments to the statute that added the attorney fee provision.  In the Assembly

5 Floor Analysis that accompanied the bill before its final approval (for approval after Senate

6 amendments), it was stated that the purpose of the fee provision is "so that rightful property

7 owners do not have to make a decision as to whether they can afford to recover their property,

8 because the attorney fees might exceed the value (or even twice the value) of the property

9 recovered." (Assembly Floor Analysis of AB 381, c. 99, Stats. 2013 [leginfo.ca.gov].  The

10 Court takes judicial notice of this document.)  In this instance, the mandatory penalty of double

11 the amount of the value of the property has resulted in a substantial recovery well in excess of

12 actual damage to Petitioner, which may allow payment of a reasonable attorney from the

13 proceeds.

14         Because the Court has ordered that the statutory penalty be paid to the trust, it likely is

15 appropriate that the fees be paid by the trust, which benefited from the relief obtained.  Even

16 though Hilja's share of the trust would be enough to offset the fees, it would be inequitable to

17 require those costs to be borne by Hilja or paid from her share of the trust, with Kenton

18 receiving his (increased) share of the trust without an offset for the fees.  Indeed, depending on

19 the amount of a fee determined to be reasonable, the Court will consider whether all or part of

20 the fee ought to be charged directly to Kenton, or to his distribution from the trust.

21 *lll*

22 *lll*

23 *lll*

24 *lll*

25 *lll*

26 *lll*

27 *lll*

28 *lll*

1      Kenton argues that fees, if sought, should have been proven at trial, and they were not.

2  But this is not a case in which attorney fees are merely an element of damages, they are an

3  additional remedy available only to a prevailing party.  The appropriate method is through a

4  motion supported by an appropriate declaration and records.  Since the Court is directing that

5  the fees be paid by the trust, it is appropriate for the Court to determine that the amount is

6  reasonable.  Attorneys for Hilja and for the trustee are directed to submit a fee motion within

7  thirty days after this decision becomes final.

8

9  Date: ___8/23/17___

10

11                                Edward G. Weil

12                                Judge of the Superior Court

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPERIOR COURT - MARTINEZ
COUNTY OF CONTRA COSTA
MARTINEZ, CA 94553
(925) 608-1000


CLERK'S CERTIFICATE OF MAILING


CASE TITLE:  MATTER OF KEADING FAMILY TRUST

CASE NUMBER: MSP16-00402 - PROBATE


THIS NOTICE/DOCUMENT HAS BEEN SENT TO THE FOLLOWING ATTORNEYS/PARTIES:


JONNA M THOMAS
4 ORINDA WAY
SUITE 250-B
ORINDA CA 94563

ROBERT C WEEMS
769 CENTER BVLD #38
FAIRFAX CA 94530


I am a clerk of the court indicated below and am not a party to this
cause. **on** the date below indicated, I **served** a copy of the
attached document(s) by depositing a true copy in the mail in a
sealed envelope with postage prepaid, at MARTINEZ, California
addressed as above indicated.


TITLE OF DOCUMENT SERVED:  STATEMENT OF DECISION


DATE- MAILED:  08/23/17                    CLERK  C/ THc.- OURT

                                           BY:/ 1( )  '--
                                           /.,-DENESE JOHNSON
                                           Voeputy clerk of the court